UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

UNITED STATES OF AMERICA,

v. 25 Cr. 00370 (LAP)

JORAM NUNEZ JOAQUIN,

Conference

Defendant.

------------------------------x

New York, N.Y.
October 8, 2025
3:00 p.m.

Before:

HON. LORETTA A. PRESKA,

U.S. District Judge

APPEARANCES

JAY CLAYTON
United States Attorney for the
Southern District of New York
MICHAEL HERMAN
RYAN ALLISON
ELIZABETH ESPINOSA
Assistant United States Attorney

EDWARD SAPONE
STEVEN BRILL
Attorneys for Defendant

ALSO PRESENT:
Meherun Mayer, Pretrial Services Officer
Taelor Nisbeth, Pretrial Services Officer

(Case called)

MR. HERMAN: Good afternoon, your Honor. Michael Herman, Ryan Allison, and Elizabeth Espinosa, joined at counsel table by pretrial services officers Taelor Nisbeth and Meherun Mayer.

THE COURT: Thank you. Good afternoon.

Is the defense ready?

MR. SAPONE: Thank you, your Honor. Good afternoon. It's good to see you again. It's like deja vu all over again.

THE COURT: It's like deja vu all over again.

MR. SAPONE: My name is Edward Sapone. I'm here with my co-counsel, Mr. Steven Brill, along with Joram Nunez Joaquin in the middle, and Madeline George, my intern, with your permission, would like to sit with us.

THE COURT: So, Mr. Sapone, does your client wish to be addressed as Mr. Joaquin or Mr. Nunez?

MR. SAPONE: Mr. Nunez.

THE COURT: Mr. Nunez. Thank you.

Mr. Nunez, you are here today because you've been charged with certain crimes in an indictment, and the purpose of today's proceeding is to advise you of certain rights that you have, to inform you of the charges against you, and to decide the bail question, which your lawyers are raising.

So, first, I'll start by explaining to you some constitutional rights that you have. You have the right to

remain silent. You're not required to make any statements. Even if you've already made statements to the authorities, you don't need to make any more statements. Any statements you make may be used against you.

As we will talk about during the bail issue, you have the right to be released either conditionally or unconditionally pending trial, unless I find that there are no conditions that would reasonably assure your presence at future court proceedings and the safety of the community.

If you're not a U.S. citizen, you have a right to request that a Consular officer from your country of origin be notified of your arrest. In such cases, a treaty or other agreement may require the U.S. Government to give that notice, whether you request it or not. I'm required to tell you this even if you are a U.S. citizen and it doesn't apply to you.

You also have the right to be represented by an attorney during all court proceedings, including this one, and during all questioning by the authorities. You have the right to hire your own lawyer, but if you cannot afford one, I'll appoint one to represent you.

Do you understand, sir?

THE DEFENDANT: Yes. Yes, your Honor.

THE COURT: Thank you.

Mr. Nunez, have you received a copy of the indictment against you, S-1 25 CRIM 370?

THE DEFENDANT: Yes.

THE COURT: Have you gone over it with your attorneys?

THE DEFENDANT: Yes.

THE COURT: Have they explained to you the charges against you?

THE DEFENDANT: Yes.

THE COURT: Do you want me to read the whole thing out in court now or is it sufficient that you've discussed it with counsel?

THE DEFENDANT: It's sufficient, my discussion with them.

THE COURT: Yes, sir. How do you now plead?

THE DEFENDANT: Not guilty.

THE COURT: Thank you.

Counsel, what would you like to do next? Mr. Herman.

MR. HERMAN: Thank you, your Honor.

My understanding is now that the defendant's been presented and arraigned, that the defendant wishes to appeal the detention order entered by Magistrate Judge Gilbert in the Northern District of Illinois, and the government's prepared to oppose that application.

THE COURT: Yes, indeed.

Mr. Sapone.

MR. SAPONE: Yes. May I, your Honor?

THE COURT: Yes, sir.

MR. SAPONE: Thank you.

Your Honor, when I reflect upon the Bail Reform Act, the case law here in our circuit, and common sense, I think I'm led to conclude that if there is a condition or a combination of conditions that can reasonably assure someone's appearance in court and keep the rest of us safe, that is, any person or community, that we should set those conditions and allow people to be at liberty. There'd be no space in the jails if it were the other way.

What we have here, your Honor, is Joram Nunez Joaquin -- he goes by Nunez -- who's a 37-year-old man. He's been married for 19 years. Part of his family is here in court, his mother, his father, his wife. Together, he and his wife have five children -- three children. They have a 14-year-old, an 11-year-old, and a five-year-old, two boys and a little girl.

