**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| UNITED STATES OF AMERICA, <br><br> v. <br><br> NAASON JOAQUIN GARCÍA, et al., <br><br>                  Defendant. | 25-cr-370 (LAP) |

**NOTICE OF DEFENDANT NAASON JOAQUIN GARCÍA'S MOTION (1)**
**TO DISMISS THE INDICTMENT, AND (2) FOR A BILL OF PARTICULARS**

PLEASE TAKE NOTICE that, upon the accompanying Memorandum of Law, and upon all prior pleadings filed in this action, Defendant Naason Joaquin García ("Naason Garcia"), by and through his counsel, respectfully moves this Court, the Honorable Loretta A. Preska, United States District Judge, Daniel Patrick Moynihan United States Courthouse, 500 Pearl Street, New York, New York 10007, at a date and time to be determined by the Court, for (1) an order dismissing the Indictment in this matter; or (2) an order directing the Government to file a bill of particulars.

PLEASE TAKE FURTHER NOTICE THAT, pursuant to the deadlines set by the Court at the March 10, 2026, Status Conference in this matter, the Government's opposition papers are due on August 21, 2026.

i

Dated: July 23, 2026                    Respectfully submitted,

                        WERKSMAN JACKSON & QUINN LLP

                        By:     /s *Caleb Mason*
                                Caleb Mason
                                Alan Jackson
                                Evan Wolk
                                888 West 6th Street, 4th Floor
                                Los Angeles, California 90017
                                Tel: (213) 688-0460
                                Email: cmason@werksmanjackson.com

                        ajackson@werksmanjackson.com
                                ewolk@werksmanjackson.com

                                *Attorneys for Defendant*
                                *Naason Joaquin García*

ii

**TABLE OF CONTENTS**

PRELIMINARY STATEMENT ...................................................................... 1

FACTUAL BACKGROUND .......................................................................... 3

ARGUMENT ................................................................................................. 5

I.      DISMISSAL OF THE INDICTMENT IS APPROPRIATE BECAUSE VENUE IS IMPROPER, IT CONTRAVENES THE FREE EXERCISE OF RELIGION, AND IT IS IMPERSMISSIBLY DUPLICITOUS ....... 6

     A.      Venue is Improper in the Southern District of New York Because the Government Relies on Overly Broad, Insufficient Allegations, and Non-Elements to Establish Venue ...................... 7

         1.      The Alleged Flight Landing at JFK, an Airport Not in the Southern District of New York, is Insufficient for Venue ...................................................................... 7

         2.      Count Five's "Flyover" Venue Allegation Also Lacks Merit ................................................................ 12

         3.      The Boilerplate "In the Southern District of New York and Elsewhere" Language Is Not Sufficient to Support Venue ............................................................... 15

         4.      The Indictment Improperly Relies on Non-Elements and Insufficient Allegations to Establish Venue in Contravention of the Constitution and the Essential Conduct Elements Test ....................................... 18

     B.      The Indictment Violates the Free Exercise Clause ...................... 23

         1.      The Government's Theory of "Spiritual Coercion" Violates the First Amendment ........................................... 23

         2.      Naason Garcia's Protections Under The Religious Freedom Restoration Act are Infringed Because the

Government Substantially Burdened His Religious Exercise ................................................................... 30

3. Naason Garcia's Equal Protection Rights Are Violated Because The Government Has Selectively Prosecuted Him and His Religion ................................................................... 32

C. The Indictment is Impermissibly Duplicitous Because It Combines Multiple Conspiracies Into One Count and Significantly Prejudices Naason Garcia ........................................ 35

1. The Racketeering Conspiracy Count Combines Multiple Conspiracies into One Charge Because It Alleges a Superfluous Timeframe and Combines Purposes from Other Alleged Enterprises into Naason Garcia's Alleged Enterprise .................................................................... 35

2. The Duplicitous Indictment Prejudices Naason Garcia Because It Muddles Any Verdict, Creates a Double Jeopardy Problem, and Inadequately Provides Notice of The Charges Against Him .................................................. 40

II. IN THE ALTERNATIVE, THE COURT SHOULD DIRECT THE GOVERNMENT TO FILE A BILL OF PARTICULARS SPECIFYING AMBIGUITIES IN THE INDICTMENT ................................................ 44

A. The Government's Production of Over 3 Million Pages and Over 20 Terabytes of Digital Content is Not an Adequate Substitute for a Bill of Particulars ................................................ 45

B. The Government Must Specify the Basis for Venue in The Southern District of New York as to All Counts ......................... 46

C. The Government Must Specify What Conduct Constituted Force, Fraud, and Coercion ......................................... 49

D. The Government Must Specify The Alleged Commercial Sex Activities That Occurred Because of Force, Fraud, and

Coercion ...................................................................................... 50

E.    The Government Must Specify What The Actual LLDM

Doctrines Are, How They Have Been Taught, and How They

Were "Corrupted" ............................................................................. 52

**CONCLUSION** ............................................................................................... 53

# TABLE OF AUTHORITIES

**Cases**                                                                 **Page(s)**

*Abouammo v. United States,*
146 S.Ct. 1571 (2026)...................................................................... 4, 18, 19, 20, 22

*Bank of Nova Scotia v. United States,*
487 U.S. 250 (1988) ..................................................................................... 29

*Cole v. State of Ark.,*
333 U.S. 196 (1948) ...................................................................................... 44

*Blumenthal v. United States,*
332 U.S. 539 (1947) ...................................................................................... 36

*City of Boerne v. Flores,*
521 U.S. 507 (1997) ...................................................................................... 30

*Dobkin v. District of Columbia,*
194 A.2d 657(D.C. 1963) ............................................................................. 31

*Employment Division, Department of Human Resources of Oregon v. Smith,*
494 U.S. 872 (1990) ...................................................................................... 30

*Ford v. McGinnis,*
352 F.3d 582 (2d Cir. 2003).......................................................................... 31

*Holt v. Hobbs,*
574 U.S. 352 (2015) ...................................................................................... 30

*Jolly v. Coughlin,*
76 F.3d 468 (2d Cir. 1996)............................................................................ 30

*Kotteakos v. United States,*
328 U.S. 750 (1946) .............................................................................. 36, 38, 40

*Mortensen v. United States,*
322 U.S. 369 (1944) ........................................................................... 2, 9, 11, 12

*Patrick v. LaFevre,*
745 F.2d 153 (2d Cir. 1984)........................................................................... 31

*Presbyterian Church v. Hull Church,*
393 U.S. 440 (1969) ...................................................................................... 23

*Reynolds v. United States*,
98 U.S. 145 (1878) ........................................................................................ 1

*Salinas v. United States*,
522 U.S. 52 (1997) .................................................................................... 4, 20

*United States v. Armstrong*,
517 U.S. 456 (1996) ...................................................................................... 32

*United States v. Ballard*,
322 U.S. 78 (1944) ................................................................... 23, 24, 25, 29

*United States v. Borelli*¸
336 F.2d 376 (2d Cir. 1964) .................................................................... 36, 40

*United States v. Bortnovsky*,
820 F.2d 572 (2d Cir. 1987) ........................................................ 44, 45, 49, 50

*United States v. Brennan*,
183 F.3d 139 (2d Cir. 1999) ........................................................................ 14

*United States v. Cabrales*,
524 U.S. 1 (1998) ........................................................................................... 6

*United States v. Chen*,
378 F.3d 151 (2d Cir. 2004) ........................................................ 44, 49, 50, 52

*United States v. Davidoff*,
845 F.2d 1151 (2d Cir. 1988) ...................................................................... 45

*United States v. Davis*,
689 F.3d 179 (2d Cir. 2012) .......................................................................... 6

*United States v. Ehrgott*,
182 F. 267 (C.C.S.D.N.Y. 1910) .............................................................. 21, 22

*United States v. Frey*,
736 F.Supp.3d 128 (E.D.N.Y. 2024) ........................................................... 25

*United States v. Kandic*,
134 F.4th 92 (2d Cir. 2025) ........................................................ 37, 40, 41, 42, 43

*United States v. Kelly*,
128 F.4th 387 (2d Cir. 2025)...................................................................................... 22

*United States v. Long*,
697 F. Supp. 651 (S.D.N.Y. 1988) ......................................................................... 15, 20

*United States v. Lozoya*ˌ
982 F.3d 648 (9th Cir. 2020)...................................................................................... 14

*United States v. Mackey*,
21-CR-80 (NGG), 2022 WL 2093012 (E.D.N.Y. May 13, 2022) ..................................... 47

*United States v. Mapp*,
No. 95 CR 1162(FB)(S–1), 1996 WL 506933 (E.D.N.Y Sept. 3, 1996).......................... 15

*United States v. McDermott*,
245 F.3d 133 (2d Cir. 2001)................................................................................. 35, 40

*United States v. Metter*,
860 F.Supp.2d 205 (E.D.N.Y. 2012)............................................................................ 18

*United States v. Moten,*
564 F.2d 620 (2d Cir. 1977)....................................................................................... 36

*United States v. O'Connor*,
650 F.3d 839 (2d Cir. 2011)....................................................................................... 22

*United States v. Purcell*,
967 F.3d 159 (2d Cir. 2020)....................................................................................... 22

*United States v. Rahman*,
189 F.3d 88 (2d Cir. 1999)......................................................................................... 23

*United States v. Rigas*,
605 F.3d 194 (3d Cir. 2010)....................................................................................... 35

*United States v. Rodriguez-Moreno*,
526 U.S. 275 (1999) ............................................................................................ 18, 22

*United States v. Royer,*
549 F.3d 886 (2d Cir. 2008)....................................................................................... 20

viii

*United States v. Salazar*,
485 F.2d 1272 (2d Cir. 1973)..................................................................................... 49

*United States* v. *Socony-Vacuum Oil Co.*,
310 U.S. 150 (1940) ........................................................................................... 21, 22

*United States v. Spraggins*,
No. 1:19-CR-00821, 2021 WL 4264418 (N.D. Ill. Sep. 20, 2021) ..................................... 15

*United States v. Sturdivant*,
244 F.3d 71 (2d Cir. 2001)............................................................................ 35, 37, 41, 42

*United States v. Sun Myung Moon*,
718 F.2d 1210 (2d Cir. 1983)........................................................................................ 1

*United States v. Svoboda*,
347 F.3d 471 (2d Cir. 2003)................................................................................... 21, 22

*United States v. Tramunti*,
513 F.2d 1087 (2d Cir. 1975).................................................................................... 36

*United States v. Vilar*,
729 F.3d 62 (2d Cir. 2013)..................................................................................... 35, 38

*United States v. Wilson*,
No. 01 CR. 53(DLC), 2001 WL 798018 (S.D.N.Y. July 13, 2001) ................................. 47


**Constitutional Provisions**
U.S. CONST. amend. I....................................................................................................... 23
U.S. CONST. amend. VI ............................................................................................... 17, 44
U.S. CONST. art III. § 2, cl. 3 .......................................................................................... 6

**Statutes**
18 U.S.C. 1591 .............................................................................................................. 25
18 U.S.C. § 1962(d)................................................................................................ 18, 19, 35
42 U.S.C. § 2000bb-1 .................................................................................................... 30
New York Penal Law § 130.25 ......................................................................................... 9
New York Penal Law § 130.35 ......................................................................................... 9
New York Penal Law § 130.40 ......................................................................................... 9
New York Penal Law § 130.50 ......................................................................................... 9
New York Penal Law § 130.52 ......................................................................................... 9
New York Penal Law § 130.55 ......................................................................................... 9

**Rules**

Fed R. Crim. P.  7(c) ................................................................................. 35, 38
Fed R. Crim. P.  7(f) ...................................................................................... 53
Fed R. Crim. P. 8(a) ...................................................................................... 35
Fed R. Crim. P.  12(b) .................................................................................. 5, 6

**Other Authorities**

Charles A. Wright & Arthur R. Miller, *Federal Practice & Procedure* § 130 (5th ed.) ... 44

Claudia Lauer & Meghan Hoyer, *Almost 1,700 priests and Clergy Accused of Sex Abuse are Unsupervised*, NBC NEWS: RELIGION (Oct. 4, 2019, at 9:03 PDT), https://www.nbcnews.com/ news/religion/nearly-1-700-priests-clergy-accused-sex-abuse-are-unsupervised-n1062396 [https://perma.cc/L8ND-B27C]. ........................................................... 34

Marci A. Hamilton, *Religious Practices that Have Contributed to a Culture of Secrecy Regarding Child Sex Abuse in Five Religious Organizations*, ChildUSA: The National Think Tank for Child Protection, https://www.abuseincare.org.nz/__data/assets/pdf_file /0027/28674/hamilton-m-religious-practices-that-have-contributed-to-a-culture-of-secrecy-regarding-child-sex-abuse-in-five-religious-organizations-child-usa-the-national-think-tank-for-child-protection-2020.pdf ........................................................... 34

NOTICIAS TELEMUNDO, *EN VIVO: Conferencia de Prensa Sobre la Detención del Líder de la Iglesia La Luz del Mundo*, at 28:15 (YouTube, June 6, 2019), https://www.youtube.com/watch?v=FGUvCe5DndI. ........................................................... 33

U.S. Dep't of Justice, Justice Manual § 9-110.100 ........................................................... 38

x

## MEMORANDUM OF LAW

Defendant Naason Joaquin García ("Mr. García"), by and through his counsel, hereby submits this Memorandum of Law in support of his motion (1) to dismiss the Indictment, and (2) for a bill of particulars.