I'm struck, your Honor, these days it seems that men know how to make babies but not raise them. Mr. Nunez is really father of the year, notwithstanding that he's earned the seat here in court, although he would dispute the earning part. He's a U.S. citizen, born in Los Angeles, California. He has zero criminal history, spotless.

Your Honor knows that part of the allegations include the fact that -- well, have to do with lawyering, so I hesitate to mention, but it's important and sometimes things can be both

good and bad. He's a lawyer, with a J.D., and he got that from Suffolk Law School in Boston in the year 2014. He has worked for the church for the last 14 years as a pastor, and in those 14 years, he has come into contact, your Honor, with thousands and thousands and thousands of people, and, putting this case aside, has never once been accused of anything bad. Spotless record. That's in Massachusetts, in New Jersey, in New York, and in Illinois.

And he's helped countless people in the community with drug addictions, marital problems, the ills of society, and that's what pastors do when they're not speaking God's word. He helps the members of the community. Your Honor, I look at the indictment, and the charges are not pretty. He's charged in one count of the counts, and the count that he's in charged in is the first, which is a conspiracy to commit RICO.

Why is that important now? It's important now because, you know, when Mr. Brill and I stand at podiums like this one these days, especially on panel cases, people are facing large mandatory minimum sentences. Here, there is none. People are facing the rest of their life in prison, or a five-year to 40-year range. Forty years in prison. Here, it's zero to 20.

Oftentimes, there's a presumption. There's a presumption that no condition or combination of conditions could meet the two-part test. Not a presumption case. I look

at the pretrial services report, and I go to the end, the last page, and it seems that if the factors above can be mitigated, an appropriate release plan may be recommended. And I think pretrial services got it right. I think pretrial services works hard. I think pretrial services does a good job and they did it here.

When you look above, they talk about the nature of the offense. Today is not the day we'll try the case. Frequent international travel. I can proffer to your Honor that I have his passport in my safe. I've been told that the times he has traveled internationally, each time has been in connection with work, minus one trip, and the one trip that was not in connection with work was a personal trip this year. He went to Spain, and he didn't go alone, and he didn't go with his buddies. He went with his family. He took his wife, and he took his children on a family trip to Spain.

THE COURT: Could I just interrupt you there, Mr. Sapone? I'm looking at page two of the pretrial services report. It says that the defendant last traveled to Mexico in January or February of 2025, and in August of 2025, as well as to Spain in June of 2025. Mr. Nunez disclosed that his international travels are primarily for leisure.

MR. SAPONE: Well, I think I need a moment.

THE COURT: I'm sorry?

MR. SAPONE: I think I need a moment.

(Defense counsel conferred with defendant)

MR. SAPONE: So, I think that there is a misunderstanding, your Honor. I'm in no way blaming anyone, but what he meant to convey is that the Spain trip was for leisure and that's what he meant by that, not the others.

THE COURT: The next sentence is, the defendant disclosed that he traveled to Mexico three or four times per year for the last 10 years.

MR. SAPONE: And that's in connection with his work. And there is something called the Last Supper, which in his church is extremely important, and that was the sort of highlight of the trip, to give the host to parishioners, mimicking the last supper.

THE COURT: All right. So he didn't say that his international travels are primarily for leisure.

MR. SAPONE: Right. It was the Spain trip is what he meant to say.

THE COURT: All right.

MR. SAPONE: Thank you, your Honor, for pointing that out.

So, I think pretrial services got it right. In the report, your Honor, I think one of the problems for him is that there appears to be no custodian with whom he can stay. We cleared that up, too, because, in fact, family, friends own a home in Woodbridge, New Jersey, in central New Jersey, which,

without traffic, I think could get us to the courthouse in about 40 minutes, and that's on Woodbridge Road. And there are two people who own that house, family friends for around nine years. One is a man by the name of Abisai Gonzalez, and his wife, Bessy. They're a married couple, your Honor, very close to Joram. They have three children, a girl who's 17, a boy who's 14, and an 11-year-old girl. And so what we are suggesting -- and I could get to my package now if that's okay with your Honor -- is that he would be on home confinement with electronic monitoring at the Woodbridge house owned by those two folks, and they could each serve as custodian.

Now, your Honor, we were able to put together what I think is a large proposal for the Court's consideration, and it's one that includes seven houses that I would hope -- and we don't have all the math done yet, but I would hope would secure a $2 million personal recognizance bond, seven houses. And I'll just very quickly tell you about them.