## PRELIMINARY STATEMENT

Two points must be made, first and foremost, about the First Amendment arguments developed herein.

1.      **What the Motion is *not* arguing**. This Motion is *not* arguing that alleged sexual contacts with or exploitation of minors are not crimes.  Defendant is not making a "First Amendment argument" asserting a "religious license to engage in sex trafficking."

The defense understands and agrees that the First Amendment does not provide a license to commit crimes.  A person who believes that God has authorized him to have multiple wives, is still committing the crime of bigamy if he in fact marries multiple wives.  See, e.g., *Reynolds v. United States*, 98 U.S. 145, 165–68 (1878); cf. *United States v. Sun Myung Moon*, 718 F.2d 1210 (2d Cir. 1983).

That is not this case.  This case is not about a defendant who believes that God has authorized him to sexually assault people, or that God has given him a license to commit crimes.

2.      **What this Motion *is* arguing**. This Motion is arguing that the prosecution is attempting to *use* the religious beliefs of adults to *define* facially consensual sexual contacts among adults *as* "sexual assault."  The prosecution is claiming that these facially consensual contacts were in fact "coerced," not by anything done or said at the time of

1

the contacts, but rather by, and on the basis of, general religious beliefs about God, Heaven, Hell, the church, and the Apostle, that the prosecution claims these adults absorbed as children growing up in the church.

The theory of liability in this case—especially, and critically for this Motion, for the counts that would support venue in this District—depends on a "spiritual coercion" theory. The theory is as follows: A person grows up believing that Heaven and Hell are real, that the Apostle is God's spokesperson on Earth, and that disobedience to God sends you to Hell. That person, as an adult, meets the Apostle. The Apostle makes sexual advances, and that person acquiesces because she believes that assenting will lead her to Heaven, while refusing will lead her to Hell. That belief is the alleged "coercion." There is no allegation that the Apostle or co-defendants threatened these adult women with anything at all (whether Hell or anything else) to get them to have sex with the Apostle. The allegation—in the adult women's own words—is that they grew up with these beliefs, and that based on these beliefs, they acquiesced to his sexual advances as adults.

The prosecution cannot deny that that is the account given by the adult women it has identified as victims. Nor can it deny that this is the explicit theory of RICO liability set forth in the Indictment: the theory that the LLDM religion was conceived by Mr. Garcia's grandfather a century ago, and was promulgated and expanded by his father, and then by him, as a means to indoctrinate people with spiritual ideas that would maximize the sexual opportunities of the Apostles (grandfather, then father, then son). That is what the Indictment says.

2

It is a real and serious First Amendment question whether that constitutes "coercion" for purposes of section 1591 or any other theory.  And that is what this Motion is about. This Motion argues that if this fact pattern—an general religious belief in the reality of Heaven and Hell and the spiritual status of the Apostle, etc.—cannot constitute "coercion" for purposes of the offenses charged in this Indictment, then Counts 1, 2, 3, and 4 must be dismissed.

As to all Counts—including Counts 5 and 6, as set forth herein—venue is not proper in this District.  And as to Count 4, the Indictment fails to allege a federal offense, under *Mortensen v. United States*, 322 U.S. 369 (1944). Accordingly, the entire Indictment must be dismissed.

## FACTUAL BACKGROUND

Ten months ago, the Government unsealed an indictment, charging Naason Garcia, the Apostle of the La Luz Del Mundo Church (LLDM), with conspiring to violate the Racketeering Influenced and Corrupt Organization Act, *inter alia*.[1]  On April 10, 2026, Naason Garcia filed a motion requesting the Government's disclosure of the grand jury materials. *See generally* Def.'s Mot. Disclosure of Grand Jury Tr., Dkt. No. 51. The motion set out several reasons to justify disclosure, including the defense's belief that the Government relied on improper legal theories to obtain the operative Indictment. *See*

---

[1] The operative Indictment contains six charges. *Id.* Count One alleges a "Racketeering Conspiracy." *Id.* ¶¶ 1–29. Count Two alleges a "Sex Trafficking Conspiracy." *Id.* ¶¶ 30–32. The next two allege "Sex Trafficking by Force, Fraud, and Coercion" and "Inducement to Travel to Engage in Unlawful Sexual Activity." *Id.* ¶¶ 33–34. The last, "Conspiracy to Sexually Exploit Children" and a "Child Exploitation Enterprise." *Id.* ¶¶ 35–42.

*generally id.* The motion also set forth Naason Garcia's intent to file a motion to dismiss. *See generally id.*

On July 8, 2026, the defense wrote the Government, requesting that it file a bill of particulars resolving ambiguities in the Indictment, including, inter alia, the Government's asserted basis for venue; the Government's assertions regarding what conduct allegedly constituted "force"; and what LLDM "doctrines" the Government contends were "manipulated or corrupted."  On July 10, 2026, the Government responded and declined the request.

The parties exchanged further correspondence on this issue. The Government asserts that that venue is established sufficiently through an allegation that a reasonably foreseeable act in furtherance of the conspiracy was committed in the District.  The defense asserts, first, that the Indictment does not identify any specific such conduct; second, that that the defense has carefully reviewed the discovery, and does not believe that there is a factual basis for an allegation of such conduct; and third, that caselaw, *see*, *e.g.*, *Abouammo v. United States*, 146 S.Ct. 1571, 1577-78 (2026), and *Salinas v. United States*, 522 U.S. 52, 63 (1997), confines venue options for RICO cases as a consequence of easing the substantive burden on the prosecution (by removing the overt act element).[2]

---

[2] In sum: *Abouammo* holds that venue is proper in the place where a defendant commits the act that the statute prohibits.  A court must "identify the conduct constituting the offense—the things a defendant must do to violate the statute at issue." 146 S.Ct. at 1576.  Then the court must ascertian "the place where their commission occurred."  Id.  And only in that place—that judicial district—is venue constitutionally proper.  *Id*. *Salinas* holds that for the RICO conspiracy offense charged here in Count 1 (18 U.S.C. sec. 1962(d)),  "[t]here is no requirement of some overt act or specific act." 522 U.S. at 63.  The *only* act required is the act of conspiring.  *Id*.  Thus, under Abouammo, venue is constitutionally proper only where that act, "conspiring," occurred.  Venue cannot be satisfied by an allegation of an overt act in the District (even if the Government could

4

Naason Garcia accordingly files this omnibus motion,[3] respectfully requesting that the Court dismiss the operative Indictment or in the alternative, respectfully requesting that the Court direct the Government to file a bill of particulars.

### ARGUMENT

Fed. R. Crim. P. (12)(b)(1) allows parties to raise by pretrial motion any defense, objection, or request that the court can determine without a trial on the merits. Accordingly, Defendant Naason Joaquin Garcia, submits this request to the Court to dismiss the Government's indictment because (a) the Indictment itself makes it apparent, even without straying from its four corners, that there is no venue in the Southern District of New York; (b) the Indictment contravenes longstanding Free Exercise principles and caselaw; and (c) the Indictment is duplicitous.

In the alternative, the Court should direct the Government to file a bill of particulars, specifying its factual basis for venue in the Southern District of New York; what specifying what conduct it contends constituted force, fraud, or coercion; specified what sexual conduct it contents constituted "commercial sex activities" that occurred because of force, fraud, and coercion; and specifying what "LLDM doctrines" it contends have been promulgated, manipulated, or corrupted, and how it contends this was accomplished.

---

make and prove such an allegation with specificity), because an overt act is *not* one of "the things a defendant must do to violate the statute."

[3] On July 21, 2026, the Court approved the request by the defense for leave to file an omnibus motion with a word limit of 20,000 words. Mem. Endrsmt. Dkt. No. 57.

The Indictment does not provide any of the above information. The discovery does not supply this information either.  Mr. Garcia is constitutionally entitled to prepare a defense, and he is materially prejudiced in doing so by being deprived of this information.

**I.      DISMISSAL OF THE INDICTMENT IS APPROPRIATE BECAUSE VENUE IS IMPROPER, IT CONTRAVENES THE FREE EXERCISE OF RELIGION, AND IT IS IMPERSMISSIBLY DUPLICITOUS**

An improper venue defense must be raised pretrial if the basis for the motion is reasonably available and can be determined without a trial on the merits. Fed. R. Crim. P. 12(b)(3)(A)(i). When "a defendant is charged with multiple crimes in a single indictment, the government must satisfy venue with respect to each charge." *United States v. Davis*, 689 F.3d 179, 185 (2d Cir. 2012).

Venue was a sufficiently important right in the Framers' minds that the Constitution "twice safeguards the defendant's venue right." *United States v. Cabrales*, 524 U.S. 1, 6 (1998). Article III of the Constitution requires that "[t]he Trial of all Crimes . . . shall be held in the State where the said Crimes shall have been committed," subject to an exception for crimes "not committed within any State." U.S. CONST. art. III § 2, cl. 3. The Sixth Amendment further requires that, "[i]n all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the State and district wherein the crime shall have been committed." U.S. CONST. amend. VI. The cornerstone of all venue analysis is thus the constitutional requirement that trial be held in the state and district where the alleged offense was "committed."  Here, these constitutional venue requirements are not satisfied.

6

A.    **Venue is Improper in the Southern District of New York Because the Government Relies on Overly Broad, Insufficient Allegations, and Non-Elements to Establish Venue**

The Indictment here fails to allege that any of the defendants committed any of the charged offenses in the Southern District of New York.  The Government inserts the boilerplate phrase "in the Southern District of New York and elsewhere" at various places in the Indictment, *see* Indictment ¶¶ 25, 27, 29, 30, 33, 34, 35, 37. But there is no sufficient allegation anywhere in the Indictment of any specific crime (or indeed any specific act at all) committed in the Southern District of New York. The Indictment attempts two venue allegations, both having to do with flights yet neither is sufficient. There are no other allegations because there were no such acts. The alleged criminal acts that are at issue in this case took place in Los Angeles or Mexico. There is simply no basis for venue in this judicial district.

1.    **The Alleged Flight Landing at JFK, an Airport Not in the Southern District of New York, is Insufficient for Venue**

Count Four refers to a 2017 flight from Johannesburg, South Africa, that flew to, as the Government puts it, "New York, New York." The Indictment says that Garcia and Rangel "persuaded, induced, enticed, and coerced Victim 7 to travel from South Africa to New York, New York." The Indictment's repeated use of the term "New York, New York," appears to be a circumlocution chosen to avoid acknowledging that New York City's airports are not in the Southern District of New York.  (The prosecution knows, because the records are in its discovery production, that the flight it is alleging here landed at JFK, in the Eastern District of New York.  The prosecution will not,

7

accordingly, suggest in opposition that perhaps the Indictment is referring to a flight that landed in Westchester.)