One is in Humble, Texas, and the value of the home, not speaking to the equity right now, but I will get that for you, is $340,700. And that's his sister-in-law and her husband. Another home that we can use to secure the proposed bond is in Houston, Texas. The value being $351,800. And that's his brother-in-law. Then we have a home owned by a family friend, with a decade of friendship. That's located in Cicero, Illinois, Al Capone's Cicero, and that is $314,200 is

what we think it's worth. We have another home in Cicero, again, a family friend, with a value of $303,000. More family friends in Tucson, Arizona, a husband and a wife own a home that's worth $560,000. And then, when you add all of that up, your Honor, it amounts to $2.1 million of home value across seven houses. There's actually -- the last one is $255,000. If I didn't say that, I want to make that clear. That's the one in San Antonio, Texas.

The last house, your Honor, that we would propose to secure the bond that we're asking you to consider is in Monterey Park, California. It's a $3 million house. And that's a family friend. So the total is $5.1 million of home value. Now we're up to eight houses, and I think that the moral situation, your Honor, of eight people, and some of them are husband and wife, so it's more than eight, that would trust Joram, that these are houses that people live in with their children, houses in which they're raising children, that they would put these houses up to secure a bond for him, because they trust that if your Honor releases him on a bracelet, living in New Jersey, with counsel taking the case seriously, he will come back to court of course every time on time.

The fact that they trust him with their family homes, where they raise their children, for me that amount of property is remarkable, and it's been a long time, if ever, that I've seen it. I have a total of all of those people, of 11

financially responsible people. So, not only would they put up their homes to secure the proposed bond, but they would also sign the bond as FRPs.

And I have five more financially responsible people, your Honor, and that is a friend of 10 years, who earns $60,000 a year working in an electric company. His name is Carlos, Carlos Robledo. Jose Sandobal, again, a family friend, hovering at around 11 years. Jose earns $73,000 a year. He drives a truck. Sam Nunez and Jessie Rios is a husband and wife, and that is Joram's sister and her husband. Together they earn $118,000 annually. She's an accountant and he's an attorney pending admission. And then Vanny Alvarado, his brother-in-law, who he's known for nineteen years tomorrow, who were earns $86,000. And then Vanny works in an engineering company. An engineering company. These last five financially responsible people earn a combined annual income of $337,000.

What strikes me about these five, your Honor, is we're talking about people who work in an electric company, they drive a truck, an engineering company, these are salt of the earth, hard-working family people, married, living in homes, raising children. For these people to sign onto a bail bond for someone like Joram Nunez, and if he were to go anywhere or violate any condition of release that your Honor would set forth, they could lose it all. They work with their hands. They work hard. And whatever they've been able to string

together throughout the years to save for a rainy day, it means a lot. It's not like some of the other cases we have, your Honor, where folks are very wealthy and it doesn't really matter if someone violates. This here would matter greatly. These are humble, hard-working, blue collar people.

And so, your Honor, I have in the binder that I hope your Honor has a copy of -- the government has a copy, too -- I have last year's tax returns for the five folks that I have just mentioned, I have the last month's bank statements, and I have whatever pay stubs I could get my hands on. We also have, although it's a lot of paper -- and we like trees -- we have the last three years of tax returns, the last three months of bank statements, and the last three pay stubs. The pay stubs, quite frankly, could have been put in the binder, but who's counting. We have one -- we have three actually.

So I think, your Honor, that we're talking about 16 people who Mr. Brill and I say are financially responsible, who are willing to sign a bail bond, and we have eight properties with a total value of $5.1 million. And we, of course, will turn the passport in, and we will agree that the two folks that own the home in Woodbridge, New Jersey, would act as custodian. And he wouldn't go anywhere other than where your Honor said he could go, because he'd be there with a bracelet, electronic monitoring.

We're hoping that you will find that in a case, your

Honor, in which there is no presumption against releasing someone, it's a case with no statutory mandatory minimum sentence, not a case where someone's facing life or 40 years or any combination, but it's zero to 20 -- it's not a case in which you look at terrible charges in an indictment. They're all on him. In fact, it's I would say, respectfully, the opposite.

Count One, the RICO conspiracy, a man who, your Honor, is -- I call him a young man, 37 years of age, but other than this case, no one's accused him of anything, and he's come into contact with thousands, with thousands of people. And the folks that are willing to trust him to go nowhere and to do nothing bad to anyone are the salt of the earth people who work, who are raising children.