"New York, New York" is a term that refers to the entire City of New York. But the Southern District of New York does not cover the entire City of New York. It covers only the Bronx and Manhattan. The Government knows that JFK Airport is in the Eastern District of New York, not the Southern District of New York. Nothing about that flight can provide venue in the Southern District of New York. Nothing in Count Four makes any reference to conduct alleged to have occurred in the Southern District of New York. Coyness in the indictment about where the airports are in New York City will not cure the absence of venue.

Moreover, Count Four does not properly allege a federal offense in any event. The charged offense is 18 U.S.C. § 2422(a). That section defines the crime as follows: "knowingly persuades, induces, entices, or coerces any individual to travel in interstate or foreign commerce . . . to engage in prostitution, or in any sexual activity for which any person can be charged with a criminal offense . . . ." § 2422(a). The verbs "persuade, induce, entice, or coerce" etc. are modified by the phrase "to engage in," which in turn modifies both prepositional clauses that follow: "in prostitution, or in any sexual activity for which any person can be charged with a criminal offense . . . ." *Id.* The purpose of travel, in short, must be a sexual act.

That is not the case here. It is not alleged in the Indictment that Victim 7 was persuaded, enticed, induced, or coerced to engage in travel with the purpose of engaging in prostitution or in criminal sexual activity. There is no allegation that Victim 7 was

8

employed as a prostitute, or engaged in any commercial sexual activity.  Instead, the allegation is that Mr. Garcia sexually assaulted her in some manner in violation of New York Penal Law.  The Indictment does not say what that alleged unlawful sexual activity was, nor where or when or even whether it allegedly took place. It simply cites various New York Penal Law sections running the gamut from misdemeanor touching to felony forcible rape—leaving it entirely unspecified what exactly the Government is claiming occurred, and how that alleged conduct violated the Mann Act.  Here are those Penal Law sections: sec. 130.35 (forcible rape), sec. 130.50 (forcible anal or oral sexual contact), sec. 130.25 (sexual contact without consent), sec. 130.40 (sexual contact without consent), sec. 130.55 (misdemeanor sexual touching without consent), and sec. 130.52 (misdemeanor forcible touching). Indictment ¶ 34.

The Mann Act theory supporting Count Four is deficient as a matter of law. *See generally Mortensen v. United States*, 322 U.S. 369 (1944). An interstate trip that eventuates in, or includes, a criminal sexual act, does *not* thereby become a Mann Act crime. If Mr. Garcia enticed Victim 7 to travel with him to the United States from South Africa, and then, once they arrived in New York, he sexually assaulted her (as noted, based on the Government's list of New York statutory sections, that could have been anything from unwanted touching to forcible rape), then the allegations fail to define a Mann Act crime as a matter of law.

The defense conferred with the prosecution on this issue, and the prosecution's response was (a) to refuse to produce grand jury transcripts, (b) to refuse to provide a bill of particulars, and (c) to refer the defense to the discovery.  The defense has indeed

9

reviewed the discovery, which substantiates precisely the argument the defense is making. Victim 7 has given statements about her relationship with Mr. Garcia, and her account cannot support a Mann Act claim.

What this individual, an adult at all relevant times, said is that the Church offered her a position as a travelling missionary, and she accepted that position. She said that as part of her missionary duties, she accompanied Mr. Garcia on numerous overseas trips over a period of several years. She said that her duties included missionary work, clerical work, and logistical work. She said that periodically during those trips Mr. Garcia made sexual advances. She said that although "having a sexual relationship with [Mr. Garcia] was never something she wanted to do," she "didn't say no," and that she "felt as if it was an obligation because [Mr. Garcia] was the LLDM leader/servant of God/apostle." She stated that she acquiesced approximately "nine times" in total, because she believed that it would be sinful to refuse, given Mr. Garcia's status as Apostle of the Church. She explained that she had been taught in childhood that "if God was mad at her, she could be struck by lightning." She did not say that Mr. Garcia or anyone else told her any of these things at the time of his sexual advances, and she did not say that Mr. Garcia or anyone else made any threats or used any force. Her account is precisely one of "spiritual coercion," based on internalized general religious doctrines about God.

That is what Victim 7 said. Her account matches precisely what the Supreme Court emphatically holds *does not* support Mann Act liability. It has been settled law for 80 years that Section 2422 does *not* criminalize every interstate trip or trip into the United States simply because criminal sexual conduct occurred during or after the trip. Nor does

10

it matter if the criminal sexual conduct was ongoing prior to the trip and was anticipated to continue during or after the trip. That is precisely what *Mortensen* holds. 322 U.S. 369, 373-74 (1944).

The Supreme Court teaches in *Mortensen* that the statute only criminalizes the inducement, enticement or coercion of a person to make trip *for the purpose of* engaging in a criminal sex act. *Id.* at 374. In *Mortensen*, two women were working for the defendants (a married couple who ran a brothel in Nebraska) as sex workers. *Id.* 372. The couple was planning a vacation, and the two women asked to come along. *Id.* They worked as prostitutes up until the interstate vacation and immediately resumed working for the defendants as prostitutes when they returned from the interstate vacation. *Id.* at 374-75. The question the Supreme Court was faced with was: Does that mean that the trip back home (from Utah to Nebraska)—which everyone in the car understood was going to be immediately followed by the two women resuming their work as sex workers for the defendants—is criminal interstate transportation under the Mann Act? *See id.* at 373. The Supreme Court's emphatic answer was "No." *Id.* at 375-77. No, it is not criminal interstate transportation under the Mann Act. *Id.* at 375-76. The fact that criminal sexual activity may occur before, during, or after a trip *does not* entail that that criminal sexual activity was the *purpose* of the trip. *Id.* at 374-75.

Here, it is undisputed that the purpose of the foreign trips on which the individual referenced in Count 4 was included was the evangelical missionary outreach of the church. That is her own statement.  The prosecutors, as officers of the Court, must acknowledge this to the Court. Just as in *Mortensen*, the fact that criminal sexual acts

11

allegedly occurred before, during, or after such a trip, does not convert the trip into a Mann Act crime. Victim-7 was part of Mr. Garcia's missionary entourage for foreign trips for two years. She alleges that he sexually assaulted her (presumably pursuant to the "spiritual coercion" theory) at some point during those trips. Those allegations cannot support Mann Act liability. They do not constitute a federal crime.[4]

### 2.    Count Five's "Flyover" Venue Allegation Also Lacks Merit

Count Five references two flights. Both fail to establish venue. First, Count 5 again references that July 2017 flight, which fails to support venue for the reasons given above.

Second, Count Five refers to a 2015 flight from Portugal to Newark that, the Government claims, "passed over the waters of the Southern District of New York," and that Garcia possessed the above-mentioned images on that flight. That, at least, is an explicit allegation of *something* happening in the Southern District of New York, albeit only a flyover. But even if the Court accepted flyover jurisdiction here (which it should not, as set forth below), this allegation also fails to establish venue for a straightforward reason that is fatal to venue as to both of the flights alleged in Count Five: according to the Indictment itself, the alleged images *did not yet exist* at the time of the June 2015 flight.

---

[4] Count Four does not allege any conduct occurring in the Southern District of New York. But even if the prosecution were to tell the Court that (despite the absence of such an allegation in Count Four in the Indictment) they plan to allege at trial that one of the alleged sexual assaults occurred within the Southern District of New York, that still does not cure the underlying Mann Act deficiency, under *Mortensen*.

12

The images allegedly possessed by Garcia on that June 2015 flight that allegedly passed over the waters of the Southern District of New York are identified in Count Five as images of Minor-Victims 8–13. Indictment ¶ 36. In the next count, Count Six, the Government alleges, for each of those victims, when it contends the images of those victims were created. *Id.* ¶ 37(b). And those dates are all after June 2015. *Id.* The date range is from May 23, 2016, through May 6, 2019.  According to the Indictment itself, the images the Government claims Garcia possessed *did not exist* at the time of the June 2015 flight.

Nor can the Government tell this Court that its specification of the images and dates of creation in Paragraph 37(b) of the Indictment has nothing to do with the "flyover possession" alleged in Paragraph 37(d) of the Indictment. The Government should not be permitted, in short, to respond to this Motion by saying, in sum and substance, "Oh, we didn't mean those images. We meant some other images."  Such a response would contradict the Indictment itself, which specifically alleges that the images allegedly possessed on the "flyover jurisdiction" flight *were* the images of Minor Victims 8, 9, 10, 11, 12 and 13. Indictment ¶ 24(f). Paragraph 24(f) of the Indictment is not ambiguous. It expressly alleges that Garcia and Rangel directed the creation of images of those individuals, and that it was "these photographs and videos" that Garcia allegedly possessed during the "flyover" flight.[5] Indictment ¶ 24(f). And the Indictment specifically

---

[5] Moreover, on June 8, 2026, the prosecution showed the defense the images it claims constitute child pornography, at the DHS offices in Manhattan. The images shown were the ones referenced in the Indictment. There were no others.

tells us when "these photographs and videos" were created. *Id.* ¶ 37(b). It gives us a table and dates. *Id. And those dates are all after June 2015. Id.* According to the Indictment itself, those photos and videos *did not yet exist* at the time of the June 2015 "flyover" flight.

In sum, an allegation of a flight landing at JFK cannot provide venue in the Southern District of New York, even if illegal images were on board; and an allegation of a flight that landed at Newark *two years before any of the alleged illegal images existed* cannot provider venue in the Southern District of New York, even if it flew over SDNY waters. Accordingly, the 2017 and 2015 flight allegations do not provide venue in the Southern District of New York.

Leaving aside the allegation of possession of images that did not yet exist, the "flyover venue" theory should be rejected as constitutionally deficient on its face. "Flyover prosecution is virtually unheard of, for good reason." *United States v. Lozoya¸* 982 F.3d 648, 654 (9th Cir. 2020).

The Second Circuit has also rejected flyover jurisdiction in certain contexts. *See United States v. Brennan*, 183 F.3d 139, 147-48 (2d Cir. 1999).[6]  In *Brennan*, the Government sought to establish venue against a defendant charged with mail fraud by one of the districts in which the mail passed through. 183 F.3d at 144. The Court rejected this basis, finding that the prescribed acts of the relevant statute only encompassed depositing and receiving the fraudulent mail, and not *using* mail. *Id.* at 147.

---

[6] *But cf. United States v. Ramirez-Amaya*, 812 F.2d 813, 816 (2d Cir. 1987) (upholding flyover venue for drug smuggling).

14

3.  **The Boilerplate "In the Southern District of New York and Elsewhere" Language Is Not Sufficient to Support Venue.**

Nothing else in the Indictment can support venue. Nowhere else in the Indictment are any specific acts of any kind alleged to have taken place in the Southern District of New York. The vague and unspecified "in the Southern District of New York and elsewhere" tagline appended to various paragraphs is not sufficient. *See United States v. Long*, 697 F. Supp. 651, 655 (S.D.N.Y. 1988) (holding that the government must allege with enough "specificity [such] that the charged acts support venue in this district"); *United States v. Mapp*, No. 95 CR 1162(FB)(S–1), 1996 WL 506933, at *9 (E.D.N.Y Sept. 3, 1996) (same).