And I want to end with this: Today is not the day for the trial. And I expect that the government will get up and will talk about the serious charges, but we know that, we know that the charges are serious. That does not mean, that does not mean that people cannot be released on a bail package. And the most important reason, your Honor, the thing that I want to stress the most -- then I'm going to sit down -- is that this is a young man married for 19 years. His wife is right there, and they have three children. And he would never go anywhere and leave those people.

To the extent that he has extended family in Mexico,

which I want you to know he does have, he's not close with them. The people who matter most are in the courtroom, his family, his wife, his children, his parents. And they live here. They are not abroad. He would never go anywhere and leave them, and he would never do anything to violate any condition, because he knows if he were to do that, the moral situation is huge. People would be devastated financially. And then your Honor would put him in, and we know what that means, putting him in detention, and he's not getting back out. And then he could forget about seeing his wife and children on the other side of bars.

I thank you for listening to me. I wish I had more. This is what I have up to the moment. Thank you for considering our modest bail package.

THE COURT: Yes, sir.

Could I ask the pretrial services officers, I have one report on the normal form, right?

PRETRIAL SERVICES OFFICER: Correct.

THE COURT: It's timestamped 9:53 a.m. Essentially, it says, although the defendant does present the above cited risk factors, there appears to be a combination of conditions which may be fashioned which could reasonably assure his presence at future court hearings and the safety of the community. Then it goes on asking certain questions. Then there is an addendum which says, recommendation: There is no

condition or combination of conditions that will reasonably assure the appearance of the defendant as required and the safety of the community.

So, what am I to make of those?

PRETRIAL SERVICES OFFICER: Yes, your Honor. So the pretrial services report was conducted in the Northern District of Illinois, and so that interviewing officer recommended detention, because the address that he provided was the address of the church. So, he and his family were living in the church. And the addendum that we prepared today, that interviewing officer also recommended detention based on his unstable living situation as well.

THE COURT: I'm not sure that's what that says.

PRETRIAL SERVICES OFFICER: Well, under the assessment of nonappearance, it says, "unstable, unsuitable living situation," and then, "ties to a foreign country, possession of a passport, and frequent international travel" is our standard assessment of nonappearance.

THE COURT: Right. Right. It doesn't seem to be tied solely to an unsuitable, unstable living situation.

PRETRIAL SERVICES OFFICER: Well, based on my discussion with the officer, that is why detention was recommended, is due to the unstable living situation.

THE COURT: All right.

MR. HERMAN: And, Judge, if the Court wants, I'm happy

to address that issue.

THE COURT: Sure. Go ahead.

MR. HERMAN: So, I was actually present in Chicago for the underlying bail hearing.

THE COURT: I saw that.

MR. HERMAN: The Chicago pretrial services officer recommended detention. This is a different formulation than we see in our district for the reasons the Court indicated, but as it's written, they're saying maybe there could be a package but not the one that was proposed. And the address is not suitable. The third-party custodian is not suitable. There are too many unknowns and misrepresentations. That was their position in Chicago.

THE COURT: Right. That's the one on the form.

MR. HERMAN: Yes, your Honor.

THE COURT: The other one, October 8, says Southern District of New York --

MR. HERMAN: That's right.

THE COURT: -- and it says, no combination of conditions.

MR. HERMAN: Yes, your Honor. My understanding, and pretrial can certainly weigh in, is when you have a 53(c) case such as this, where the defendant elects to do a detention hearing in the district of arrest, the district of arrest will do the pretrial report, like the Court noted, and then if the

defendants were detained and come here, our district will simply do a cover letter, which they did here. But they will do their own recommendation.

And, as the Court just noted, the recommendation dated today is for detention, and that's from our officers seated to my left.

PRETRIAL SERVICES OFFICER: Your Honor. Just to clarify, I did interview this defendant earlier this afternoon, and, during that interview, he was still unable to provide an address where he would reside, which largely contributed to my recommendation for detention, along with the nature of the instant offense.

THE COURT: Mr. Herman.

MR. HERMAN: Thank you very much, your Honor. So, as the Court knows, and I'll start with the standard, it is a de novo case of course, but you do have a well reasoned and detailed opinion by the magistrate judge in Illinois, Judge Gilbert. He did recommend detention there, both in an oral ruling and then later in his written ruling, and I think that is worth reading and is worth exploring. Nothing has changed since then. Many of the cosigners Mr. Sapone referenced were proposed in Illinois, and while this is de novo of course, the Court has behind you a very well reasoned opinion by Judge Gilbert that rejects those and really asks a lot of questions that are still unexplained: His access to substantial amounts

of wealth; his access to foreign travel; his lies to banks. There was an extended discussion that the Court I'm sure read about his lies to banks to lease luxury vehicles and his lies to pretrial, and they simply cannot be reconciled. There's still no explanation.