The court in *United States v. Spraggins* reviewed an indictment alleging non-specific boilerplate venue language like the language in the operative Indictment and found it to be insufficient. In that case, the indictment used the line "at Chicago, and . . . in the Northern District of Illinois, Eastern Division, and elsewhere," but did not specify any particular acts that occurred in the district. No. 1:19-CR-00821, 2021 WL 4264418, at *2-3 (N.D. Ill. Sep. 20, 2021). The court found this allegation insufficient because "the phrase 'at Chicago,' standing alone, was not sufficiently detailed and concrete to tie actual proposed facts to the venue of Chicago." *Id.* Additionally, the court held that addressing venue pretrial was proper to safeguard the right that each defendant must "be protected from prosecution in a place far from his home and the support system that is necessary to mount an adequate defense." *Id.* at *3 (internal quotations omitted). Otherwise, the court said, "[the] alternative would be to risk the waste of significant

15

resources, including a jury's time, to try charges in this District that should never have been brought here in the first place." *Id.*

Just so here. Deferring the venue issue to a Rule 29 motion at the close of the Government's case at trial would "risk the waste of significant resources, including a jury's time." As noted, Counts 1-3 recite the phrase "in the Southern District of New York and elsewhere," but never identify, specify, describe, or allege any specific action taken in the Southern District of New York. Indictment ¶¶ 15, 18, 20.

Count Four, as noted, describes an act that occurred *outside* the Southern District of New York. *Id.* ¶¶ 20-21. Counts Five and Six rely on an attempt to create "flyover venue," as discussed above. *Id.* ¶¶ 22, 26-28.  There is nothing in the Indictment that alleges any specific act that any defendant (or anyone else, for that matter) did in the Southern District of New York.[7] *See generally* Indictment. This is not consistent with the constitutional right of vicinage.

Significant judicial resources could be misspent, and significant prejudice to the defendants will ensue, if the Government is permitted to take this case to trial in New York without ever alleging any specific criminal acts that occurred in New York. If this

---

[7] Consider Paragraph 24(d), which accuses Garcia "or his father" of directing "church members" to book travel accommodations for trips "from Los Angeles, California, and Mexico to various destinations within the United States, and around the world, including to Malaysia, the United Kingdom, Spain, Portugal, Poland, South Africa, Australia, and elsewhere, so that the Apostle [note—the Indictment leaves it unspecified as to which Apostle] could abuse the victims whenever he wanted."  There are no dates or even date ranges listed, but the accusation of sexual assault is made against "Naason and his father." Mr. Garcia's father died in 2014.  And there is no specific allegation anywhere in the complaint of any sexual assault in New York, other than the allegation in Count Four of a sexual assault against an adult ("Victim-7"), and as noted, that Count references only a flight that landed at JFK, which is outside the Southern District of New York.

case proceeds to trial, three months of a New York courtroom's time,[8] and New York jurors' time, will be taken up with allegations about people and events that have no connection to New York whatsoever, and this Court and those jurors will be weighing allegations of crimes in a place other than the state and judicial district where those crimes allegedly were committed. Mr. Garcia is constitutionally entitled to a jury drawn from the state and judicial district in which the charged crimes allegedly occurred. U.S. CONST. amend. VI.  And he should be entitled to enforcement of that right *before* being subjected to a three-month trial in a judicial district that has nothing to do with this case. The constitutional vicinage right does not give way to the expansive charging practices.

If the Government actually had any specific allegations of criminal conduct committed in SDNY, it would have put them in the indictment.  It would have alleged specific acts that occurred in New York; it would *not* have inserted a "flyover venue" allegation based on the alleged possession of photos and videos on a flight into Newark that took place *two years before* those photos and videos even existed; it would have been willing to produce the grand jury transcripts; and would have been willing to submit a bill of particulars.

The Government knows that this is a Los Angeles case, not a New York case.  The Government wants to put on a three-month trial without ever having to specify to this Court why we are in New York at all.  Making a California defendant *first* go through a three-month trial about California events, in a New York courtroom, before having the

---

[8] And that is just the Government's estimate for its own case-in-chief.

chance to litigate the constitutional validity of New York venue, is a waste of judicial resources and a jury's time; and it is a violation of a core constitutional right. *United States v. Metter*, 860 F.Supp.2d 205, 207 (E.D.N.Y. 2012).

> **4.    The Indictment Improperly Relies on Non-Elements and Insufficient Allegations to Establish Venue in Contravention of the Constitution and the Essential Conduct Elements Test**

The Constitution's venue protections are echoed in the law. Fed. R. Crim. P. 18 requires the Government to "prosecute an offense in a district where the offense was committed." The Supreme Court has also held that courts must determine the location of an offense's "essential conduct elements." *United States v. Rodriguez-Moreno*, 526 U.S. 275, 281 (1999). Put differently, courts may establish venue only by identifying where the alleged conduct constituting the offense occurred. *Id.* at 279.

For example, the Supreme Court in *Abouammo v. United States* unanimously held that venue for a charge under 18 U.S.C. § 1519 was proper only where a document was falsified. 146 S.Ct. 1571, 1577-78 (2026). The court reasoned that the only proscribed conduct of § 1591, which imposes criminal liability on a person who knowingly falsifies a record or document with the intent to impede or obstruct a federal investigation, is the act of falsifying a document. *Id.* The Government's claimed basis for venue was based on the location of the contemplated effects of the falsification. But because those effects are not elements, "those effects cannot figure in determining where [the defendant's] crime [was] committed." *Id.* at 1578 (internal quotations omitted). The court further explained that "Section 1519 prohibits only one act: that of falsifying a document. Because the Government need show nothing else, a § 1519 offense is relatively easy to prove. But

18

with that ease comes one cost: Because the Government need show nothing else, its venue options are confined." *Id.* at 1579.

That sentence bears special emphasis here: "**But with that ease comes one cost: Because the Government need show nothing else, its venue options are confined**." Here, the Government has chosen to charge a statutory offense, sec. 1962(d), that requires the Government to "show nothing else" other than the formation of the agreement. That is a significant "easing" of the elements. But the Government wants to have its cake and eat it too. This should not be permitted: under *Abouammo*, the Government's cake is frosted with the confinement of its venue options. And that means that it must try this case only where the single prohibited act—the formation of the agreement—occurred. If, as here, no additional overt acts are required to be proven, then the Government cannot base a venue argument on such alleged acts. That, the Supreme Court has just last month instructed us, is the price the Government pays for charging crimes with only a single inchoate element.

Because an agreement to violate RICO is the only the element of an 18 U.S.C. § 1962(d) offense, the alleged offense in Count 1, the Government's reliance on an alleged overt act to establish venue is insufficient. Since the broad and unspecified boilerplate allegation that criminal conduct occurred "in the Southern District of New York and elsewhere" should be held insufficient, venue must be based on a specific allegation that the act the Government needs to prove for conviction occurred in the district. The only specific allegation of an act is the alleged possession of child pornography aboard a flight which passed through Southern District waters. Indictment ¶¶ 32, 36, 37(b), 37(d). But

19

such alleged possession is not an element of section 1962(d)—it is not something that the Government must prove to convict a defendant of that offense. Therefore, it cannot on its own support venue.

As noted, the Supreme Court in *Salinas* held that a RICO conspiracy conviction under 18 U.S.C. § 1962(d) does *not* require an overt act to be proven. 522 U.S. at 63. Prior to *Salinas*, some courts found that an overt act could establish venue for a RICO conspiracy. *E.g.*, *Long*, 697 F.Supp. at 656. After *Salinas*, however, no court has squarely addressed whether venue for a RICO conspiracy may still be established by an overt act.[9] The new decision in *Abouammo* provides strong reasons to believe that it cannot.

Congress has not enacted a statutory venue provision for RICO conspiracy;[10] accordingly, the essential conduct elements test must be applied. *See Abouammo*, 146 S.Ct. at 1577 n.3 (holding that the conducts elements test is appropriately applied to cases where Congress has not prescribed a venue rule to accompany a given offense). Applied here, venue for RICO *cannot* be established by an overt act because it is not an essential element of § 1962(d) under *Salinas*. Allowing an overt act to be the basis for venue would contravene the Supreme Court's decision in *Abouammo*, by allowing the Government to ease its burden of proof by removing the need to prove an overt act at

---

[9] Though the court in *United States v. Royer* used language like "RICO conspiracy," the court reviewed a conviction under § 1962(c) and not under § 1962(d), the actual RICO conspiracy statute. 549 F.3d 886, 896-97 (2d Cir. 2008). Consequently, the court found, venue was proper where the defendant committed a *predicate* act. *Id.* at 897. But the court's reasoning in *Royer* makes sense when acknowledging that their analysis was done under § 1962(c). That reasoning, however, cannot identically apply to a venue analysis under § 1962(d).

[10] 18 U.S.C. § 1965 creates venue rules for civil proceedings only, not criminal proceedings.

trial, but failing to enforce the cost: confined venue options. *Abouammo* teaches, clearly, expressly, and directly, that you can't have the one without the other.  This Court should enforce that teaching here.

Additionally, the alleged possession of child pornography aboard the flight which passed through Southern District waters is similarly insufficient as to Counts 2 and 5 because it is not an element of those charges.[11]  The only elements that need to be proven are an agreement, a knowing and willful joinder, and the commission of an overt act in furtherance of the conspiracy. *United States v. Svoboda*, 347 F.3d 471, 476 (2d Cir. 2003). Simple possession of child pornography is neither an agreement nor a knowing and willful joinder. Nor is it an overt act for any of the alleged conspiracies.

Overt acts are defined as conduct that is "part of the continuous cooperation necessary to keep the conspiracy alive." *United States* v. *Socony-Vacuum Oil Co.*, 310 U.S. 150, 253 (1940) (internal citations omitted). An overt act "cannot succeed the completion of the contemplated crime." *United States v. Ehrgott*, 182 F. 267, 273 (C.C.S.D.N.Y. 1910).

The alleged possession of child pornography created from the contemplated crime of sexually exploiting children or of engaging in sex trafficking cannot be defined as an overt act under *Socony-Vacuum* or *Ehrgott*.  The contemplated crime is, per the Indictment, exploiting minors to create sexual images or videos.  Subsequent possession of such images or videos comes, by definition, after the creation of those images or

---

[11] Count 2 alleges a conspiracy to engage in sex trafficking. *Supra* note 1. Count 5 alleges a conspiracy to sexually exploit children. *Id.*

videos has been completed.  Whatever the policy arguments are regarding the ills of possession, the holdings of *Ehrgott* and *Socony-Vacuum* remain good law: an alleged wrongful act that occurred *after* the completion of an earlier crime is one that "succeeds" the earlier act, and therefore is not part of the earlier completed crime.

Instead, possession of child pornography, then, even if created by the conspiracies, resembles the *effects* of such offenses, like the effects in *Abouammo* held to be invalid to establish venue. It is a byproduct of what those offenses might create. Possession of child pornography is simply a distinct, separate, and subsequent offense. *See Svoboda*, 347 F.3d at 476; *see also United States v. O'Connor*, 650 F.3d 839, 857 (2d Cir. 2011) (affirming a defendant's conviction of sexually exploiting children despite her acquittal of possessing child pornography). Consequently, this possession cannot be used to establish venue for Counts 2 and 5 under *Rodriguez-Moreno*. Thus, the Court should dismiss Counts 2 and 5 on these grounds.

Lastly, Counts 3 and 4 also do not incorporate the flyover event. *See* Indictment ¶¶ 33–34. And possession of child pornography is not an element of either charge. *See United States v. Purcell*, 967 F.3d 159, 192 (2d Cir. 2020); *see also United States v. Kelly*, 128 F.4th 387, 413 (2d Cir. 2025). Accordingly, dismissal of these counts is also appropriate.

For the reasons stated, because the flyover event cannot sufficiently establish venue under Counts 1-5 because it is not an element of any of the alleged offenses, the Court should dismiss these counts.

### B.    The Indictment Violates the Free Exercise Clause

The Indictment violates the Free Exercise Clause under *United States v. Ballard*, 322 U.S. 78, 86 (1944), because it would require the Court or a jury to find that particular religious beliefs are false, fraudulent, or criminally coercive. The Free Exercise Clause provides that "Congress shall make no law . . . prohibiting the free exercise [of religion]." U.S. CONST. amend. I. Religious exercise is among one of the activities "most jealously guarded by the First Amendment." *United States v. Rahman*, 189 F.3d 88, 117 (2d Cir. 1999).  Relevant here is the line of cases beginning with *United States v. Ballard*, and including *Presbyterian Church v. Hull Church*, 393 U.S. 440, 449-51 (1969), which holds that a court cannot make a finding about the truth or falsity of religious beliefs, about whether particular religious beliefs are "deviations" from church doctrine, or about whether promulgation of religious doctrine constitutes fraud.