In terms of a few things that Mr. Sapone said, you know, look, I don't think it's -- I'm not dwelling on this, but just to correct, our position is there is a presumption of detention under 18, United States Code, section 3142(e)(3)(D), because the defendant committed multiple acts of sex trafficking obstruction in violation of 18, United States Code, section 1591(d), as in David. And that is one of the statutory presumption factors.

The Illinois judge declined to decide whether or not there was a presumption, because he found even if there wasn't a presumption, that detention was still appropriate. We think that's correct. There is a presumption. It's a rebuttable one. Of course I'm not going to dwell on it too much, but I do think it needs to be corrected.

In terms of the criminal history, this racketeering enterprise has lasted decades, and while the defendant has not previously been arrested, the conduct of this conspiracy has been going on for a substantial period of time. The defendant's own conduct goes back many years, including in 2019, and, in fact, his falsely representing himself to be a

lawyer for the church has been going on for a very, very long time. And I think that point, which was alluded to by Mr. Sapone, is very important. There's a reason he falsely held himself out as an attorney. It's to provide credibility to himself when he is telling vulnerable members of his own church who have been sexually exploited that what they experienced was not true, and to tell him where the evidence would be so he could destroy it. And in some cases they listened to him or they were coerced into signing false declarations that the defendant said he prepared as a lawyer, and that's incredibly damaging to these women and also to the legal profession.

I also think it's important to recognize the many unknowns that call into question whether this defendant could abide by any order of the Court. He has substantial access to wealth. In our written submission we mentioned that the search warrants executed at codefendant's houses -- codefendants are his uncle and his grandmother, so that's Naason and Eva, respectively, conservatively seized $1.5 million in cash. Since that time, we've counted the money. It's actually closer to $3 million in cash, along with jewelry, and that's just what was found in several properties in California. That does not include the vast wealth that is available to the defendant from Mexico, where the church is headquartered.

He has not addressed his access to that money, as well

as the lies to banks to obtain luxury cars and to pretrial. So I don't think -- we're not swayed by the fact that parishioners in the very church that he's exploited are willing to put up their properties. There is every likelihood that upon his fleeing, those people would be reimbursed by the church, which has access to this amount of money.

The defense also has not addressed the alternate basis we're seeking for detention here, which is the substantial risk of obstruction. The defendant's primary role, as I noted earlier, in the conspiracy, was to obstruct the sex trafficking investigation, and he did that repeatedly in both the United States and Mexico after Naason, his uncle, and the lead defendant here, was arrested on state charges. In doing that, he learned the identities of many of the victims in that case.

There is every reason to believe he would continue those acts of obstruction. He's been promoted in the church since that time. According to him, as he told pretrial, he's a pastor in the Cicero, Illinois, church since 2023, which is a major church branch for the organization. And he did go to the Holy Supper just in August 2025, at a time when many U.S. based leaders of the church didn't go. He went, and when he returned, he told CBP officers that he was an attorney by trade. These are just examples of how he has continued to lie and simply cannot be trusted.

So, your Honor, there are many, many more things I

could address, including questions we have about some of these properties, which we have not vetted, questions about the ability of the church to reimburse people, questions about the lies that still have not been addressed, but I think ultimately pretrial in our district was correct when they recommended detention. Magistrate Judge Gilbert was correct and thoughtful in his ruling.

I'm happy to answer the Court's questions, but, ultimately, we think detention remains appropriate in this case.

THE COURT: Thank you.

MR. HERMAN: Thank you.

THE COURT: Mr. Sapone.

MR. SAPONE: Yes. Very, very briefly, your Honor.

THE COURT: Yes, sir.

MR. SAPONE: This is not a "tit for tat" situation, but I just want to clear something up, and I say it respectfully. The government has said nothing has really changed between Chicago's presentation and here before your Honor. I think over there five financially responsible people were proffered. We come before you with 16. We think that's very significant.

With respect to the homes that were suggested to secure a bond, they suggested four versus the seven that we're suggesting. And they did not have the $3 million home in

Chicago that we now have here in New York, the value of which -- all of it, which is $5.1 million in homes, did not have that in Chicago. And of course it's the number of FRPs that is striking to me. All these people trust this man. And they did not have in Chicago the proffer of the Woodbridge, New Jersey, home where he would stay on a bracelet with two custodians. And these are folks that have been family friends for a long time.