This Indictment alleges explicitly that particular religious doctrines allegedly held and promulgated by the defendants are fraudulent, are in and of themselves criminally coercive, and are "corruptions" and "manipulations" of "true" LLDM doctrine. Litigation of all of these allegations are prohibited by the First Amendment. Additionally, the Indictment requires an unconstitutional inquiry into religious beliefs, violates the Religious Freedom Restoration Act, and arises from discriminatory motives.

### 1.    The Government's Theory of "Spiritual Coercion" Violates the First Amendment

Courts are prohibited from finding that religious doctrines are false, or that the promulgation of religious doctrines is fraud. This doctrine expressly applies when people

obtain valuable things from other people by promulgating religious doctrines, and those other people claim that the religious doctrines were false and fraudulent. *Ballard*, 322 U.S. at 86. In *Ballard*, the defendants purported to be divine messengers capable of healing those with ailments and diseases. *Id.* at 79-80. They were convicted, *inter alia*, of conspiracy to defraud. *Id.* at 80. In reversing their convictions, the Supreme Court emphasized the following:

> Men may believe what they cannot prove. They may not be put to the proof of their religious doctrines or beliefs. Religious experiences which are as real as life to some may be incomprehensible to others . . . The religious views espoused by respondents might seem incredible, if not preposterous, to most people. But if those doctrines are subject to trial before a jury charged with finding their truth or falsity, then the same can be done with the religious beliefs of any sect. When the triers of fact undertake that task, they enter a forbidden domain.

*Id.* at 86-87.

The Indictment here asks the trier of fact to do what *Ballard* forbids. It alleges that Naason Garcia coerced individuals to sexually gratify him using "the guise of serving the Apostle to receive religious blessings," and that he similarly provided "the promise of religious blessings and eternal salvation" and "the avoidance of eternal damnation." Indictment . The Indictment also alleges that victims "believed that serving the Apostle would lead to religious blessings, whereas questioning, doubting, or disobeying the Apostle was a sin that could lead to eternal damnation." *Id.* at 11. The Indictment then alleges that the existence of these beliefs allowed for sexual activity "by holding out the promise of blessings" or "eternal damnation if they resisted." *Id.*

24

Based on these allegations, the Government has charged Defendants under 18 U.S.C. § 1591, which prohibits sex trafficking by "fraud or coercion." [12] *Id.* at 19-20, 22-24, 26.  The Indictment expressly alleges that the promulgation of these religious doctrines was the means by which Garcia "induced, coerced, or persuaded."  The Government is thus expressly charging that these religious doctrines constitute "fraud or coercion."

"Fraud" means "a knowing misrepresentation of a material fact made to induce another to act to his or her detriment." *United States v. Frey*, 736 F.Supp.3d 128, 138 (E.D.N.Y. 2024) (internal quotations omitted). *Ballard* directly forbids any court from making a finding that promulgation of a religious doctrine is fraud, or is a "misrepresentation of a material fact."

"Coercion" is defined as a follows by section 1591:

The term "coercion" means–
    (a) threats of serious harm to or physical restraint against any person;
    (b) any scheme, plan, or pattern intended to cause a person to believe that failure to perform an act would result in serious harm to or physical restraint against any person; or
    (c) the abuse or threatened abuse of law or the legal process. . .
    The term "serious harm" means any harm, whether physical or nonphysical, including psychological, financial, or reputational harm, that is sufficiently serious, under all the surrounding circumstances, to compel a reasonable person of the same background and in the same circumstances to perform or to continue performing commercial sexual activity in order to avoid incurring that harm.

---

[12] The Indictment does not allege any instance of the use of physical coercion or force, other than a single vague, unspecified, boilerplate use of the word.  There is no allegation anywhere in the Indictment—which is long and detailed, and which the lead prosecutor described as a "speaking indictment," of any use or threat of force by any of the defendants against anyone.

§ 1591(e)(2); § 1591(e)(5).

"Fraud" and "coercion" are the only two options. And the Indictment (and the affidavit to which the Government directed the defense in response to the defense's request for particularity) *explicitly states* that the church's religious teachings about Heavan and Hell were *both* the proximate cause of alleged victims' acquiescence to Garcia's advances, *and* were intentionally promulgated with that purpose in mind. (This is particularly apparent, inter alia, with respect to the individual identified in the Indictment in Count 4 as "Victim 7.")

Accordingly, because *Ballard* squarely prohibits a court from making a finding that promulgation of a religious doctrine is fraud, this Indictment, in order to state a cognizable claim, must be alleging (and a jury would have to find) that LLDM's religious teachings about salvation and damnation are criminally actionable coercion.  The Indictment must, definitionally, thus be alleging that the church's religious teachings about Heaven and Hell are "threats of serious harm or physical restraint." How can a court make such a finding? Such a finding would presumably require the Court to find that Heaven and Hell are factually real, and La Luz Del Mundo's teachings about them are factually true—something this Court cannot constitutionally do.

There is no middle ground here, and no doctrinal or conceptual needle to thread. If Heaven and Hell are, say, metaphorical allusions to good and bad or right and wrong; or if they are literary and artistic devices; or if they are recrudescent superstitions from a time when humans did not know what caused thunder—if, in short, Hell is *anything other than* a physically real, actually existing place where people are literally subjected to

26

physical tortures, then the threat of "eternal damnation" is not a legally cognizable threat sufficient to support the "coercion" element of section 1591.

There is no legal authority of any sort that holds coercion mentions *spiritual* or *religious* harm. No statute defines coercion as including salvation or damnation. No case has ever held that implicit promises of salvation or implicit threats of damnation constitute coercion. No case has ever come remotely close to such a holding.

There are good reasons why our law does not recognize "spiritual coercion," and they are the same reasons our law prohibits finding that religious promises of salvation are fraudulent. If it were otherwise, then every dollar dropped in the collection plate, ever check sent to a televangelist, every monthly tithe, would be coerced. Engaging in actions because one thinks it will help one reach Heaven or avoid Hell is the core and defining act of every single religion that has doctrines about Heaven and Hell. And for those that don't, we could substitute reincarnation, or enlightenment. People who belong to religions give money, donate time, and labor, and engage in *all manner* of conduct they would not otherwise contemplate, because their religions promulgate doctrines about what sorts of conduct leads to salvation, or damnation (or reincarnation, or enlightenment). There simply would be no First Amendment if prosecutors could file charges alleging that the doctrines of a church constitute fraud or coercion.

Here, promulgation of religious doctrines is the centerpiece of the Indictment. Without the allegations about promulgation of religious doctrines, there is nothing left to support the allegations of coercion and fraud. There is literally no act specifically described or alleged in the Indictment as a means of "inducing or coercing" sex *other*

27

*than* promulgation of religious doctrines.[13]  The alleged promises of religious blessings or salvation, and the implied threat of eternal damnation are, per the Indictment, the means by which individuals were persuaded to engage in sex with Garcia.  *See* Indictment  11, 18-20. And the Indictment says that for the past 100 years, the Church leadership has "conspired" to promulgate such doctrines—creating a worldwide Christian denomination with 5 million members, filling churches every week, providing meaning to millions of families—all of it, according to the Government, so that one man, and then his son and his grandson, could have ample sexual partners.

This Court should ask itself a simple question: Suppose a group of teenagers accompanies a Catholic priest on a pilgrimage to Lourdes cathedral, where—the Church explicitly teaches—they can obtain spiritual benefits including the intercession of saints on their behalf—and on that trip the priest makes sexual advances toward a teenager. The teenager acquiesces because the Catholic religion teaches that priests are God's representatives on earth, the custodians of God's church and the interpreter's of God's word.  Is the Catholic Church now subject to being called a sex-trafficking RICO conspiracy by the USAO?  Is the leadership of the church subject to indictment for promulgating the doctrines that led the teenager to acquiesce to the priest's advances?

---

[13] See, e.g., Count 1, at 15; Count 2, at 19; Count 3, at 20. The Indictment momentarily alleges the use of physical force but alleges no victim or approximate time or place; is unsupported, makes it impossible to ascertain the nature of the accusation involved, and is buried under allegations of spiritual fraud and coercion. Indictment ¶ 24(c).

We don't need to search far for the answer. This scenario has been documented and litigated in dozens of cases involving the Catholic Church.  No prosecutor has, or ever would, bring an indictment making allegations against that church of the sort the Government has brought here against this church.

In this case, to convict these defendants on the trafficking and conspiracy charges, a jury would have to find either that (a) religious doctrines about salvation and damnation are factually false misrepresentations; or (b) that the fear of damnation constitutes cognizable "sufficiently serious" harm under section 1591.  Whether damnation is a "sufficiently serious" harm simply cannot be answered without a predicate finding that Hell is *real*, and stories about Hell are *true*.[14]  But this is a finding that a court and a jury are absolutely forbidden from making, under *Ballard*.

Because the sex-trafficking and conspiracy counts rest entirely on "spiritual coercion" through promulgation of religious doctrine, the indictment rests on a "legally invalid theory," *Bank of Nova Scotia v. United States*, 487 U.S. 250, 255-56 (1988), and dismissal is warranted.

---

[14] Nor can the Government argue that it doesn't matter whether stories about Hell are true, so long as members of the religion believed them.  Not so. The coercion element requires a jury finding of "sufficiently serious harm," which is an objective standard, as the statute itself emphasizes by using a "reasonable person" test.  So the jury would have to make a finding as to whether a reasonable person would believe that Hell is a real place.  There is no possible interpretation of the First Amendment that would permit such an inquiry.

29

### 2. Naason Garcia's Protections Under The Religious Freedom Restoration Act are Infringed Because the Government Substantially Burdened His Religious Exercise

A legislative fortress additionally guards the freedom of religious exercise. In response to the Supreme Court's decision in *Employment Division, Department of Human Resources of Oregon v. Smith,* 494 U.S. 872 (1990), holding that neutral, generally applicable laws that incidentally burden the exercise of religion usually do not violate the Free Exercise Clause of the First Amendment, Congress enacted the Religious Freedom Restoration Act (RFRA). *Holt v. Hobbs*, 574 U.S. 352, 356-57 (2015). The RFRA provides greater protection for religious exercise than was available under the First Amendment. *Id.* at 357. It prohibits the Government, except in immensely restrictive circumstances, from "substantially burden[ing] a person's exercise of religion." 42 U.S.C. § 2000bb-1(a)-(b), *invalidated as applied to states by City of Boerne v. Flores*, 521 U.S. 507 (1997).[15]

Defendants need only prove two elements to establish a prima facie RFRA violation: (1) that they were engaged in religious exercise that (2) the Government substantially burdened. § 2000bb-1(a). Both elements are met here.

*First*, Naason Garcia has engaged and continues to engage in religious exercise through the LLDM Church. Courts may not inquire into a belief's appropriateness or truth, however unusual or unfamiliar it may be. *Jolly v. Coughlin*, 76 F.3d 468, 476 (2d

---

[15] Congress then enacted the Religious Land Use and Institutionalized Persons Act of 2000 (RLUIPA) after the Supreme Court in *Flores* invalidated the RFRA as it applied to states. *Holt*, 574 U.S. at 357. The RLUIPA reinstated religious protections for land-use regulation and religious exercise by institutionalized persons. 42 U.S.C. § 2000cc; § 2000cc–1.

Cir. 1996). Instead, "scrutiny extends only to whether a claimant [(a)] sincerely holds a particular belief and [(b)] whether the belief is religious in nature." *Id.* Sincerity is satisfied simply by an adherent's subjective good faith in the expression of his beliefs. *Patrick v. LaFevre*, 745 F.2d 153, 157 (2d Cir. 1984); *see Dobkin v. District of Columbia*, 194 A.2d 657, 659 (D.C. 1963) (member of Jewish faith who works on Saturdays cannot claim a free exercise violation by being compelled to appear in court on the Sabbath). And when an adherent simply perceives his beliefs as religious in nature, the religious nature prong is met. *Patrick*, 745 F.2d at 158; *see Ford v. McGinnis*, 352 F.3d 582, 590-91 (2d Cir. 2003) (finding that the religious nature of an RFRA claimant's beliefs was not discounted because of contrary opinions from religious officials).