And then the last thing I want to say is the government said, and, again, it's always respectfully, that there is a likelihood if he flees, the church will reimburse. What I say to that is nobody has a crystal ball. Maybe they do. Maybe they don't. That is speculative.

THE COURT: Mr. Sapone, would you address a couple of the items in Judge Gilbert's addendum to his order of detention? In the first paragraph, Judge Gilbert talks about the differing representations about Mr. Nunez's income: How much he made, whether his wife had an income or not, and the fact that he made a $22,000 down payment on the Maserati last March on supposed income of $3,500 a month.

MR. SAPONE: Yes. And thank you for raising that, your Honor. One moment, please.

(Pause in proceeding)

MR. SAPONE: I'm ready, your Honor.

THE COURT: Yes, sir.

MR. SAPONE: So it was just cleared up for me, your Honor. Joram doesn't pay expenses. He doesn't pay a mortgage. He doesn't pay bills, because the church takes care of that overhead, which in a month could come out to like $7,500 or $10,000. And so that's how he was able to put the down payment on the car, because of all of that savings.

THE COURT: So, still, on an income -- even if it's a clean income of $3,500 a month, he put down $22,000 on a car?

MR. SAPONE: So what he's telling me is he wants you to know he earns $4,000 a month income and does not pay any living expenses. So that's I could say colloquially clean money.

THE COURT: Okay. So that's five months, more than five months of income.

MR. SAPONE: Yes.

THE COURT: For a car down payment. That's what you're telling me.

MR. SAPONE: Yes, and I think the significant part of it, and I hate to be repetitive, he finds it significant there's no overhead, so he's able to do that.

THE COURT: So he's spending no money on anything for five months except on a car down payment for a Maserati?

MR. SAPONE: I see your Honor's point for sure. I just want to ask him one question.

(Pause in proceeding)

PRETRIAL SERVICES OFFICER: Your Honor, if I may, the pretrial report indicates he spends $600 a month on groceries.

THE COURT: I saw that.

PRETRIAL SERVICES OFFICER: And $2,000 a month on credit card payments.

THE COURT: I saw that. Thank you.

MR. SAPONE: I guess he was able to amass savings, your Honor, over 14 years as a pastor. Now it's $4,000 a month, no overhead. He was able to squirrel some money away and he was able to pay for the car. Thank you.

THE COURT: I note that in the Southern District report on page two the defendant said his wife has a BMW X7 valued at $80,000, but then she's also supposed to be on food stamps.

PRETRIAL SERVICES OFFICER: Your Honor, also, the defendant informed me that he's paying off that BMW because his wife is unemployed.

THE COURT: I can't hear you.

PRETRIAL SERVICES OFFICER: The defendant informed me, because his wife is unemployed, he is also paying off that BMW.

THE COURT: All right. When you're ready.

MR. SAPONE: Your Honor is correct. His wife does own that vehicle, yes.

THE COURT: Yet receives food stamps?

MR. SAPONE: I haven't spoken to her about that, your

Honor.

THE COURT: On page two of Judge Gilbert's addendum, he talks about the Florida residence, which is listed in the Illinois pretrial services report on page two as having a value of $300,000. Judge Gilbert notes the defense did not address the government's contention that this residence was transferred to the defendant by the LLDM Church for only $100 in 2019.

What do we have to say about that?

MR. SAPONE: One moment, please.

THE COURT: Yes. Yes, sir.

(Pause in proceeding)

MR. SAPONE: We're ready, your Honor.

THE COURT: Yes, sir.

MR. SAPONE: So, as explained to me, that $300,000 Florida residence was a long time ago the property of Joram's grandfather. He owned it, Joram's grandfather, and then when he passed on, he willed it to Naason, who's one of the codefendants. And then Naason gave it to the church, and then the church gave it to Joram, the view being that it was his grandfather's, his, you know, blood grandfather's originally, and so as they were figuring out what to do with it, they thought it might be fair to give it to Joram, because it was his grandfather's originally.

THE COURT: Okay. Still looking at page two of Judge Gilbert's addendum, at the bottom of the first big paragraph,

he talks about the cash and valuables located in the residence of defendant's grandmother and uncle.

What do we have to say about that?

MR. SAPONE: One moment, please.

THE COURT: Yes, sir.