Here, Naason Garcia holds multiple sincere, religious-in-nature beliefs, including that he is the acting Apostle, serving as a spiritual guide and teacher of the LLDM Church faith and the intermediary between his God and humanity; he has the ability to promise religious blessings. And he helps to teach and promulgate those and related doctrines.

Here, *expressly because of* those beliefs and his teaching of them, alleged actions of his that would not otherwise be federal crimes (paradigmatically including alleged sexual contact with adults who acquiesced to his advances in whole or in part because of his promulgation of those religious beliefs) have *become* federal crimes, in this Indictment. His promulgation of general religious beliefs about God and salvation is expressly alleged as part of the actus reus of the charged offenses, and as the core underlying act supporting RICO liability. That is a substantial burden on free exercise in violation of RFRA.

31

Th Indictment castigates the LLDM Church for its practices and teachings. Calling the RICO conspiracy the "Joaquin Enterprise" rather than "the leadership of the LLDM Church" is just a fig leaf.  The Government asserts as criminally predicate conduct teachings and doctrines shared by many religions, e.g., alleged ostracization of those who leave the church, or the custom of 10% tithing. Indictment Pars. 2-7(h). Contending in an Indictment that a church's core doctrines and practices are crimes is the very essence of putting Government "pressure" on the exercise of religious freedom of that church's adherents.

### 3. Naason Garcia's Equal Protection Rights Are Violated Because The Government Has Selectively Prosecuted Him and His Religion

The Government may not selectively decide to prosecute "based on 'an unjustifiable standard such as race, religion, or other arbitrary classification.'" *United States v. Armstrong*, 517 U.S. 456, 464 (1996) (quoting *Oyler v. Boles,* 368 U.S. 448, 456 (1962)). "A selective-prosecution claim is not a defense on the merits to the criminal charge itself, but an independent assertion that the prosecutor has brought the charge for reasons forbidden by the Constitution." *Id.* at 463.

To demonstrate selective prosecution, a defendant need only show that a prosecution "had a discriminatory effect and that it was motivated by a discriminatory purpose." *Id.* at 465. Both prongs are met by direct admission from government officials of discriminatory purpose. *Id.* at 469 n.3 (citing Brief for United States). Alternatively, a defendant will prevail if he shows that persons similarly situated were not prosecuted and

32

that the decision to prosecute was invidious or in bad faith. *United States v. Fares*, 978 F.2d 52, 59 (2d Cir. 1992). Both avenues are satisfied here.

First, immediately following Mr. Garcia's first arrest in California, the presiding Attorney General, Xavier Becerra, held a press conference at which he publicly and vitriolically denounced the LLDM Church. He called the church a cult that was engaged in an elaborate international sex trafficking ring. NOTICIAS TELEMUNDO, *EN VIVO: Conferencia de Prensa Sobre la Detención del Líder de la Iglesia La Luz del Mundo* (YouTube, June 6, 2019), https://www.youtube.com/watch?v=FGUvCe5DndI. Becerra said that Mr. Garcia—who is the spiritual leader of a church with 5 million members in 150 countries—was "not a religious leader" and was "sick and demented." *Id.*

Mr. Becerra's comments serve as a direct admission of discriminatory intent because they evidence disdain for Naason Garcia and LLDM and a desire to "cure" what he believes to be a disease. And these were not casual off-the-cuff comments overheard at a restaurant.  This was the prepared statement of the Attorney General of California, announcing the California prosecution of which this case is a direct outgrowth.

The factual allegations, investigation, discovery materials, and witnesses in this case are virtually identical to those in that original California case.  Thus Mr. Becerra's comments should be considered when evaluating the origins and motivations of this prosecution. There is no LLDM Church in the Southern District of New York.  As set forht above, the Indictment covers 100 years of conduct over three generations of church leaders—none of whom worked, lived, or did anything in New York other than allegedly fly over the harbor en route to a landing in Newark, or land at JFK on a return flight from

33

Johannesburg.  This is not a locally originated and investigated case.  It is a case that was picked up, fully formed, from a California elected official who announced to the world his personal animosity toward this church the day the case was filed.

Even if Mr. Becerra's open contempt for LLDM and Mr. Garcia is not imputed to the prosecutors of SDNY, it remains true that similarly situated institutions, paradigmatically the Catholic Church, and their leaders, have never been were not prosecuted as the LLDM leadership is being prosecuted here.  An estimated 1700 priests and clergy that "the Roman Catholic Church considers credibly accused of child sexual abuse" remain unprosecuted. Claudia Lauer & Meghan Hoyer, *Almost 1,700 priests and Clergy Accused of Sex Abuse are Unsupervised*, NBC NEWS: RELIGION (Oct. 4, 2019, at 9:03 PDT), https://www.nbcnews.com/ news/religion/nearly-1-700-priests-clergy-accused-sex-abuse-are-unsupervised-n1062396 [https://perma.cc/L8ND-B27C].  And as First Amendment scholars have detailed, many other religions, including the Southern Baptist Convention, Jehovah's Witnesses, Ultra-Orthodox Judaism, and the Church of Jesus Christ of Latter-Day Saints, have been credibly alleged in numerous cases to have encouraged, tolerated, or abetted child sex abuse within their institutions. Yet none of them, nor their leadership, have ever been named in RICO indictments.[16]

---

[16] *See generally* Marci A. Hamilton, *Religious Practices that Have Contributed to a Culture of Secrecy Regarding Child Sex Abuse in Five Religious Organizations*, ChildUSA: The National Think Tank for Child Protection, https://www.abuseincare.org.nz/__data/assets/pdf_file /0027/28674/hamilton-m-religious-practices-that-have-contributed-to-a-culture-of-secrecy-regarding-child-sex-abuse-in-five-religious-organizations-child-usa-the-national-think-tank-for-child-protection-2020.pdf (last visited June 16, 2026).

**C.    The Indictment is Impermissibly Duplicitous Because It Combines Multiple Conspiracies Into One Count and Significantly Prejudices Naason Garcia.**

To be legally sufficient, an indictment must contain "a plain, concise, and definite written statement of the essential facts constituting the offense charged[.]" Fed. R. Crim. P. 7(c)(1). It is imperative that the indictment states the approximate time and place of the alleged crime. *United States v. Vilar*, 729 F.3d 62, 80 (2d Cir. 2013). Under Fed. R. Crim. P. 12(b)(3)(B)(i), a court may hear a motion to dismiss alleging a defect in the indictment for joining two or more offenses in the same count (i.e., duplicity).

An indictment is impermissibly duplicitous if it (1) combines two or more distinct crimes into one count in contravention of Fed. R. Crim. P. 8(a), and this combination (2) prejudices the defendant. *United States v. Sturdivant*, 244 F.3d 71, 75 (2d Cir. 2001). An impermissibly duplicitous indictment is subject to dismissal. *United States v. Rigas*, 605 F.3d 194, 210 (3d Cir. 2010); *see Sturdivant*, 244 F.3d at 79. Here, because both prongs are satisfied, the Indictment must be dismissed.

**1.    The Racketeering Conspiracy Count Combines Multiple Conspiracies into One Charge Because It Alleges a Superfluous Timeframe and Combines Purposes from Other Alleged Enterprises into Naason Garcia's Alleged Enterprise**

18 U.S.C. § 1962(d) provides that "[i]t shall be unlawful for any person to conspire to violate any of the [substantive RICO] provisions. . . ." The Supreme Court has held that because Congress used "to conspire," a phrase of well-settled federal criminal law, § 1962(d) inherits established principles of federal conspiracy law. *Salinas v. United States*, 522 U.S. 52, 63 (1997). One important principle is that the crux of a conspiracy is the specific agreement. *United States v. McDermott*, 245 F.3d 133, 137 (2d

35

Cir. 2001) (holding that no liability for conspiracy will exist beyond the "concerted purpose or agreement as [the defendant] understands it; . . . his liability is limited to the common purposes while he remains in it," (internal quotations omitted); *see United States v. Borelli*¸ 336 F.2d 376 (2d Cir. 1964) (holding that instructions to find particular agreements between defendants was necessary because they did not participate in every phase of a narcotics conspiracy).

Another related principle of federal conspiracy law is that two separate conspiracies exist as a matter of law when the Government fails to establish a common agreement or purpose between defendants. *Kotteakos v. United States*, 328 U.S. 750, 753-755 768 (1946) (finding multiple conspiracies because the defendants had different agreements as to their fraud offenses with no single enterprise); *see also Blumenthal v. United States*, 332 U.S. 539, 559 (1947) (finding one conspiracy because the defendants all had the same objective of selling whiskey above a regulatory ceiling).

Courts regularly find one single conspiracy when a single person oversaw the conspiracy. *United States v. Moten,* 564 F.2d 620, 625 (2d Cir. 1977), *cert. denied,* 434 U.S. 942 (1977) (refusing to separate conspiracies because the activity of a kingpin was "central to the involvement of all"), or when there was mutual dependence and assistance between operations. *United States v. Tramunti*, 513 F.2d 1087, 1106-07 (2d Cir. 1975) (finding one drug conspiracy despite "two spheres of operation" because the defendants counted money together, were linked by a common distributor, and knew intimate details of each other's operations, *inter alia*).

36

Separate conspiracies charged in one count render an indictment duplicitous. *See Sturdivant*, 244 F.3d at 74 (indictment was duplicitous because two separate transactions lacking any link were alleged in the same count); *see also United States v. Kandic*, 134 F.4th 92, 100 (2d Cir. 2025) (indictment was duplicitous because two conspiracies alleged in same count).

Here, because the Racketeering Conspiracy charge (Count 1) facially asserts *separate* conspiracies allegedly centered on, successively, Aaron, Samuel, and Naason Garcia, the first prong of an impermissibly duplicitous indictment is satisfied. The Indictment alleges a conspiracy focused on each successive Apostle during separate periods. Indictment ¶¶ 8–14.  For example, the Indictment alleges that "from the LLDM Church's founding in 1926 through his death in 1964, Aaron sexually abused girls and women," that Samuel engaged in sexual abuse "during his time as Apostle between 1964 and 2014," and that Naason Garcia engaged in sexual abuse "during his time as Apostle, which began in or about 2014." Indictment ¶ 9. These alleged acts are facially sequential, starting and stopping in the listed time frames.

Other than allegedly using the LLDM Church as a vehicle to perpetrate abuse, Indictment ¶ 8, there is no connection between Aaron, Samuel, and Naason Garcia to establish a single conspiracy. Unlike *Moten*, where there was a single leader, or *Traumunti*, where mutual dependence and assistance existed between two operations, here there are three separate alleged leaders, and the conspiracies are separated by time—indeed by decades.  Naason Garcia was not the Apostle while his predecessors operated their alleged conspiracies—indeed, for much of that time he was not even alive. Nor did

37

he rely on their alleged prior conspiracies or operations, because of the sequential nature of the alleged conspiraces: one started when the previous one ended.  And the allegation that co-defendants Eva Garcia is a "bridge" between her husband, Samuel, and her son, Naason, is not sufficient to join the two into one single conspiracy, because according to the Indictment itself, the two conspiracies served different purposes, thereby separating these conspiracies under *Kotteakos*: one conspiracy was to serve Samuel, and then the next conspiracy was to serve Naason.  Because the Indictment incorporates these separate conspiracies into one Count, it is impermissibly duplicitous.