(Pause in proceeding)

MR. SAPONE: Ready, your Honor.

THE COURT: Yes, sir.

MR. SAPONE: So I'm told that that is in California, and Joram lives outside of Chicago, not in California. It's not his. He loves his grandmother. They go visit a couple times a year, but he just has nothing to do with it. He doesn't know.

THE COURT: Okay. But the government's point I think was that he has access to wealth should he wish to flee, and I think the government said that the cash amount was closer to $3 million.

MR. SAPONE: I think the contention at this table is that he does not have access to wealth, that if extended family members have something, that is theirs. That does not mean it is his. And so that's what I would say, your Honor, that if they have that, that is their property. It's not his. And he has no intention, your Honor, of fleeing. He is not going to leave his wife and his kids. He's not.

THE COURT: One more question on the cash flow that we

talked about. When we were discussing the $22,000 down payment on the Maserati, the income and expenses from the Illinois pretrial services report, as the officer pointed out, shows $600 for groceries, $700 and $600 for vehicle loan payments, $500 for automobile insurance, $2,000 a month for credit cards, and $600 for a loan payment, which I assume is student loans. That totals $5,000, which is above his reported monthly income.

MR. SAPONE: May I have just one moment, your Honor.

THE COURT: Yes, sir.

(Pause in proceeding)

MR. SAPONE: I'm ready.

THE COURT: Yes, sir.

MR SAPONE: Your Honor, those are fluctuating and variable. He did his best to be accurate, but we want your Honor to know that the largest sort of purchase, if you will, is, as you pointed out, the Maserati, and $12,000 of that was from a credit card, and $10,000 he took out of savings. So it's not like he had all of that, you know, in his right pocket.

And then, like, the $2,000 in credit cards, there are some months where he'll pay the absolute minimum, which is a very small fraction of that. So the point here --

THE COURT: It says right here, "credit card minimum payments $2,000."

MR. SAPONE: I think that's a mistake. I think if

there's a running balance of $2,000, there are times he pays a fraction in minimum payments.

THE COURT: No. It does say "minimum" here.

MR. SAPONE: Yes, you are right, your Honor.

So he makes $4,000 a month, has no overhead, and sort of moves things around, uses credit cards, and lives on the $4,000. That's what it is.

THE COURT: How does the Maserati and the BMW help him ministering to his flock?

MR. SAPONE: Can I find that out?

THE COURT: Of course.

(Pause in proceeding)

MR. SAPONE: So, your Honor, here's a little dose of truth, honesty.

THE COURT: Yes, sir. Truth we like.

MR. SAPONE: He's young. I wish it was a Ford or a Chevy. I'm not happy that we're talking about a Maserati and a designer luxury car.

THE COURT: Truth becomes you, Mr. Sapone.

MR. SAPONE: Thank you, your Honor. I appreciate it. I really do. Was it over his head? Yes. Should he have made those purchases? Did he need those purchases? Absolutely not. He's young, you know. He should have gotten himself a nice Chevy. Then I wouldn't be getting hot under the collar here.

THE COURT: Well, the Camaro will do for that.

MR. SAPONE: So that's what it is. He wanted to treat himself to something nice, and maybe he overindulged.

THE COURT: Okay. What's the purchase price on a Maserati?

MR. SAPONE: It seems that it was 45 to $50,000 used.

THE COURT: Oh, used. That changes everything. Thank you, Mr. Sapone.

MR. SAPONE: I'm hoping you'll find that.

THE COURT: Thank you, Mr. Sapone.

MR. HERMAN: Just briefly, your Honor, on the California properties, the August 2025 trip to Mexico, the defendant didn't fly back to Chicago. He flew back to LA. And upon leaving the airport, he drove directly to these properties, and that was just a month before his arrest. So he has access to those properties.

The second thing I'll say is not what Mr. Sapone said. He receives substantial sums of money from church entities, purportedly from legal services, while not actually being able to provide legal service as a lawyer. From 2023 to 2024, he received close to $50,000 in checks from various church entities, all in round numbers, some of which are checks addressed to Joram Nunez, Esquire. And we think he used that money and other church money to fund his lavish lifestyle.

So we think Judge Gilbert got it right. We think the Court is asking the correct questions. And, ultimately, we

think detention remains appropriate. Thank you.

THE COURT: Mr. Sapone.

MR. SAPONE: Yes, your Honor. So, I just very quickly checked into the trip from Mexico to LA, and I'm told he did not go to those properties. He went to his mom's house to visit his mother when he came back from Mexico.