*First*, the alleged time of the offense improperly groups Naason Garcia for conduct which he could not possibly be a part of.  Only after 14 pages of narrative going back to 1926 does the Government finally attempt to allege the RICO conspiracy, and at its forefront is Naason Garcia. Indictment ¶ 25. The fatal flaw, however, is that the Government alleges that this conspiracy began on October 15, 1970, the day RICO became law. *Id.*; U.S. Dep't of Justice, Justice Manual § 9-110.100.  On that date, Naason Garcia was 15 months old.  Unless the Government plans to tell this Court that Mr. Garcia was a RICO conspirator as a toddler, then it cannot be disputed that Count 1 is alleging the existence of a conspiracy that Naason Garcia was not a part of, and that had a different purpose (serving Samuel) from that of the conspiracy alleged to have existed from 2014 on, after he became the Apostle (serving Naason).

The Indictment thus fails to adequately specify the approximate time of the alleged crime as required under the *Vilar* court's interpretation of Fed. R. Crim. P. 7(c)(1).  Though the older co-defendants may have agreed to violate a substantive RICO provision

38

beginning in 1970, Naason Garcia simply cannot be grouped with them. If this were only one conspiracy, then Naason Garcia apparently began conspiring to violate RICO before he could even utter a sentence. Nevertheless, the Indictment attempts to corral Samuel's conspiracy with Naason Garcia's alleged conspiracy in a single count. The result of this improper grouping is that multiple offenses, including those *unattributable to Naason*, are being included in one count against him.  That is the definition of a duplicitous Indictment.

Second, by its pure language, the Indictment alleges separate conspiracies because the purposes alleged lack a common purpose and instead cluster other purposes which implicate offenses allegedly committed by Aaron and Samuel's purported conspiracies. The Indictment enumerates the Joaquin LLDM enterprise's alleged purposes, with the first being "[s]exually gratifying each of Aaron, Samuel, and NAASON. . . when each served as Apostle and leader of s [sic] the [Enterprise.]" Indictment ¶ 23(a). The government's alleged purpose of sexually gratifying each Apostle separately, individually, and at different times cannot establish a single conspiracy.

The purpose of any purported conspiracy was necessarily different when each Apostle assumed his respective position. Indeed, it is impossible for Naason Garcia to have made a specific agreement to sexually gratify Aaron. Aaron died five years before Naason Garcia was born (and RICO had not yet been enacted). Indictment ¶ 3. Similarly, if a common purpose was to sexually gratify Samuel during his tenure, that purpose was abandoned when he died. But per the Indictment, a new purpose, and thus a new conspiracy, was created when Naason Gacia became the Apostle.

39

The Indictment seeks to impose liability beyond the only possible common purpose that existed while Naason Garcia was the Apostle. This directly contravenes *McDermott* and *Borelli*, in which the court emphasized that liability is limited to the common purposes as the defendant understands them. Contrastingly, the situation is like *Kotteakos*, where multiple conspiracies existed because the defendants had conspired to commit different offenses. Here, again, per the Indictment, Naason Garcia necessarily had to conspire to a *different* offense with a different purpose when he was the Apostle, as compared to when his father was the Apostle.

Thus, because the courts in *Sturdivant* and *Kandic* held that multiple conspiracies alleged in one count satisfy the first prong of an impermissibly duplicitous indictment, the multiple conspiracies and enterprises alleged here satisfy the first prong.

> **2.    The Duplicitous Indictment Prejudices Naason Garcia Because It Muddles Any Verdict, Creates a Double Jeopardy Problem, and Inadequately Provides Notice of The Charges Against Him**

A duplicitous indictment will be prejudicial if any of three conditions is satisfied. First, prejudice will be found if the defendant would be deprived of his right to a unanimous verdict, because a guilty verdict would not reveal whether the jury found a defendant guilty of only one crime and not the other, or guilty of both. *Kandic*, 134 F.4th at 99-100. Second, prejudice will be found if a double jeopardy issue would arise from a potential verdict. *See id.* at 75 (finding no double jeopardy problem because the Government conceded that the duplicitous count provided "a broad double jeopardy bar" covering all crimes resulting from the defendant's alleged conspiracy).

In *Sturdivant*, the court found prejudice because one count involving two criminal transactions, which happened at different times, created uncertainty as to whether the jury's guilty verdict concealed a finding of guilty as to one crime and a finding of not guilty as to the other. 244 F.3d at 78.

Third, prejudice is created when the duplicitous indictment impedes the defendant's right to notice of the charge against him because the Indictment does not supply a plain, concise, and definite written statement of the essential facts constituting the offense charged, thereby preventing the defendant from being able to prepare a defense. *Kandic*, 134 F.4th at 100. In *Kandic*, the court found that as a general matter, a "novel, omnibus conspiracy count that did not specify the set of possible [offenses]" impaired the defendant's ability to adequately prepare a defense. *Id.* at 101. The court did not find prejudice because the defense had not raised the issue or requested a bill of particulars, *inter alia*. *Id.* at 102. Here, the defendants have done both of these things.

Here, all three conditions of possible prejudice are satisfied. *First*, as the Indictment stands, it would be impossible to determine whether a jury verdict was based on a conspiracy centered on and directed toward Naason Garcia, or based on a conspiracy centered on and directed toward Samuel (or Aaron, for that matter), conspiracies distinct from each other as previously established. Indeed, the Government's incorporation of the LLDM Church's history, Indictment ¶¶ 2–7(h), Samuel's alleged offenses (alleged against a man who has been dead for 12 years),[17] *id.* at 4, and periodic references to the

---

[17] There is also a serious Due Process issue created by the fact that the Indictment alleges actions by Samuel that would be held against Naason, per the Indictment. But Samuel is dead,

41

enterprise serving each Apostle, *id.* at 9-11, 13-14, would significantly distort the jury's finding as to the ends of the enterprise. A verdict, guilty or not, would not provide the answer. Like in *Sturdivant*, where there was uncertainty with the jury's guilty verdict because of the duplicitous count, the RICO Conspiracy count here creates uncertainty as to what offense Naason Garcia would be held liable for. This likelihood of uncertainty severely prejudices the defense and would create substantial difficulty for post-trial motions and appellate review.

*Second*, a double jeopardy problem, prejudicial to Naason Garcia, is created here because after a verdict is issued, the Government may try to pursue charges against Garcia for conspiring to violate RICO in relation to Samuel's conspiracy. Because of the duplicitous Indictment, Naason Garcia faces the risk of being tried for participating in a conspiracy belonging to Samuel and later being subject to charges for the same alleged participation. Unlike *Sturdivant* and *Kandic*, where no double jeopardy problem was created because of the Government's own actions (e.g., conceding that there was a double jeopardy bar, using a general verdict), the Government here has made no such assurance. Though the Government may make such a proffer later in the case, no such indication has been given. Even if the Government does, prejudice still exists from verdict uncertainty and lack of notice.

---

and cannot be called as a witness. The Government is explicitly attempting to convict *Naason* Garcia based on the alleged actions of *Samuel* Garcia, who is dead. That prejudices Naason's right to a fair trial.

*Third*, the Government's duplicitous RICO Conspiracy charge impedes Naason Garcia's right to notice of the charge against him because it lacks a plain, concise, and definite written statement of the essential facts constituting the offense charged, thereby preventing him from being able to prepare a defense. As currently framed, the superfluous century-long temporal range and the disparate purposes charged create enormous difficulty in formulating a defense. Evaluating the extent of potential conduct that could be raised at trial will be impossible without knowing the precise timing. And determining which predicate acts might be alleged against Naason Garcia would similarly be impossible without knowing the metes and bounds of his alleged enterprise.

Indeed, it is likely that there will be prejudicial surprises at trial. For example, the Government may, at trial, allege some conduct that occurred during Samuel's alleged conspiracy but attribute it to Naason Garcia's alleged conspiracy. Because the Indictment fails to sufficiently specify the extent of the enterprise, prejudicial surprise may occur and result in unnecessary continuances. Additionally, unlike the defense in *Kandic*, the defense here is concurrently requesting a bill of particulars from the Government.

For those reasons, Naason Garcia is subject to significant prejudice. The duplicitous Indictment would shroud the jury's verdict in uncertainty, create a significant double jeopardy problem, and impede Naason Garcia's ability to prepare a defense. Consequently, because the Indictment charges multiple conspiracies in one RICO Conspiracy Count that prejudices Naason Garcia, the Court should dismiss the Indictment.

## II.    IN THE ALTERNATIVE, THE COURT SHOULD DIRECT THE GOVERNMENT TO FILE A BILL OF PARTICULARS SPECIFYING AMBIGUITIES IN THE INDICTMENT

No principle of procedural due process is more established than an accused's right to receive notice of the specific charges against him. *Cole v. State of Ark.*, 333 U.S. 196, 201 (1948). "In all criminal prosecutions, the accused shall enjoy the right . . . to be informed of the nature and cause of the accusation . . . ." U.S. CONST. amend. VI. An indictment must be specific enough to permit a defendant "to identify with sufficient particularity the nature of the charge pending against him, thereby enabling [the] defendant to prepare for trial, to prevent surprise, and to interpose a plea of double jeopardy should he be prosecuted a second time for the same offense." *United States v. Bortnovsky*, 820 F.2d 572, 575 (2d Cir. 1987) (per curiam). When an indictment fails to provide notice to the defendant of the specific acts of which he is accused of, a request for a bill of particulars will be granted pursuant to Fed. R. Crim. P. (7)(f). *United States v. Chen*, 378 F.3d 151, 163 (2d Cir. 2004).

"The relevant inquiry when evaluating a defense request is not what the defendant knows but what the [G]overnment intends to prove." Charles A. Wright & Arthur R. Miller, *Federal Practice & Procedure* § 130 (5th ed.). The Government cannot say: 'The defendant knows what he did, and has all the information necessary.' Since the defendant is presumed to be innocent and may in fact be innocent of the charge, he also should be presumed ignorant of the facts on which the charges are based." *Id.*

The Indictment here charges Naason Garcia with six counts.  Each lacks the specificity required to allow him to adequately prepare for trial, minimize surprise, or

44

defend against double jeopardy. Consequently, Naason Garcia requests that the Court direct the Government to file a bill of particulars to specify its basis for venue in the Southern District of New York; what alleged conduct constituted force, fraud, and coercion; the alleged commercial sex activities that occurred because of force, fraud, and coercion; and what the actual LLDM doctrines are, how they have been taught, and how they were "corrupted."

A.    **The Government's Production of Over 3 Million Pages and Over 20 Terabytes of Digital Content is Not an Adequate Substitute for a Bill of Particulars**

No matter how tall the mountain of discovery, the Government is not relieved from its obligation to particularize an indictment. *Bortnovsky*, 820 F.2d at 575. Similarly, material produced pursuant to the Jencks Act, which requires prosecutors to produce statements made by a government witness, will not be a categorical substitute for a bill of particulars, even when produced before the witness's testimony. *United States v. Davidoff*, 845 F.2d 1151, 1155 (2d Cir. 1988) (holding that the Government cannot rely on producing Jencks Act materials or 6,000 pages of material as an adequate substitute for a straightforward identification of offenses that the prosecution intends to prove).

In *Bortnovsky*, an indictment charged the defendants with a RICO conspiracy and mail fraud for falsifying burglary insurance claims. 820 F.2d at 573-74. It did not specify the dates of the falsified burglaries or identify which documents were falsified. *Id.* at 574. Instead, the Government produced 4,000 documents. *Id.* The court determined that "[t]he Government did not fulfill its obligation [to advise the defendant of the specific acts of which he is accused] merely by providing mountains of documents to defense counsel

45

who were left unguided as to which documents would be proven falsified and instead impermissibly shifted the burden of proof by forcing them to rummage through the 4,000 documents." *Id.* at 575. Consequently, the court reversed the defendants' convictions. *Id.*

Here, the Government's discovery production has been far more voluminous than the production in *Davidoff* or in *Bortnovsky*. At the time of filing this motion, the Government has produced over 3 million documents ranging from financial reports, institutional records, electronic device metadata, police reports, digital media, subpoenas, etc., totaling over 20 terabytes of digital content. This colossal amount of information cannot suffice the notice requirement under the Sixth Amendment because this mere deposit shifts the burden of proof, forcing the defense to rummage through 750 times the number of documents from *Bortnovsky*.