And regarding the checks, the government said we think he used that money to live a lavish lifestyle. Whenever someone says they think, it gets me nervous. You know, I don't know how lavish it is. I'm not happy about the car for sure. But, you know, like we have seen in so many cases -- and I don't think these items are like at the top of the list of things that we've seen. His whole life is the church, the church. He lives in the church. They're paying his overhead. They give him $4,000 a month. He does the best he can, you know, to feel good about himself, get into a nice car and go and drive and try to help people.

THE COURT: Thank you.

Anything else, Mr. Herman?

MR. HERMAN: No, your Honor. Thank you.

THE COURT: All right. Thank you, counsel. As we note, the statute tells us the factors to consider. The nature and circumstances of the offense charged, I do take into account that the offense does include obstruction and that that can be a continuing process.

The weight of the evidence against the defendant, I don't know that the government has said too much about that. The history and characteristics of the defendant, among those things are family ties, which I acknowledge and understand that very well.

Financial resources seems to be a problem here. I adopt what Judge Gilbert said in Chicago about the unexplained wealth. There is still no explanation for the varying representations of Mr. Nunez's income and his wife's situation. I cannot believe and find incredible the suggestion that Mr. Nunez is living on $4,000 a month, even though his housing and those expenses are covered. Even the expenses listed on page three of four of the Chicago -- of the Illinois pretrial services report takes up more than $4,000 a month that he's supposedly living on.

With respect, for example, to the Florida residence, there's still questions about that. The access to wealth seems to be without question, the grandmother and uncle's home, and the income from the church, and the checks for Mr. Nunez, even if he's representing himself to be a lawyer. So I find that I cannot believe anything that is said, and, thus, find that it is unlikely that Mr. Nunez will adhere to any terms and conditions that the Court sets.

By doing so, I do not mean to denigrate the individuals who have offered their homes and to sign the

papers. It all has to do with this defendant.

In addition, aside from the danger of fleeing -- and I note that the defendant has engaged in lots of international travel -- and the access to wealth, I do take into account the danger of continuing obstruction of evidence in this case. Accordingly, I find that there are no terms and conditions that will assure the defendant's presence in court and keep him from obstructing justice with respect to the evidence in this court. Again, I adopt Judge Gilbert's addendum from Illinois.

For those reasons, Mr. Nunez is remanded. I don't think I asked the government to recite the nature of the discovery, and I wanted to remind Mr. Sapone about the scheduled pretrial conference.

Mr. Herman, do you want to just recite the nature of the discovery for counsel, unless you've had a conversation with him before?

MR. HERMAN: Yes, your Honor. So, the government did outline to some extent the discovery in the co-defendant Naason's pretrial conference, but, generally, there are substantial numbers of search warrants and electronic evidence, including from this defendant, including iClouds, email accounts, and cell phones. And there are substantial numbers of law enforcement reports and investigative activity.

This investigation has been going on for a long period of time, a matter of years. In terms of this discovery, where

we are, just so the Court is aware, we've been working with the parties on a suitable protective order. It does appear, though, that we're going to have to litigate that, and so I expect we will be filing something in the near future about a protective order, but once a protective order is entered, whenever that gets resolved, we are prepared to make initial production promptly and will continue to role out the substantial amount of discovery in the case after that. As the Court noted, there is a conference for all parties on December 15.

THE COURT: December 15 at 1:00 p.m., counsel.

MR. SAPONE: Yes, your Honor.

THE COURT: All right. Please confer, and, Mr. Herman, you can punch all this up. Confer among yourselves before December 15, and if we're not doing anything that day, don't drag everybody in here.

MR. HERMAN: Understood, your Honor.

THE COURT: Okay. Is there anything else today, friends?

MR. HERMAN: Yes, your Honor. Just for the Court's awareness, there was a Rule 5(f) order entered in Chicago. The Court also entered one in the codefendant's appearance, and the Court, you know, can and should enter another one for this defendant.

The Court also excluded time to December 15 at the

codefendant's hearing. We'd ask the Court, in an abundance of caution, to also exclude time here for the same reasons, concerning discovery, and any discussions about pretrial disposition.

THE COURT: Any objection?

MR. SAPONE: None.

THE COURT: Very well. Time is excluded again until December 15, to allow the government to make discovery, defendant to review discovery and determine if there are any motions to be made.

Anything else, friends?

MR. HERMAN: No, your Honor. Thank you.

MR. SAPONE: No. It's always nice to see your Honor.

(Adjourned)