Though some documents may be duplicative or immaterial, this ocean of documents still demands navigation as part of trial preparation. The Indictment, constitutionally, should be a chart outlining the coastlines. But here it is not. Garcia has been given no guidance.  "There be dragons" is all he can glean from the Indictment. He remains unaware of the specific acts of which he is accused. Thus, a bill of particulars is warranted, and the Government's voluminous discovery production cannot substitute for particularizing the Indictment.

### B. The Government Must Specify the Basis for Venue in The Southern District of New York as to All Counts

When the Government makes conflicting statements as to venue, "a bill of particulars stating, and clarifying, the facts that the government [will use] to establish

venue at trial is warranted even at [the] early stage." *United States v. Mackey*, 21-CR-80 (NGG), 2022 WL 2093012, at *3 (E.D.N.Y. May 13, 2022). And when the Government relies on a non-element to establish venue, an appropriate vehicle to correct this inadequacy is a bill of particulars. *United States v. Wilson*, No. 01 CR. 53(DLC), 2001 WL 798018, at *6–8 (S.D.N.Y. July 13, 2001) (directing the Government to file a bill of particulars because in establishing venue for a charge of falsifying records, the Government's grounds for venue were the *effects* of falsified records).

Here, because the Government has relied on conflicting statements and non-elements as its basis for venue in the Southern District of New York. Under *Mackey* and *Wilson*, a bill of particulars is warranted. *First*, to establish venue, the Government relies on sexually explicit photographs that were allegedly on Naason Garcia's devices as he passed through the Southern District of New York in 2015, yet simultaneously alleges that these very images were created *after* that flight. Indictment ¶¶ 36, 37(b), 37(d).

The Indictment expressly lists approximate dates for each alleged occurrence of image or video creation, with the earliest being May 23, 2016. *Id.* This allegation is in direct contradiction to the Indictment's allegation that Mr. Garcia possessed those same images and videos in June *2015*, on a flight from Portugal to Newark, New Jersey. *Id.* ¶¶ 36, 37(d). This allegation is incorporated into Counts 2, 5, and 6. *Id.* ¶¶ 32, 36, 37(b), 37(d). Accordingly, the Government must specify another event that could establish venue in the Southern District of New York.

And a flight in July 2017 from South Africa to New York, New York, is alleged, but such an international flight could only land at John F. Kennedy International Airport

47

in Queens, New York, a borough that is not part of the Southern District of New York. As noted above, this flight cannot support venue.

Without such specification, the defense is left unaware of what other events may have occurred in the Southern District of New York. There is no other assertion of any with particularity. It follows that the Indictment fails to inform Naason Garcia of the nature and cause of the accusation against him, thereby failing to provide him adequate notice. As the Indictment stands, there is no possible way to ascertain whether *any* alleged act was committed in the instant district. The same problems raised in *Bortnovsky* exist here then because without this specificity, the defense cannot adequately prepare for trial and is at risk of surprise at trial. This, in turn, requires a bill of particulars under *Chen*.

While the Government has made general assertions that some criminal conduct occurred in the Southern District of New York, the appropriate inquiry should be whether the Government has stated the facts they will use to establish venue at trial. The Government here has not. Vague allegations that some criminal conduct occurred in the Southern District of New York are littered throughout the Indictment. *E.g.*, Indictment ¶¶ 25, 30, 33–35. Yet other than the flyover event, which is already inadequate, no factual allegation is made as to how venue is established. Without resolving venue now, the Court would run the risk of empaneling a jury and waiting for the prosecution's entire three-month case (the Government's estimate) is concluded, before entertaining a venue motion. If venue is missing—as it is—then there is no need for a three month trial in New York.

48

Thus, because the Government relies on conflicting statements, non-elements, and broad allegations that risk wasting judicial resources to establish venue, the Court, pursuant to Fed. R. Crim. P. 7(f), should direct the Government to file a bill of particulars stating, and clarifying, the facts that the government will use at trial to establish venue in the Southern District of New York.

### C.    The Government Must Specify What Conduct Constituted Force, Fraud, and Coercion

A bill of particulars is an appropriate remedy when an indictment fails to state the approximate time and location of the alleged conduct. *See United States v. Salazar*, 485 F.2d 1272, 1277 (2d Cir. 1973) (holding that an indictment tracking statutory language is legally adequate if it also states an approximate time and place). The Government's allegations of "force" lack an approximate time and place that would make the Indictment legally adequate. Additionally, the allegations of "fraud" and "coercion" in the Indictment fail to advise Naason Garcia of the specific acts of which he is accused of, and they make it impossible to identify with particularity the nature of the charge pending against him, warranting a bill of particulars under *Chen* and *Bortnovsky*.

The Indictment merely asserts generally that force, fraud, and coercion were used to cause alleged victims to engage in commercial sexual activity. *E.g.* Indictment ¶¶ 24(a), 24(c), 33. This generality is not sufficient. The only specification as to force is that Naason Garcia "used, and aided and abetted the use of, physical force to restrain and rape victims." But this assertion (made as part of an allegation of a conspiracy that spanned

49

more than 50 years) contains no approximate date or location. These vague allegations do not inform Naason Garcia of the specific offenses he is accused of.

As it concerns fraud or coercion, the Government's only potentially correlated particularity stems from allegations that religious "blessings" were used to defraud and coerce alleged victims into commercial sexual activity. Indictment ¶¶ 24(a), 24(c). This problem mirrors the problems highlighted in *Chen* and *Bortnovsky* that warranted a bill of particulars in the view of those courts. Here, the Government should particularize whether religious "blessings" it is referring to, and whether it is alleging that religious promulgations are criminal fraud.  If that is what Naason Garcia is being accused of, he has a right to be told.

Therefore, because the Government has (1) failed to specify an approximate time and place for its force allegations and (2) should specify whether religious "blessings" are being asserted as fraud or coercion, this Court, pursuant to Fed. R. Crim. P. 7(f), should direct the Government to file a bill of particulars with these items.

### D. The Government Must Specify The Alleged Commercial Sex Activities That Occurred Because of Force, Fraud, and Coercion

To reiterate the rules from *Chen* and *Bortnovsky*, a bill of particulars is appropriate if the Indictment fails to advise Naason Garcia of the specific acts of which he is accused or makes it impossible to identify with particularity the nature of the charge pending against him. Here, the Indictment fails to provide the necessary information to ascertain the charges against Naason Garcia because the specific alleged "commercial sexual activities" are unclear.

As its first charge and as incorporated in other relevant counts, the Indictment asserts that on account of sexual acts, victims were allegedly "provided with housing, travel, the promise of religious blessings and eternal salvation, tickets to concerts and amusement parks, and the avoidance of eternal damnation." Indictment ¶ 24(a), 32-33. This allegation provides no specificity as to *which* alleged victims were given these, if they each received all the "benefits" provided, if some victims only received religious blessings, etc. Absent these specifics, the defense is unaware of the facts that the Government intends to use at trial to prove its allegation of commercial sex acts.

Lastly, the Indictment's allegation involving co-defendants Rosa Sosa and Azalia Rangel Garcia, and alleged commercial sex activity is inadequate. It is alleged that they "received powerful positions in the Joaquin LLDM Enterprise on account of their facilitation of, and participation in, . . . sex trafficking, and on account of their requiring the victims to engage in sex acts . . . ." Indictment ¶ 24(a). This allegation is inadequate. It is unclear at what point some sort of "promotion" was given, whether it was after the first alleged victim, some point in between, or after the last alleged victim that these "promotions" were given. If after the first, then there can be no commercial sex act after that, given that nothing else is being received. If after the last, it is possible that nothing of value was given before that. Accordingly, the defense is unaware of the specific acts which the Government seeks to prove at trial, warranting a bill of particulars under *Chen* and *Bortnovsky*.

Thus, the Court should direct the Government to file a bill of particulars pursuant to Fed R. Crim. P. 7(f) because of the lack of specificity as to the commercial sex acts alleged.

### E.    The Government Must Specify What The Actual LLDM Doctrines Are, How They Have Been Taught, and How They Were "Corrupted"

The Government is obligated to provide notice as to the specific acts which constitute the offense alleged. *Chen*, 378 F.3d at 163. The Government has alleged that part of the actus reus of the charged offenses is the promulgation of numerous LLDM religious doctrines.

The Government asserts the following as examples of these doctrines: "The Apostle cannot sin, and therefore, nothing the Apostle does is a sin," "The only way for members of the LLDM Church to obtain eternal salvation is to follow the teachings of the Apostle. God will punish and eternally damn anyone who doubts the Apostle, fails to follow the Apostle's teachings, or defies the Apostle," "Serving the Apostle is a blessing and can lead to eternal salvation," *inter alia*. Indictment ¶¶ 7(a)-7(h). Subsequently, the Government alleges that Naason Garcia corrupted the LLDM religion so that he could "achieve criminal purposes." Indictment ¶ 8.

The major problem here is that the Government alleges that religious blessings were "corrupted" and "manipulated" to defraud victims into sexual acts. Indictment ¶¶ 24(a), 24(c), 33. But the Indictment entirely fails to specify which of its asserted church doctrines are "real," and which are "manipulated," and if the latter, then how they were manipulated or altered. Without this specification, the defense cannot adequately prepare

for trial because it will not have been given notice of the specific acts which the Government intends to prove to constitute fraud.  Thus, the Court, pursuant to Fed R. Crim. P. 7(f), should direct the Government to file a bill of particulars specifying some distinction between the actual LLDM religious doctrines, how they were taught, and the doctrines that came into effect *after* some alleged corruption.

## CONCLUSION

For the foregoing reasons, Defendant respectfully requests that the Court dismiss the Indictment, or, in the alternative, that the Court direct the Government to file a bill of particulars.

Dated: July 23, 2026                    Respectfully submitted,

                                        WERKSMAN JACKSON & QUINN LLP

                                        By:     /s *Caleb Mason*
                                                Caleb Mason
                                                Alan Jackson
                                                Evan Wolk
                                                888 West 6th Street, 4th Floor
                                                Los Angeles, California 90017
                                                Tel: (213) 688-0460
                                                Email: cmason@werksmanjackson.com
                                                        ajackson@werksmanjackson.com
                                                        ewolk@werksmanjackson.com

                                                *Attorneys for Defendant*
                                                *Naason Joaquin García*

## <u>LOCAL RULE 16.1 CERTIFICATE OF COMPLIANCE</u>

I declare under the penalty of perjury pursuant to 28 US C. § 1746 that defense counsel has conferred with counsel for the Government in an effort in good faith to resolve by agreement the issues raised by this Motion via letter correspondence sent on July 8, 2026; July 10, 2026; July 17, 2026; July 20, 2026; and July 23, 2026 without the intervention of the Court and has been unable to reach an agreement.

Dated: July 23, 2026                    Respectfully submitted,

WERKSMAN JACKSON & QUINN LLP

By:      /s *Caleb Mason*
          Caleb Mason
          Alan Jackson
          Evan Wolk
          888 West 6th Street, 4th Floor
          Los Angeles, California 90017
          Tel: (213) 688-0460
          Email: cmason@werksmanjackson.com
                ajackson@werksmanjackson.com
                ewolk@werksmanjackson.com

          *Attorneys for Defendant*
          *Naason Joaquin García*

54

## **LOCAL RULE 16.1 CERTIFICATE OF COMPLIANCE**

I declare under the penalty of perjury pursuant to 28 US C. § 1746 that this Motion

contains 15,169 words.

Dated: July 23, 2026                     Respectfully submitted,

                                         WERKSMAN JACKSON & QUINN LLP

                                         By:     /s *Caleb Mason*
                                                         Caleb Mason
                                                         Alan Jackson
                                                         Evan Wolk
                                                         888 West 6th Street, 4th Floor
                                                         Los Angeles, California 90017
                                                         Tel: (213) 688-0460
                                                         Email: cmason@werksmanjackson.com
                                                                 ajackson@werksmanjackson.com
                                                                 ewolk@werksmanjackson.com

                                                         *Attorneys for Defendant*
                                                         *Naason Joaquin García*

55