UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| UNITED STATES OF AMERICA,<br><br>v.<br><br>NAASÓN JOAQUÍN GARCÍA;<br>ROSA SOSA; AZALIA RANGEL<br>GARCÍA; EVA GARCÍA DE JOAQUÍN;<br>JORAM NÚÑEZ JOAQUÍN; and<br>SILEM GARCÍA PEÑA,<br><br>                    Defendants. | Case No. 25-CR-370 (LAP) |

**EVA GARCÍA DE JOAQUÍN'S MEMORANDUM OF LAW IN SUPPORT OF HER:
(1) MOTION TO SEVER; (2) MOTION TO DISMISS, STRIKE, OR NARROW COUNT
ONE TO THE EXTENT IT RELIES ON FOREIGN PREDICATE CONDUCT NOT
INDICTABLE WHEN IT OCCURRED, AND TO PRECLUDE ANY RETROACTIVE
USE OF 18 U.S.C. § 1596 AS A BASIS OF LIABILITY AGAINST HER; AND
(3) MOTION TO STRIKE THE GOVERNMENT'S RELIANCE ON SPIRITUAL
COERCION AS A BASIS FOR THE SEX-TRAFFICKING PREDICATES IN THE
CONSPIRACY CHARGES**

# TABLE OF CONTENTS

**TABLE OF AUTHORITIES** ........................................................................................................ iv

**INTRODUCTION** ...................................................................................................................... 1

**SEVERANCE IS NECESSARY TO PROTECT MS. DE JOAQUÍN'S CONSTITUTIONAL RIGHT TO A FAIR AND AN INDIVIDUALIZED DETERMINATION OF GUILT** .................................................................................................. 2

**I.     Preliminary Statement** ................................................................................................ 2

**II.    Relevant Factual and Legal Background** ................................................................. 4

      A.     Counts Mentioning Ms. de Joaquín ............................................................... 5

      B.     Counts That Do Not Mention Ms. de Joaquín ............................................... 7

      C.     Related Cases That Do Not Mention Ms. de Joaquín .................................... 9

**III.   Legal Standard** ......................................................................................................... 10

      A.     Constitutional Protections ............................................................................. 10

      B.     Applicable Federal Rules of Criminal Procedure ........................................ 11

              *i.     Rule 8(b)—Joinder* ....................................................................... 11

              *ii.    Rule 14(a)—Severance* ................................................................. 12

      C.     Racketeer Influenced and Corrupt Organizations ("RICO") Act ................ 12

**IV.    Argument** .................................................................................................................. 14

      A.     Legal Joinder is Improper Under Federal Rule of Criminal Procedure 8(b) ........ 14

      B.     A Joint Trial Would Create Unacceptable Spillover Prejudice ............................ 15

      C.     Independent Evidentiary Problems Require Severance ....................................... 18

      D.     Judicial Economy Does Not Justify Forcing Ms. de Joaquín into a Joint Trial ......................................................................................................... 19

      E.     Fundamental Fairness and the Integrity of the Trial Process Require Severance ...................................................................................................... 20

**V. Conclusion** ...................................................................................................... **21**

**FOREIGN PREDICATE CONDUCT NOT INDICTABLE WHEN IT OCCURRED IS AN IMPERMISSIBLE BASIS FOR LIABILITY FOR COUNT ONE IN THE INDICTMENT** ........................................................................................... **22**

**I. Preliminary Statement** ...................................................................................... **22**

**II. Legal Standard** ................................................................................................. **25**

      A.    Federal Rules of Criminal Procedure 7 and 12 Permit a Pretrial Challenge to Count One's Legal Sufficiency ................................................................... 25

      B.    *RJR Nabisco's* Two-Step Framework Governs the Indictability of Foreign Conduct ................................................................................... 26

      C.    Section 1596 Must Be Construed Prospectively, and Retroactive Use Would Violate the *Ex Post Facto* Clause ................................................ 28

**III. Argument** ....................................................................................................... **30**

      A.    RICO's Conspiracy and Complicity Provisions Do Not Enlarge the Predicates' Territorial Reach ................................................................ 30

      B.    Each Predicate Requires Its Own Two-Step Analysis, and the Indictment Satisfies Neither Step ................................................................................. 32

      C.    Sections 2421 and 2422 Give No Clear Indication of Foreign Reach, and Their Focus Is the Person Protected ................................................ 34

      D.    The Indictment Does Not Plead Facts That Fall Within the Scope of Section 2423's Extraterritorial Subsections ................................................ 35

      E.    Section 2251 Reaches Abroad Only Through Domestic Production or Transmission ................................................................................... 37

      F.    Section 2252 Requires a Domestic Shipment, Mailing, or Receipt ................ 39

      G.    Section 1344 Does Not Apply Abroad and Requires a Domestic Banking Core ........................................................................................ 40

      H.    Sections 5324 and 5332 Regulate the Border and Do Not Reach Foreign-to-Foreign Conduct ................................................................................... 41

I.      Section 1596 Cannot Retroactively Supply a Hook for Pre-Enactment Foreign Trafficking and Forced-Labor Conduct ...................................................... 43

      *i.*    *Section 1596 Supplies Prospective Reach, Not Retroactive Reach* .......... 43

      *ii.*   *Retroactive Use of Section 1596 Would Violate the Ex Post Facto Clause* ................................................................... 45

      *iii.*  *Before Section 1596, Sections 1591 and 1589 Had Only Limited Foreign Reach* ......................................................................... 46

J.      In the Further Alternative, the Court Should Order the Narrow Bill of Particulars Needed to Litigate the Timing and Territorial Defenses .................................... 48

**IV.    Conclusion and Relief Requested** ................................................................ **51**

**SPIRITUAL COERCION IS A LEGALLY UNTENABLE BASIS TO MAINTAIN THE GOVERNMENT'S CONSPIRACY CHARGES PREDICATED ON SEX TRAFFICKING AGAINST MS. DE JOAQUÍN** ................................................................................ **53**

**I.     Preliminary Statement** ............................................................................... **53**

**II.    Applicable Law** .......................................................................................... **54**

    A.     Relevant Pleading Rules .......................................................................... 54

    B.     Relevant Conspiracy-Specific Rules ........................................................ 55

**III.   Argument** .................................................................................................... **56**

    A.     The Inextricable Link Between the Government's Allegations and Protected First Amendment Activity Necessitates Specific Factual Allegations of Coercion ...... 56

    B.     Ms. de Joaquín's Requested Relief is Discrete and Specific ............................... 59

# <u>TABLE OF AUTHORITIES</u>

**Cases**

*Adhikari v. Kellogg Brown & Root, Inc.*,
    845 F.3d 184 (5th Cir. 2017) ...................................................................................... 44

*Bascuñán v. Elsaca*,
    927 F.3d 108 (2d Cir. 2019)...................................................................................... 40

*Beazell v. Ohio*,
    269 U.S. 167 (1925)................................................................................................... 29

*Boyle v. United States*,
    556 U.S. 938 (2009)................................................................................................... 13

*Carr v. United States*,
    560 U.S. 438 (2010)................................................................................................... 29

*Collins v. Youngblood*,
    497 U.S. 37 (1990)..................................................................................................... 29

*Costello v. United States*,
    350 U.S. 359 (1956)................................................................................................... 26

*Doe 1 v. Iglesia Del Dios Vivo Columna Y Apoyo De La Verdad La Luz Del Mundo (LLDM)*,
    No. 22STCV29220 (Cal. Super. Ct. Sep. 8, 2022) ................................................. 10

*Erlinger v. United States*,
    602 U.S. 821 (2024)................................................................................................... 10

*Estelle v. Williams*,
    425 U.S. 501 (1976)................................................................................................... 20

*European Cmty. v. RJR Nabisco, Inc.*,
    764 F.3d 129 (2d Cir. 2014)...................................................................................... 41

*Faretta v. California*,
    422 U.S. 806 (1975)................................................................................................... 10

*Hamling v. United States*,
    418 U.S. 87 (1974)..................................................................................................... 25

*Hughes Aircraft Co. v. U.S ex rel. Schumer*,
    520 U.S. 939 (1997)............................................................................................. 29, 45

*H.J. Inc. v. Nw. Bell Tel. Co.*,
    492 U.S. 229 (1989) ............................................................................................ 13

*Kousisis v. United States*,
    605 U.S. 114 (2025) ............................................................................................ 11

*Landgraf v. USI Film Prods.*,
    511 U.S. 244 (1994) ..................................................................................... passim

*Martin v. La Luz Del Mundo*,
    No. 2:20-cv-01437 (C.D. Cal. Feb. 12, 2020) ................................................. 10

*Microsoft Corp. v. AT&T Corp.*,
    550 U.S. 437 (2007) ............................................................................................ 26

*Morrison v. Nat'l Austl. Bank Ltd.*,
    561 U.S. 247 (2010) ..................................................................................... passim

*People v. Morales*,
    20 N.Y.3d 240 (2012) ........................................................................................ 17

*Reves v. Ernst & Young*,
    507 U.S. 170 (1993) ............................................................................................ 13

*RJR Nabisco, Inc. v. European Cmty.*,
    579 U.S. 325 (2016) ..................................................................................... passim

*Roe v. Howard*,
    917 F.3d 229 (4th Cir. 2019) ....................................................................... 46, 47

*Russell v. United States*,
    369 U.S. 749 (1962) ............................................................................................ 24

*Stogner v. California*,
    539 U.S. 607 (2003) ............................................................................................ 29

*United States v. Ahemeid*,
    819 F. Supp. 3d 143 (E.D.N.Y. 2026) ............................................................. 54

*United States v. Aleynikov*,
    676 F.3d 71 (2d Cir. 2012) ................................................................................ 54

*United States v. Alfonso*,
    143 F.3d 772 (2d Cir. 1998) ................................................................... 25, 26, 54

*United States v. Ali*,
718 F.3d 929 (D.C. Cir. 2013) ............................................................... 31

*United States v. All Assets Held at Bank Julius Baer & Co.*,
251 F. Supp. 3d 82 (D.D.C. 2017) .......................................................... 41

*United States v. Ballard*,
322 U.S. 78 (1944) ....................................................................... 56, 57, 58

*United States v. Baston*,
818 F.3d 651 (11th Cir. 2016) ................................................................ 44

*United States v. Bortnovsky*,
820 F.2d 572 (2d Cir. 1987) ................................................................... 50

*United States v. Burden*,
600 F.3d 204 (2d Cir. 2010) ................................................................... 13

*United States v. Cardascia,*
951 F.2d 474 (2d Cir. 1991) ................................................................... 17

*United States v. D'Amico*,
734 F. Supp. 2d 321 (S.D.N.Y. 2010) .................................................... 55

*United States v. Daidone*,
471 F.3d 371 (2d Cir. 2006) ................................................................... 13

*United States v. Davidoff*,
845 F.2d 1151 (2d Cir. 1988) ............................................................ 48, 49

*United States v. DiNome*,
954 F.2d 839 (2d Cir. 1992) .............................................................. 15, 16

*United States v. Figueroa*,
618 F.2d 934 (2d Cir. 1980) ................................................................... 17

*United States v. Frey*,
736 F. Supp. 3d 128 (E.D.N.Y. 2024) ................................................... 55

*United States v. Gallo*,
668 F. Supp. 736 (E.D.N.Y. 1987) ........................................................ 17

*United States v. Gaudin*,
515 U.S. 506 (1995) ............................................................................... 10

*United States v. Harris*,
991 F.3d 552 (4th Cir. 2021) ................................................................ 34, 35

*United States v. Harvey*,
2 F.3d 1318 (3d Cir. 1993)................................................................................. 39

*United States v. Hawit*,
No. 15-CR-252-PKC, 2017 WL 663542 (E.D.N.Y. Feb. 17, 2017)................................. 32

*United States v. Hoskins*,
902 F.3d 69 (2d Cir. 2018)................................................................ 28, 31

*United States v. Iossifov*,
45 F.4th 899 (6th Cir. 2022) ................................................................ 32

*United States v. Jin*,
No. 23-091-2-CKK, 2025 WL 2409749 (D.D.C. Aug. 19, 2025) ............................ 40, 41

*United States v. Johansen*,
56 F.3d 347 (2d Cir. 1995)................................................................ 15

*United States v. Juvenile*,
599 F. Supp. 1126 (D. Or. 1984) ................................................................ 30, 45

*United States v. Kalichenko*,
840 F. App'x 644 (2d Cir. 2021) ................................................................ 37

*United States v. Kalichenko*,
No. 14-CR-95-JFB, 2019 WL 1559422 (E.D.N.Y. Apr. 10, 2019)............................ 37, 39

*United States v. Kapordelis*,
569 F.3d 1291 (11th Cir. 2009) ................................................................ 39

*United States v. Larson*,
807 F. Supp. 2d 142 (W.D.N.Y. 2011) ................................................................ 54

*United States v. Lech*,
161 F.R.D. 255 (S.D.N.Y. 1995) ................................................................ 11

*United States v. Lorenzo*,
534 F.3d 153 (2d Cir. 2008)................................................................ 13

*United States v. Muyet*,
945 F. Supp. 586 (S.D.N.Y. 1996) ................................................................ 50

*United States v. Nachamie,*
        91 F. Supp. 2d 565 (S.D.N.Y. 2000) ....................................................... 50

*United States v. Napout*,
        963 F.3d 163 (2d Cir. 2020)................................................................... 31

*United States v. Pepe*,
        895 F.3d 679 (9th Cir. 2018) ........................................................... 33, 37

*United States v. Pirro*,
        212 F.3d 86 (2d Cir. 2000)................................................................ 24, 25

*United States v. Pizzonia*,
        577 F.3d 455 (2d Cir. 2009)................................................................... 55

*United States v. Resendiz-Ponce*,
        549 U.S. 102 (2007)............................................................................... 25

*United States v. Rinsch*,
        807 F. Supp. 3d 238 (S.D.N.Y. 2025) ................................................... 50

*United States v. Rodriguez*,
        162 F.4th 288 (2d Cir. 2025) ................................................................ 54

*United States v. Sampson*,
        371 U.S. 75 (1962)................................................................................. 26

*United States v. Scarpa*,
        913 F.2d 993 (2d Cir. 1990)................................................................... 55

*United States v. Shellef*,
        507 F.3d 82 (2d Cir. 2007)..................................................................... 11

*United States v. Skinner*,
        70 F.4th 219 (4th Cir. 2023) ..................................................... 37, 38, 40

*United States v. Spinelli*,
        352 F.3d 48 (2d Cir. 2003)..................................................................... 15

*United States v. Thomas*,
        893 F.2d 1066 (9th Cir. 1990) ............................................................... 39

*United States v. Turoff*,
        853 F.2d 1037 (2d Cir. 1988)........................................................... 11, 14

*United States v. Valerio*,
765 F. App'x 562 (2d Cir. 2019) ........................................................... 37

*United States v. Vilar*,
729 F.3d 62 (2d Cir. 2013)................................................................... 26

*United States v. Weingarten*,
632 F.3d 60 (2d Cir. 2011) ................................................... 34, 36, 39

*United States v. Yannotti*,
541 F.3d 112 (2d Cir. 2008)................................................................ 55

*United States v. Zhong*,
26 F.4th 536 (2d Cir. 2022) ................................................................ 11

*Weaver v. Graham*,
450 U.S. 24 (1981)............................................................................... 29

*Wong Tai v. United States*,
273 U.S. 77 (1927)............................................................................... 48

*Zafiro v. United States*,
506 U.S. 534 (1993).......................................................... 10, 11, 12, 19

## Constitutional Provisions

U.S. Const. amend. V................................................................................. 10, 20

U.S. Const. amend. VI ............................................................................... 10, 20

U.S. Const. art. I, § 9, Cl. 3 ........................................ 23, 28, 29, 45, 46, 51

## Statutes and Rules

18 U.S.C. § 2.......................................................................................... passim

18 U.S.C. § 7.......................................................................................... 43, 46, 47

18 U.S.C. § 1344.................................................................................... passim

18 U.S.C. § 1589.................................................................................... passim

18 U.S.C. § 1590.................................................................................... 46

18 U.S.C. § 1591.................................................................................... passim

18 U.S.C. § 1596 ......................................................................................... passim

18 U.S.C. § 1961 .......................................................................... 13, 22, 27, 30

18 U.S.C. § 1962 ......................................................................................... passim

18 U.S.C. § 2251 ......................................................................................... passim

18 U.S.C. § 2252 ......................................................................................... passim

18 U.S.C. § 2252A ............................................................................................. 9

18 U.S.C. § 2315 ............................................................................................. 41

18 U.S.C. § 2421 .......................................................................... 22, 30, 34, 35

18 U.S.C. § 2422 ...................................................................... 8, 22, 30, 34, 35

18 U.S.C. § 2423 ......................................................................................... passim

18 U.S.C. § 3271 ....................................................................................... 43, 47

18 U.S.C. § 3500 ............................................................................................. 50

31 U.S.C. § 5316 ............................................................................................. 42

31 U.S.C. § 5324 .................................................................... 22, 30, 33, 41, 42

31 U.S.C. § 5332 ......................................................................................... passim

Cal. Pen. Code 287 ......................................................................................... 10

Cal. Pen. Code 288 ......................................................................................... 10

Fed. R. Crim. P. 7 ............................................................... 24, 25, 48, 51, 54

Fed. R. Crim. P. 8 ............................................................................. 11, 12, 14

Fed. R. Crim. P. 12 ........................................................... 25, 26, 50, 53, 54

Fed. R. Crim. P. 14 ......................................................................... 12, 15, 17

Fed. R. Evid. 403 ............................................................................................. 18

Fed. R. Evid. 404 ............................................................................................. 18

New York Penal Law § 130.25 ...................................................................................................... 8

New York Penal Law § 130.35 ...................................................................................................... 8

New York Penal Law § 130.40 ...................................................................................................... 8

New York Penal Law § 130.50 ...................................................................................................... 8

New York Penal Law § 130.52 ...................................................................................................... 8

New York Penal Law § 130.55 ...................................................................................................... 8

The William Wilberforce Trafficking Victims Protection Reauthorization Act of 2008 ............. 23

**Other Authorities**

Press Release, Cal. Dep't of Just., Attorney General Bonta Secures Conviction Against
Megachurch Leader Naasón Joaquín García (June 3, 2022),
https://oag.ca.gov/news/press-releases/attorney-general-bonta-secures-conviction-against-
megachurch-leader-naas%C3%B3n ................................................................................. 10

**INTRODUCTION**

The defining feature of the case against Eva García de Joaquín ("Ms. de Joaquín") is governmental overreach.  Ms. de Joaquín finds herself in this case not due to any credible allegation of her own guilt; rather, she is the proxy for one of the government's actual targets, Samuel Joaquín Flores—Ms. de Joaquín's deceased spouse.  Because the government cannot prosecute the dead, it has concocted complex conspiracies predicated on decades-old, extraterritorial conduct to rope Ms. de Joaquín into this case.  The indictment displays these flaws upon close reading.

The indictment asports Ms. de Joaquín into a prosecution vehicle crafted for others with Ms. de Joaquín stuffed in the trunk as a ride-along passenger.  Only two of its six counts involve Ms. de Joaquín.  Those six counts, and the narrative presenting them, center on the conduct of Naasón Joaquín García ("Naasón"), not Ms. de Joaquín.  Close inspection reveals a patchwork quilt of theories, some sections comprised of conduct outside the reach of the charging statutes, and others premised on extraterritorial allegations barred by the Constitution.

Ms. de Joaquín timely presents three issues in her omnibus pretrial motion.  *First*, Ms. de Joaquín moves this Court to sever her trial from her codefendants' trial.  As shown below, a joint trial will irreparably prejudice Ms. de Joaquín.  *Second*, Ms. de Joaquín moves this Court to dismiss, strike, or narrow Count One to the extent it relies on foreign predicate conduct not indictable when it occurred, and to preclude retroactive use of 18 U.S.C. § 1596 as a basis of liability.  *Finally*, Ms. de Joaquín moves this Court to strike the government's *ultra-vires* "spiritual coercion" theory because it does not state a criminal offense for the sex-trafficking predicates alleged and its presentation violates Ms. de Joaquín's rights under the First Amendment.

1

Ms. de Joaquín addresses each motion in turn.

## SEVERANCE IS NECESSARY TO PROTECT MS. DE JOAQUÍN'S CONSTITUTIONAL RIGHT TO A FAIR AND AN INDIVIDUALIZED DETERMINATION OF GUILT

**I.     Preliminary Statement**

The Constitution and federal law reject the notion of guilt by association.  This motion

addresses that issue and demonstrates that the only way for Ms. de Joaquín to receive a fair trial

is through severing her trial from her co-defendants' trial.  The Indictment places

Ms. de Joaquín—an elderly woman in declining health, charged in only two of the six counts—at

the edge of a sprawling, decades-long prosecution centered on other people.  The indictment's

core allegations focus on conduct, time periods, and alleged victims that bear no relation to her.

Without a severance, Ms. de Joaquín will stand trial in the shadow of grave allegations that do

not implicate her, and she would need to challenge evidence that would never be admissible

against her alone.  Under these circumstances, it would be impossible for Ms. de Joaquín to

receive a fair trial, mocking the Constitution's guarantee of fairness in the process.

The indictment betrays the government's guilt-by-association strategy.  The government

has collapsed generations, roles, and responsibility into a single non-cohesive narrative.

Regarding Ms. de Joaquín, the Indictment offers limited, temporally remote allegations tied to an

uncharged individual who died more than a decade ago.  In stark contrast, the true focus of the

charges in the indictment centers on later conduct committed by different actors and includes far

more serious charges than those naming or implicating Ms. de Joaquín.  The evidence presented

in connection with the charges against Ms. de Joaquín's codefendants threatens to overwhelm the

jury's assessment of the limited case against Ms. de Joaquín with an ocean of materials that will

create only confusion and unfair stigma.  Severance presents the sole adequate remedy.

Although the government has packaged this case as a broad enterprise prosecution, the allegations against Ms. de Joaquín remain remarkably narrow.[1]  The government alleges two separate and distinct conspiracies—one involving Ms. de Joaquín's son, Naasón, and one involving her deceased husband (and Naasón's father), Samuel Joaquín Flores.  The government's case focuses primarily on Naasón, who is named in every count.[2]  Naasón's conspiracy concerns alleged acts in the last decade.  Samuel's alleged conspiracy, in contrast, presents allegations from a nearly fifty-year period, *viz.*, from 1970 until his death in 2014.

Close examination of the indictment reveals the absence of allegations that Ms. de Joaquín participated in the substantive conduct underlying almost the entirety of the government's case, including the most serious allegations charging sex trafficking by force, fraud, and coercion, inducement to travel for unlawful sexual activity, conspiracy to sexually exploit children, and child exploitation enterprise.  Those extraordinarily serious and highly prejudicial counts will drive the evidence presented at a joint trial, yet they do not charge or involve Ms. de Joaquín; in fact, they do not mention her at all.  Proceeding with a joint trial will pose a threat that Ms. de Joaquín will be convicted solely because of her affiliation with Samuel, who is deceased and not on trial, or with Naasón, her son, through guilt by association, spillover prejudice, or both.

Naasón, the primary focus of the government's case, is already serving a near seventeen-year sentence for sex crimes against children in California.  In 2022, he pleaded guilty to two counts of forcible oral copulation with a minor and one count of a lewd act involving a child.  In other words, he has already admitted guilt to at least some of the allegations at issue here.  The

---

[1] Indictment, *United States v. Naasón Joaquín García, et. al*., Case No. 1:25-cr-00370 (S.D.N.Y. Sept. 2, 2025).
[2] *Id*.

California prosecution did not name Ms. de Joaquín in that case, but she will be intimately connected at trial with someone the government can (and will) refer to as an admitted sex offender. The fact that she is his mother amplifies the threatened prejudice.

In sum, at a joint trial, the government will present the jury with a sweeping and emotionally-charged narrative that risks overwhelming the narrow and fact-specific inquiry required for Ms. de Joaquín. A joint trial under these circumstances would undermine Ms. de Joaquín's Sixth Amendment rights, including her right to confrontation concerning co-defendants who may not testify, and would deprive her of a fair trial and the fundamental fairness the Constitution guarantees. The Constitution demands more. It requires that Ms. de Joaquín be judged, if at all, on the evidence against her—and her alone. Under the facts presented here, severance provides the remedy to meet this constitutional guarantee.

## II.   Relevant Factual and Legal Background

The indictment charges six defendants across six counts, but it charges Ms. de Joaquín in only two.[3] Count One alleges a racketeering conspiracy, and Count Two alleges a sex trafficking conspiracy.[4] The indictment does not charge Ms. de Joaquín in Count Three—sex trafficking by force, fraud, and coercion; Count Four—inducement to travel to engage in unlawful sexual activity; Count Five—conspiracy to sexually exploit children; or Count Six—child exploitation enterprise.[5]

---

[3] *Id.*
[4] *Id.*
[5] *Id.*

A.      Counts Mentioning Ms. de Joaquín

Count One sweeps broadly.  It alleges a racketeering conspiracy that began in approximately October 1970 and continued through August 2025.[6]  Within that expansive period, the indictment includes allegations concerning Naasón and the deceased Samuel.[7]  The allegations concerning Samuel (the Apostle and LLDM leader before Naasón) span decades and include assertions that adult women helped him identify girls and women for abuse.[8]  The indictment alleges that after Samuel's death in 2014, Naasón took over as both Apostle and leader of the abuse.[9]  As to Ms. de Joaquín, the indictment alleges that, on at least one occasion, she held down a minor victim so Samuel could rape the victim.[10]  This is the beginning and end of any specific, overt acts that mention Ms. de Joaquín in the entire thirty-one page indictment.  The indictment also alleges that Ms. de Joaquín facilitated and participated in Samuel's abuse of girls and women.[11]  This conclusory assertion identifies no specific, overt act, and is thus *ipse dixit*.[12]  Both allegations remain tied to Samuel-centered conduct as part of a separate conspiracy and do not make Ms. de Joaquín a participant in the later Naasón-centered conspiracy that dominates the indictment.  The structure of the indictment sets up two discrete, binary conspiracies: one set of conduct spanning the period from approximately 1970 through 2014, involving Samuel, and a separate set of alleged conduct continuing from December 2014 to 2025, centered on Naasón.[13]  The indictment fails to offer any kind of meaningful transactional

---

[6] Indictment ¶ 25.
[7] *Id.*
[8] *Id.*
[9] Indictment ¶ 9.
[10] Indictment ¶ 10.
[11] Indictment ¶ 20.
[12] The vague nature of these allegations presents a separate problem, addressed in a separate part of this omnibus motion.  *See infra* at 22.
[13] *See generally* Indictment.

link that ties Ms. de Joaquín to both of these conspiracies.[14]  In spite of this, the indictment

alleges a continuing conspiracy.  This is only the beginning of the indictment's vague and overly

broad assertions.

Count One indiscriminately uses vague, broad language.  It references the "Joaquín

LLDM Enterprise" without specifying if this means another entity operating inside the LLDM

Church, a subset of Church leadership, the entire Joaquín family, select Joaquín family members,

actual named defendants, or even other associates affiliated with the Church.[15]  There are no

facts alleged as to how Ms. de Joaquín was actually associated with this "enterprise," as either a

leader or member, other than her relationship with Samuel (as his wife) and Naasón (as his

mother).  The government alleges no facts as to how Ms. de Joaquín joined, continued, or agreed

to further the alleged conspiracy.[16]  It similarly omits any specific allegations regarding how,

when, and where Ms. de Joaquín groomed or prepared girls or women for Samuel's abuse, or

held down any victims.[17]

Count Two presents a narrower timeline that nevertheless reflects the same problems that

plague Count One, *i.e.*, the use of vague and overly broad language without *any* mention or

accusation of Ms. de Joaquín's alleged overt acts.  It alleges a sex trafficking conspiracy from

approximately December 2014 through August 2025 and involving Victims 5 through 10.[18]

During this entire period, the indictment does not accuse Ms. de Joaquín of any wrongdoing.

[14] The government's meagre assertion in its detention letter that Ms. de Joaquín provided
political support to her son Naasón for his ascension to Apostle is a woefully insufficient link to
claim that Ms. de Joaquín was part of the government's second alleged conspiracy.  *See* ECF No.
12 at 11.  So too is the fact that Ms. de Joaquín lived in a nice house and traveled frequently.
*See id.*
[15] Indictment ¶ 15–24.
[16] Indictment ¶ 23, 24.
[17] Indictment ¶ 10.
[18] Indictment ¶ 30.

The indictment's own chronology creates a critical distinction: Samuel died in 2014, while the indictment alleges that, from approximately December 2014 (after Samuel's death) through the present, Naasón served as the Apostle of the LLDM Church, led the alleged enterprise, and became the principal beneficiary of the alleged criminal activity.[19]  The government may try to collapse those periods into one narrative, but the charged facts separate Ms. de Joaquín's alleged conduct in time, character, and focus from much of the proof the government will offer against others at a joint trial.

Count Two does not contain any factual allegations as to how Ms. de Joaquín agreed and participated in sex trafficking as either a leader or member of the conspiracy.[20]  Victim-6 is the only alleged victim for whom the indictment sets forth a more detailed time period concerning Ms. de Joaquín.  But the indictment contains no specific allegations that Ms. de Joaquín caused any victim to engage in a commercial sex act, including Victim-6, or how Eva purportedly participated in the trafficking of Victim-6 in or about April 2017.[21]

B.     Counts That Do Not Mention Ms. de Joaquín

Counts Three to Six have nothing to do with Ms. de Joaquín.  Count Three charges sex trafficking by force, fraud, or coercion under Title 18 U.S.C. §§ 1591(a), (b)(1) and 2.[22]  The government's theory is that certain defendants, namely Naasón and Azalia Rangel García, directly engaged in or facilitated coercive sex trafficking of identified victims through force, threats, or deception.[23]  The government alleges that, following Samuel's death, Rosa Sosa and Azalia Rangel García began working for Naasón to help him sexually abuse children and women

---

[19] *Id.*
[20] Indictment ¶ 28, 30, 31.
[21] *Id.*
[22] Indictment ¶ 33.
[23] *Id.*

in the LLDM Church.[24]  The indictment alleges that Rosa Sosa and Azalia Rangel García

identified and primed girls and boys as young as thirteen years old for Naasón's sexual abuse.[25]

Ms. de Joaquín is not named in any of these acts or allegations.  The indictment also alleges

that both Naasón and his father sexually abused victims "often with the direct assistance" of

Rosa Sosa, Azalia Rangel García, Ms. de Joaquín, "and others," but the government does not at

all specify how or when and again does not name Ms. de Joaquín in this specific Count.[26]

Count Four charges inducement to travel to engage in unlawful sexual activity under

Title 18 U.S.C. §§ 2422(a) and 2.[27]  This Count alleges that certain defendants, namely Naasón

and Azalia Rangel García, caused individuals to travel, including across state or national lines,

with the intent that they engage in illegal sexual conduct.[28]  Count Four specifically mentions

Victim-7 and the government's allegation that Naasón and Azalia Rangel García attempted to

engage in unlawful sexual activity with her in violation of New York Penal Law §§ 130.25,

130.35, 130.40, 130.50, 130.52, and 130.55.[29]  Nowhere does the indictment allege a specific

interaction between Ms. de Joaquín and Victim-7, nor does it present any overt act between

Ms. de Joaquín and Victim-7.

Count Five charges conspiracy to sexually exploit children under Title

18 U.S.C. § 2251(a), (e).[30]  The government's theory here is that certain defendants, namely

Naasón and Azalia Rangel García, agreed to produce or participate in the production of child

---

[24] Indictment ¶ 11.
[25] *Id.*
[26] Indictment ¶ 24(d).
[27] Indictment ¶ 34.
[28] *Id.*
[29] *Id.*  Article 130 of the New York Penal Law covers sex offenses; these offenses include rape, criminal sex acts, forcible touching, and sexual abuse.
[30] Indictment ¶ 35–36.

exploitation material, involving coordinated conduct directed at minors. The government alleges that Naasón and Azalia Rangel García induced minors to create sexually explicit photographs and videos that were transmitted to Naasón via email and cellphone messaging applications for Naasón's sexual gratification and that Naasón and Azalia Rangel García transported these materials in or about June 2015 on a flight from Portugal to Newark, New Jersey.[31] The Count Five allegations omit Ms. de Joaquín in full.

Count Six charges participation in a child exploitation enterprise under Title 18 U.S.C. § 2252A(g).[32] The government alleges that certain defendants, namely Naasón and Azalia Rangel García, organized a venture involving multiple participants engaged in child exploitation offenses as part of a structured enterprise. Specifically, the government alleges that these violations constitute three or more separate incidents involving more than one victim, and that Naasón and Azalia Rangel García, along with others "known and unknown" committed a "litany of felony offenses."[33] Again, the indictment omits Ms. de Joaquín from the entire recitation of this Count, *viz.*, the government does not ascribe her any specific, overt acts or other misconduct relating to it.

C.     Related Cases That Do Not Mention Ms. de Joaquín

At least three separate legal cases relate to the core allegations in this indictment and entirely omit Ms. de Joaquín. *First*, the related criminal proceedings in California confirm Ms. de Joaquín's nonexistent and peripheral role in the alleged "enterprise." California authorities arrested Naasón in June 2019 for allegations of sexual abuse of minor girls from his own congregation. Naasón later pleaded guilty in California in 2022 to two counts of forcible

---

[31] Indictment ¶ 36.
[32] Indictment ¶ 37.
[33] *Id.*

oral copulation with a minor (Cal. Pen. Code 287(c)(2)(C)) and one count of a lewd act involving

a child (Cal. Pen. Code 288(c)(1)).[34]  He was sentenced to sixteen years and eight months in

prison.  Those proceedings did not name or charge Ms. de Joaquín.

     *Second*, Ms. de Joaquín is not a party in related civil litigation against the Church, nor

is she involved in that litigation at all.[35]  *Finally*, Sochil Martin's civil complaint against the

LLDM church (for allegations of Naasón's sex trafficking and abuse) likewise did not mention

Ms. de Joaquín at all.[36]

### III.    <u>Legal Standard</u>

    A.    <u>Constitutional Protections</u>

    The Sixth Amendment guarantees that the accused receives a fair trial before an impartial

jury, the right to confront and cross-examine adverse witnesses, the right to present a complete

defense, and the effective assistance of counsel.[37]  These rights are inherently personal and

individualized; they presuppose a trial in which the jury is able to evaluate the evidence as it

relates to a single defendant, rather than as part of a collective narrative.[38]

    The Due Process Clause of the Fifth Amendment independently requires that the

government establish guilt through individualized proof beyond a reasonable doubt.[39]  This

---

[34] Press Release, Cal. Dep't of Just., Attorney General Bonta Secures Conviction Against Megachurch Leader Naasón Joaquín García (June 3, 2022), https://oag.ca.gov/news/press-releases/attorney-general-bonta-secures-conviction-against-megachurch-leader-naas%C3%B3n.

[35] *See Martin v. La Luz Del Mundo*, No. 2:20-cv-01437-FWS-AS (C.D. Cal. Feb. 12, 2020); *Doe 1 v. Iglesia Del Dios Vivo Columna Y Apoyo De La Verdad La Luz Del Mundo (LLDM)*, No. 22STCV29220 (Cal. Super. Ct. Sep. 8, 2022).

[36] Complaint, *Martin*, No. 2:20-cv-01437-FWS-AS, ECF No. 1.

[37] U.S. Const. amend. VI.

[38] *Zafiro v. United States*, 506 U.S. 534, 539–40 (1993); *see also Faretta v. California*, 422 U.S. 806, 819–20 (1975); *see also* U.S. Const. amend. VI.

[39] *United States v. Gaudin*, 515 U.S. 506, 509–10 (1995); *see also Erlinger v. United States*, 602 U.S. 821, 830–31 (2024); *see also* U.S. Const. amend. V.

bedrock principle demands that juries judge each defendant on the basis of her own conduct, her own intent, and the evidence properly admitted against her.[40]  Any trial structure that dilutes this requirement—by encouraging jurors to reason from association, proximity, or collective wrongdoing—undermines the constitutional standard.[41]

        B.      <u>Applicable Federal Rules of Criminal Procedure</u>

        i.      *Rule 8(b)—Joinder*

Federal Rule of Criminal Procedure ("Rule") 8(b) permits the joinder of defendants only when the indictment alleges that they participated in the same act or transaction, or in the same series of acts or transactions, constituting an offense or offenses.[42]  The Rule does not require the government to charge every defendant in every count, but it does demand a genuine transactional relationship connecting the joined defendants to the joined counts.  Absent that connection, joinder fails at the threshold.[43]

The Second Circuit construes Rule 8(b) narrowly and has held that it imposes a more restrictive test than Rule 8(a).[44]  Unlike Rule 8(a), Rule 8(b) does not authorize joinder simply because the charged offenses share the same or similar character; similarity is not a substitute for a connecting transaction.[45]  The charged conduct must instead reflect a common plan, a common scheme, or a substantial identity of facts or participants that ties the charges together.  Where the

---

[40] *Zafiro*, 506 U.S. at 534.
[41] *United States v. Zhong*, 26 F.4th 536, 557 (2d Cir. 2022).
[42] Fed. R. Crim. P. 8(b).
[43] *United States v. Shellef*, 507 F.3d 82, 97–98 (2d Cir. 2007), *abrogated on other grounds by Kousisis v. United States*, 605 U.S. 114 (2025); *see also United States v. Lech*, 161 F.R.D. 255, 256–68 (S.D.N.Y. 1995).
[44] *United States v. Turoff*, 853 F.2d 1037, 1042–43 (2d Cir. 1988) (Rule 8(a) permits joinder of multiple offenses against one defendant if the offenses are of the same or similar character, arise from the same act or transaction, or are connected with or part of a common scheme or plan).
[45] *Id.*

government rests joinder on thematic overlap rather than a shared transaction, the Rule's narrow standard is not satisfied.

        *ii.        Rule 14(a)—Severance*

Even when joinder satisfies Rule 8(b), Rule 14(a) authorizes the Court to sever defendants or counts when joinder threatens to prejudice a defendant.[46]  The Rule vests the Court with discretion to protect against prejudice at trial, and the careful exercise of that discretion reduces the risk of reversible error on appeal.  The Supreme Court supplied the governing severance standard in *Zafiro v. United States*.[47]  Under *Zafiro*, a district court should grant severance when a joint trial creates a serious risk that it would either compromise a specific trial right of one of the defendants or prevent the jury from making a reliable judgment about guilt or innocence.[48]  The Court further recognized that the grouping of many defendants in a joint, complex case heightens this risk of prejudice, and even more so when the allegations present markedly different degrees of culpability amongst them.[49]

        C.        <u>Racketeer Influenced and Corrupt Organizations ("RICO") Act</u>

Because the government seeks to unite numerous defendants, disparate events, and distinct allegations under the umbrella of a single alleged enterprise, the Court must carefully examine the individualized proof required for each charged offense in assessing whether a joint trial would create an unacceptable risk of jury confusion, evidentiary spillover, and guilt by association.  For the overarching Racketeer Influenced and Corrupt Organizations ("RICO") Act allegations, the government must prove both (1) the charged statutes are among the offenses

---

[46] Fed. R. Crim. P. 14(a).

[47] 506 U.S. 534 (1993).

[48] *Id.* at 539.

[49] *Id.*

capable of constituting "racketeering activity," and (2) the elements of each alleged predicate offense as to each defendant.[50] Further, a "pattern of racketeering activity" requires at least two acts of racketeering activity,[51] but two alleged acts are insufficient by themselves; the government must also prove that the alleged predicates are related and amount to, or pose a threat of, continued criminal activity.[52] In the Second Circuit, relatedness generally requires both a relationship between the predicate acts and the enterprise, and a relationship among the predicate acts themselves.[53]

Against that backdrop, the analysis also turns to the elements required to establish liability for individual defendants under the charged RICO provisions. "Conspiracy" requires proof of an unlawful agreement and the defendant's knowing and intentional participation in it; mere association with wrongdoers, or even suspicious acts that happen to further the scheme, will not establish the knowledge the offense requires.[54] A RICO Act charge under 18 U.S.C. § 1962(c) requires the government to establish an enterprise, the defendant's participation in the operation or management of that enterprise's affairs, and a pattern of racketeering activity; the existence of an enterprise cannot stand in for individualized proof against each defendant.[55] A sex-trafficking charge under 18 U.S.C. § 1591 requires the specific statutory conduct, a nexus to interstate or foreign commerce, the requisite *mens rea*, and proof of force, threats, fraud, or coercion, or a knowing benefit from participation in a venture the

---

[50] *See* 18 U.S.C. § 1961(1).

[51] *See* 18 U.S.C. § 1961(5).

[52] *H.J. Inc. v. Nw. Bell Tel. Co.*, 492 U.S. 229, 239–43 (1989); *United States v. Daidone*, 471 F.3d 371, 375–76 (2d Cir. 2006).

[53] *United States v. Burden*, 600 F.3d 204, 216–17 (2d Cir. 2010).

[54] *See United States v. Lorenzo*, 534 F.3d 153, 158–60 (2d Cir. 2008).

[55] *See Reves v. Ernst & Young*, 507 U.S. 170, 183, 185 (1993) (adopting the "operation or management" test); *Boyle v. United States*, 556 U.S. 938, 944–46 (2009) (defining the enterprise element).

defendant knew had engaged in such conduct.[56]  Each of these standards demands a defendant-specific showing, and each magnifies the need for severance where the indictment risks merging distinct defendants and events into a single prejudicial story.

## IV.    Argument

### A.    Legal Joinder is Improper Under Federal Rule of Criminal Procedure 8(b)

Defendants who allegedly committed unrelated acts cannot be tried together, even when those acts resemble one another in kind.[57]  This requirement operates as a legal threshold, and the government must satisfy it as to each defendant individually.  The government falls short with respect to Ms. de Joaquín.

Most glaringly, the single overt act the indictment attributed to Ms. de Joaquín involves Samuel Joaquín Flores—not Naasón, the figure at the center of the government's case.  Samuel died in 2014 and faces no charges or trial.  As mentioned previously, the indictment divides the timeline into two distinct periods and conspiracies, one allegedly led by Samuel, the other by his son Naasón.[58]  Except for a familial connection between Naasón and Samuel, and the fact that each led the LLDM church (*in seriam*), the government offers no meaningful transactional link that ties Ms. de Joaquín to both conspiracies.  The allegations against Ms. de Joaquín describe isolated conduct, not participation in a common enterprise.  No operational scheme ties her to the broader sex trafficking operation the government intends to prove, only two counts mention her, and the indictment alleges no overlap between her and her codefendants on the counts that will

---

[56] 18 U.S.C. § 1591(a); *see also id.* § 1591(e)(4) (defining "participation in a venture" as knowingly assisting, supporting, or facilitating a violation).
[57] *Turoff*, 853 F.2d at 1042–43.
[58] Indictment ¶¶ 9, 10, 11, 17.

consume the trial.  (Nor did Samuel and Naasón overlap as leaders of the Church.)  Without

specific allegations presenting facts to demonstrate this link, joinder is improper here.[59]

        B.        <u>A Joint Trial Would Create Unacceptable Spillover Prejudice</u>

Even if the Court found joinder to be technically proper (and it should not), the prejudice

to Ms. de Joaquín threatened by a joint trial independently compels severance under Rule 14(a).

There exists a genuine risk that the jury will adopt the broader case as its lens for judging

Ms. de Joaquín, importing the weight of many counts she does not face into its assessment of the

two counts she does.  The jury will hear evidence on alleged acts, records, and witness testimony

that the government could not introduce against her in a separate trial.  The highly prejudicial

and inflammatory evidence will include, among other things, live testimony from alleged victims

who have never even met Ms. de Joaquín and video evidence of sexual abuse that does not at all

involve or depict Ms. de Joaquín.  Faced with that kind of evidence, jurors will be tempted to

infer Ms. de Joaquín's knowledge, intent, agreement, or guilt from the surrounding facts, even

though the evidence specific to her conduct is thin and, as to most of the trial, nonexistent.

In *Spinelli*, the Second Circuit recognized the appropriateness of severance where proof

against a codefendant so far outweighs the evidence against the defendant seeking severance; in

such circumstances, a joint trial threatens unacceptable spillover prejudice.[60]  Even before then,

---

[59] *United States v. Johansen*, 56 F.3d 347, 351–52 (2d Cir. 1995).  The Second Circuit addressed the issue of variance between the indictment and the proof at trial, holding that when the indictment alleges a single conspiracy but the evidence at trial demonstrates multiple conspiracies, there is a variance that may prejudice the defendant.  The court emphasized that the government must prove the conspiracy alleged in the indictment and each defendant's membership in it.

[60] "There are, of course, cases in which the sheer volume and magnitude of the evidence against one defendant so dwarfs the proof presented against his co-defendant that a severance is required to prevent unacceptable spillover prejudice."  *See United States v. Spinelli*, 352 F.3d 48, 55 (2d Cir. 2003).

the court applied the same principle in *DiNome* and reversed the fraud convictions of peripheral defendants.[61]  In doing so, the court held that once the more serious counts against those defendants fell away, the mass of evidence concerning their codefendants' far graver crimes presented marginal relevance to the actual charges presented against the peripheral defendants.[62]  Ms. de Joaquín occupies the same peripheral position as the *DiNome* peripheral defendants.

The structure of this case makes it impossible for the jury to keep the evidence separate.  Ms. de Joaquín will likely spend entire weeks of trial sitting next to the other defendants without a single passing mention of her name.  The government will ask the jury to perform a sorting exercise across decades, yet Ms. de Joaquín answers only for moments.  The remaining evidence will not function as mere background; it will serve as substantive proof on charges that never name her.  Under those conditions, the jury cannot realistically compartmentalize the evidence and return an individualized verdict as to Ms. de Joaquín.  The evidence against Naasón dates from the last decade, and includes photographs, videos, and documents which will corroborate the government's charges against him, while the allegations touching Ms. de Joaquín reach back nearly half a century and will draw in only testimony about alleged events long past.  A jury viewing video and photo evidence of child sexual abuse by Naasón may improperly believe the government is correct in arguing that the church is corrupt now and has always been.  Put another way, the jury may confuse the modern, temporally-limited evidence as proof that the alleged corruption of the church existed fifty years ago.  A jury confronting that imbalance will

---

[61] *United States v. DiNome*, 954 F.2d 839 (2d Cir. 1992).
[62] *Id.* at 843–44.

weigh the evidence by accumulation rather than by its actual persuasive force, and it will read

the proof against Naasón as proof against Ms. de Joaquín.[63]

A jury that hears and sees such inflammatory evidence may as well foist their visceral

reaction upon Ms. de Joaquín, rather than weigh the limited proof of her own conduct. That is

guilt by association, and the courts have warned that severance must guard against exactly this

danger—"the spectre of guilt by association—or, more likely, guilt by confusion."[64] Rule 14(a)

supplies the remedy, empowering the Court to sever a defendant when joinder threatens

prejudice, both to protect the fairness of the trial and to insulate any verdict from reversal on

appeal. The government will likely invoke the general preference for joint trials, citing cases

such as *United States v. Cardascia*.[65] While that preference is both undeniable and material, it

does not end the analysis. Rather, it yields when a joint trial threatens a defendant's right to an

individualized verdict. This case presents that precise scenario that should give the Court pause.

It is too complex, spans too long a period, and will lard the trial with a series of serious counts

that neither name nor implicate Ms. de Joaquín.

Naasón appears in every count, including the four gravest charges that exclude

Ms. de Joaquín: Sex Trafficking by Force, Fraud, and Coercion (Count Three); Inducement to

Travel to Engage in Unlawful Sexual Activity (Count Four); Conspiracy to Sexually Exploit

Children (Count Five); and Child Exploitation Enterprise (Count Six). The gravity of those

charges, combined with the evidence the government intends to introduce, will be virtually

---

[63] *United States v. Figueroa*, 618 F.2d 934, 944–46 (2d Cir. 1980); *see also People v. Morales*, 20 N.Y.3d 240 (2012) (reversing the district court's decision and ordering a new trial where a large volume of unrelated evidence caused spillover prejudice).
[64] *United States v. Gallo*, 668 F. Supp. 736, 750 (E.D.N.Y. 1987).
[65] 951 F.2d 474 (2d Cir. 1991).

impossible for any jury to wall off from its judgment of Ms. de Joaquín—who is, after all, the mother of the central figure in the government's case.

C.     Independent Evidentiary Problems Require Severance

A joint trial will include rafts of evidence the government could not introduce against Ms. de Joaquín in a separate trial.  The proof underlying the other counts would not constitute direct evidence of the charges she faces, and it would not qualify as proper other-acts evidence under Federal Rule of Evidence 404(b).  As this Court is well aware, Rule 404(b) permits other-act evidence only for limited, non-propensity purposes—such as proving motive, intent, or knowledge—and not to suggest that a defendant acted in conformity with alleged prior wrongdoing.[66]  Even if the government could manufacture some marginal relevance, the evidence would remain far more prejudicial than probative, and Federal Rule of Evidence 403 would demand its exclusion because of the substantial risk of unfair prejudice or undue waste of time.[67]

A joint trial will guarantee myriad evidentiary challenges, and repeated limiting rulings and instructions to try to confine the jury's consideration of particular evidence to specific defendants and purposes.  These challenges, as well as the volume and frequency of resulting instructions, threaten the judicial economy offered by a joint trial while creating significant practical risks that jurors will struggle to understand and follow the permissible uses of the evidence before them.

Finally, a joint trial would impair Ms. de Joaquín's ability to present a complete defense.  Given the narrow, discrete allegations she faces, her defense is narrow and individualized, and

---

[66] Fed. R. Evid. 404(b).
[67] Fed. R. Evid. 403.

18

trying her alongside defendants accused of far broader conduct would obscure it. Due process

entitles her to present admissible evidence in her own favor, yet a joint trial may pit her strategy

against her codefendants.[68] Her codefendants may seek to shift blame onto her or pursue another

alternative defense that is incompatible with her own; she, in turn, may need to pursue a theory

irreconcilable with their defenses. Separate trials best resolve those conflicts.[69]

> D. Judicial Economy Does Not Justify Forcing Ms. de Joaquín into a
> Joint Trial

The government's likely response—a paean to judicial economy—does not overcome

this motion. Out of the gate, and for the reasons presented, a joint trial will not actually be

judicially economical. Put another way, a joint trial will require the adjudication of multiple side

shows, with repeated limiting instructions, admissibility disputes, sidebars, redactions, and

defendant-by-defendant evidentiary parsing. It is no exaggeration to recognize that a joint trial

will guarantee extra weeks of trial time. By contrast, a separate trial for Ms. de Joaquín would

be targeted, brief, and efficient, with far fewer witnesses and limited evidentiary gymnastics.

*Second*, even if the Court believed that the judicial economies of scale favored a joint

trial, the prejudice Ms. de Joaquín would suffer would be too significant to overcome. Judicial

economy cannot supplant the right to a fair trial. Thus, this Court should not rely on this

rationale to justify what would undoubtedly be an injustice against Ms. de Joaquín.

---

[68] *See Zafiro*, 506 U.S. at 538 (The Court held that mutually antagonistic defenses are not prejudicial *per se* but that severance is warranted if there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants or prevent the jury from making a reliable judgment about guilt or innocence).
[69] *Id.*

      E.      <u>Fundamental Fairness and the Integrity of the Trial Process</u>
              <u>Require Severance</u>

The Constitution demands more than nominal fairness; through the Fifth and Sixth Amendments, it guarantees fairness in practice.[70]  The Supreme Court has long held that due process secures a trial that is fair in both fact and appearance, recognizing that the presumption of innocence forms a basic component of that guarantee.[71]  A joint trial that submerges Ms. de Joaquín in a prosecution aimed at others would compromise that fairness in exactly the way these protections forbid.

Ms. de Joaquín is the defendant for whom these safeguards exist.  She is elderly, cognitively impaired, and physically fragile.  Before these allegations, she spent eight spotless decades serving the poor and needy.  She sits at the periphery of the government's case and of the lascivious, salacious, and shocking charged conduct.  She was absent from the prior criminal case in California which ended without her involvement (or even a passing accusation against her).  To try her alongside the central figures of a decades-long, multi-count scandalous sex abuse prosecution—on charges that, in their majority, say nothing about her—would convert the trial into an exercise in guilt by association.  More than a typical criminal trial, the fact that the centerpiece of the photos, videos, evidence and libidinous allegations are the Apostle of a massive Christian church instantly converts the proceeding into a moral inquisition, sure to incite deep reactions in the jurors.  That Ms. de Joaquín is the mother of this Apostle easily puts her into the crossfire of the wrath and hostile reactions of the jury toward her son.  The Court should sever Ms. de Joaquín from her codefendants and try the two counts against her separately.

---

[70] *See* U.S. Const. amend. V, VI.
[71] *Estelle v. Williams*, 425 U.S. 501, 503 (1976).

**V.    <u>Conclusion</u>**

For the foregoing reasons and to ensure she receives a fair trial, Ms. de Joaquín respectfully requests that the Court sever her trial from the other defendants in this case.

**FOREIGN PREDICATE CONDUCT NOT INDICTABLE WHEN IT OCCURRED IS AN IMPERMISSIBLE BASIS FOR LIABILITY FOR COUNT ONE IN THE INDICTMENT**

**I.        Preliminary Statement**

Count One in the indictment is a chocolate Easter bunny: substantial appeal on the outside, but empty upon examination.  Count One presents decades of alleged foreign conduct as racketeering activity without demonstrating a predicate statute that reached the charged conduct when it occurred.  That failure is fatal under RICO.  Because RICO is limited to the reach of its predicates and because the later-enacted Section 1596 carries no retroactivity command, this Court should dismiss or strike Count One as to Ms. de Joaquín to the extent Count One rests on that foreign predicate conduct or on Section 1596 or, in the alternative, the Court should narrow Count One to exclude that conduct.

Two settled rules compel that result.  *First*, RICO borrows its predicates; it does not enlarge them.  A pattern of racketeering activity must be built from acts that were independently "indictable" under a listed predicate statute.[72]  Critically here, the Supreme Court has held that foreign conduct is indictable "only to the extent that the predicates alleged in a particular case themselves apply extraterritorially."[73]  Where a predicate statute reaches only to the water's edge, RICO cannot carry it across.  None of the predicate statutes the indictment presents extends to wholly foreign conduct.[74]  As a result, the indictment must demonstrate either that

---

[72] 18 U.S.C. § 1961(1).

[73] *RJR Nabisco, Inc. v. European Cmty.*, 579 U.S. 325, 339 (2016).

[74] *See* Indictment ¶ 25.  The predicate categories listed in Count One are: trafficking in persons, 18 U.S.C. §§ 1591 and 2; forced labor, 18 U.S.C. §§ 1589 and 2; transportation and inducement to travel for purposes of unlawful sexual activity and enticement of minors, 18 U.S.C. §§ 2421, 2422, and 2; travel to engage in illicit sexual conduct and engaging in illicit sexual conduct abroad, 18 U.S.C. §§ 2423 and 2; sexual exploitation of children, 18 U.S.C. §§ 2251, 2252, and 2; financial institution fraud, 18 U.S.C. §§ 1344 and 2; and structuring and bulk cash smuggling, 31 U.S.C. §§ 5324, 5332, and 18 U.S.C. § 2.

22

(1) the predicate statute expressly reaches abroad or (2) the proscribed conduct occurred in the United States.  This indictment provides neither.

*Second*, Section 1596 cannot supply the extraterritorial reach after the fact.  Congress enacted Section 1596 on December 23, 2008,[75] and through it, provided general extraterritorial reach to Sections 1591 and 1589.[76]  That provision contains no retroactivity command.  As a result, the government may not apply that 2008 statute to prosecute foreign trafficking or forced-labor conduct completed *before* December 23, 2008.  Doing so would attach a new federal consequence to closed conduct and strip Ms. de Joaquín of a defense she held when the conduct occurred, which is precisely what the *Ex Post Facto* Clause forbids.

Supreme Court authority demonstrates the merits of Ms. de Joaquín's challenge.  In *RJR Nabisco*, the Court held that RICO reaches foreign racketeering activity only as far as its predicates do.[77]  In *Landgraf*, the Court held that, absent a clear retroactivity command, a statute does not reach conduct completed before its enactment.[78]  Together, this established Supreme Court precedent compels relief here.

The indictment's individualized allegations against Ms. de Joaquín concern the era of Samuel Joaquín Flores, whose tenure as LLDM's Apostle ended with his death in 2014.[79]  It alleges that she helped identify and groom girls and women for Samuel, facilitated and participated in his abuse, and on one occasion, held down a minor victim so that Samuel could rape her.[80]  The indictment pleads no date, no location, no predicate subsection, and no

---

[75] The William Wilberforce Trafficking Victims Protection Reauthorization Act of 2008 ("2008 TVPRA").
[76] 18 U.S.C. § 1596(a).
[77] *RJR Nabisco*, 579 U.S. at 339.
[78] *Landgraf v. USI Film Prods.*, 511 U.S. 244, 269–70, 280 (1994).
[79] Indictment ¶¶ 9, 10, 20.
[80] *Id.* ¶¶ 10, 20.

jurisdictional hook for any of this conduct. That silence matters because Ms. de Joaquín lived in Mexico throughout Samuel's lifetime and did not relocate to the LLDM residence in Los Angeles until after his death in 2014.[81] On the face of the indictment, the conduct most specific to Ms. de Joaquín is foreign, undated, and predates Section 1596. Accordingly, the indictment identifies no Count One predicate that Ms. de Joaquín can properly be tried on.[82]

Moreover, the remaining references to Ms. de Joaquín sit in enterprise-wide group allegations that name her alongside other defendants and "others," without identifying any act, date, place, or predicate subsection attributable to her. Group pleading of that kind cannot satisfy *RJR Nabisco's* predicate-by-predicate requirement.

Ms. de Joaquín's ask is simple: she asks the Court to enforce two rules of law: (1) RICO cannot make foreign conduct indictable where the predicate statute did not reach that conduct; and (2) Section 1596 does not reach conduct completed before December 23, 2008. Applied here, those rules require the Court to fashion relief—either by dismissal or striking unlawful surplusage—to exclude from Count One foreign predicate conduct that was not indictable when it occurred, and to limit Section 1596 as a basis of liability to post-enactment conduct only. And should the Court decline these prayers for relief, Ms. de Joaquín requests, as her final alternative, a bill of particulars under Rule 7(f) identifying, for each predicate act the government attributes to her, the predicate subsection criminalizing the conduct, the date and place of the act, and, for foreign conduct, the jurisdictional basis establishing its unlawfulness at the time of occurrence.

---

[81] Def. Bail Opp. (ECF No. 41) at 5.

[82] *See United States v. Pirro*, 212 F.3d 86, 92 (2d Cir. 2000) ("The Indictment Clause of the Fifth Amendment requires that an indictment contain some amount of factual particularity to ensure that the prosecution will not fill in elements of its case with facts other than those considered by the grand jury.") (citation omitted). This constitutional requirement is also included in the Federal Rules of Criminal Procedure. *See* Fed. R. Crim. P. 7(c)(1); *see also Russell v. United States*, 369 U.S. 749, 770 (1962).

Ms. de Joaquín's demands for particulars, served on January 13 and June 17, 2026, are attached as **Exhibit A** and **Exhibit B**, respectively, and the government's responses on January 29 and July 1, 2026, to those demands are attached as **Exhibit C** and **Exhibit D**, respectively.[83]

## II. <u>Legal Standard</u>

### A. <u>Federal Rules of Criminal Procedure 7 and 12 Permit a Pretrial Challenge to Count One's Legal Sufficiency</u>

Rule 7(c)(1) requires an indictment to contain a "plain, concise, and definite written statement of the essential facts constituting the offense charged."[84] An indictment suffices only if it "contains the elements of the offense charged and fairly informs a defendant of the charge against which he must defend," and it must be judged "as it was actually drawn, not as it might have been drawn."[85] Even where an indictment tracks the statutory language, it must "state some fact specific enough to describe a particular criminal act, rather than a type of crime."[86]

Rule 12, on the other hand, permits any defense "capable of determination without a trial of the general issue" to be raised before trial.[87] On such a motion, the Court tests whether the

---

[83] On January 13, 2026, Ms. de Joaquín served a demand for a bill of particulars under Rule 7(f). The government declined in full on January 29, 2026. On June 17, 2026, Ms. de Joaquín served a supplemental and renewed demand seeking, among other particulars, identification of each act attributed to her that the government contends occurred outside the United States, whether each occurred before or after December 23, 2008, and the jurisdictional basis on which the government contends each foreign act was indictable when it occurred. The government declined again on July 1, 2026. Neither response addressed the territorial or timing requests, and neither identified which individual requests the government was declining, although both of Ms. de Joaquín's letters asked the government to do so.

[84] Fed. R. Crim. P. 7(c)(1).

[85] *Hamling v. United States*, 418 U.S. 87, 117–18 (1974); *Pirro*, 212 F.3d at 91–93; *United States v. Resendiz-Ponce*, 549 U.S. 102, 108, 110 (2007); *see United States v. Alfonso*, 143 F.3d 772, 776–77 (2d Cir. 1998).

[86] *Pirro*, 212 F.3d at 93.

[87] Fed. R. Crim. P. 12 advisory committee's note to 1944 amendment.

indictment is "valid on its face" and does not weigh "the sufficiency of the evidence."[88]  The

Court does not decide whether the government can prove its allegations.  As the Supreme Court

has explained, even where "none of these charges have been established by evidence, [] at this

stage of the proceedings the indictment must be tested by its sufficiency to charge an offense."[89]

Where the indictment's own allegations do not state a legally valid federal offense, however, the

Court may dismiss, strike, or narrow the charge.[90]  The indictment need not recite the phrase

"extraterritorial hook," but where Count One relies on foreign conduct as a predicate, it must

plead facts showing that a valid predicate basis made that conduct indictable when (and where)

it occurred.

> B.      *RJR Nabisco's* Two-Step Framework Governs the Indictability of
>          Foreign Conduct

Whether foreign conduct is indictable under a predicate statute presents a question of the

reach of the statute's proscriptions, and the Court may resolve it now.  Extraterritorial reach

concerns a statute's substantive scope, not merely a court's adjudicatory power, and thus

provides a question the Court can decide before trial.[91]

The extraterritorial reach of a statute begins with a presumption.  Federal statutes apply

only domestically unless Congress clearly indicates otherwise, because "United States law

governs domestically but does not rule the world."[92]  The inquiry is not whether a jurist thinks

Congress would have wanted a statute to reach foreign conduct, but whether Congress

---

[88] *Alfonso*, 143 F.3d at 776–77; *see* Fed. R. Crim. P. 12(b)(3)(B) (permitting a pretrial motion based on a defect in the indictment).

[89] *United States v. Sampson*, 371 U.S. 75, 78–79 (1962).

[90] *Alfonso*, 143 F.3d at 776–77; *Costello v. United States*, 350 U.S. 359, 363 (1956).

[91] *Morrison v. Nat'l Austl. Bank Ltd.*, 561 U.S. 247, 254 (2010); *see United States v. Vilar*, 729 F.3d 62, 72–73 (2d Cir. 2013).

[92] *RJR Nabisco*, 579 U.S. at 335 (quoting *Microsoft Corp. v. AT&T Corp.*, 550 U.S. 437, 454 (2007)).

"affirmatively and unmistakably instructed that the statute will do so."[93]  Most simply: "When a statute gives no clear indication of an extraterritorial application, it has none."[94]  Even further, this presumption against extraterritoriality applies "across the board," whether the statute "regulates conduct, affords relief, or merely confers jurisdiction."[95]

The Supreme Court teaches to apply this presumption through two steps.  At step one, the Court asks "whether the presumption against extraterritoriality has been rebutted–that is, whether the statute gives a clear, affirmative indication that it applies extraterritorially."[96]  A statute that clears step one reaches abroad only as far as "the limits Congress has (or has not) imposed on the statute's foreign application."[97]  A statute that does not clear step one is then tested at step two, where the Court asks "whether the case involves a domestic application of the statute" by "looking to the statute's 'focus.'"[98]  "[I]f the conduct relevant to the focus occurred in a foreign country, then the case involves an impermissible extraterritorial application regardless of any other conduct that occurred in U.S. territory."[99]

This framework governs RICO's predicates directly.  RICO defines "racketeering activity" as acts "indictable," "chargeable," or "punishable" under specified statutes, and it supplies no territorial reach of its own; it borrows the reach of the particular predicate upon which the indictment relies.[100]  *RJR Nabisco* accordingly held that Section 1962 reaches foreign racketeering activity "only to the extent that the predicates alleged in a particular case themselves

---

[93] *Id.* (citing *Morrison*, 561 U.S. at 261).
[94] *Id.* at 335 (quoting *Morrison*, 561 U.S. at 255).
[95] *Id.* at 336–37.
[96] *Id.* at 337.
[97] *Id.* at 337–38; *see Morrison*, 561 U.S. at 265.
[98] *Id.* at 337.
[99] *Id.* at 337.
[100] 18 U.S.C. §§ 1961(1), 1962(c), (d).

apply extraterritorially."[101]  Foreign conduct must violate "a predicate statute that manifests an unmistakable congressional intent to apply extraterritorially," because although "a number of RICO predicates have extraterritorial effect, many do not," and "[t]he inclusion of *some* extraterritorial predicates does not mean that *all* RICO predicates extend to foreign conduct."[102] As the Court put it succinctly: "[I]f a particular statute does not apply extraterritorially, then conduct committed abroad is not 'indictable' under that statute and so cannot qualify as a predicate under RICO's plain terms."[103]  Each predicate must therefore be examined on its own, and the same analysis governs RICO's conspiracy and complicity provisions.[104]

      C.      <u>Section 1596 Must Be Construed Prospectively, and Retroactive Use Would Violate the *Ex Post Facto* Clause</u>

As a general matter, a statute enacted after completed conduct is presumed not to reach that conduct.[105]  Section 1596 is subject to this general presumption.  When a statute is enacted after the events at issue, the first task is to determine whether Congress "has expressly prescribed the statute's proper reach."[106]  If Congress has not, the court asks whether applying the statute would have "retroactive effect," including whether it would "impair rights a party possessed when he acted, increase a party's liability for past conduct, or impose new duties with respect to

---

[101] *RJR Nabisco*, 579 U.S. at 339.
[102] *Id.* (emphasis in original).
[103] *Id.*
[104] *See RJR Nabisco*, 579 U.S. at 341 (assuming without deciding that § 1962(d)'s extraterritoriality tracks that of the underlying predicate); *cf. United States v. Hoskins*, 902 F.3d 69, 96–97 (2d Cir. 2018) (the extraterritorial reach of an ancillary offense like aiding and abetting or conspiracy is coterminous with that of the underlying criminal statute).
[105] *See Landgraf*, 511 U.S. at 245 (the presumption against retroactive legislation "is deeply rooted in this Court's jurisprudence" and "finds expression in several constitutional provisions, including, in the criminal context, the *Ex Post Facto* Clause.").
[106] *Id.* at 280.

transactions already completed."[107]  A statute operates retroactively when it "attaches new legal

consequences to events completed before its enactment."[108]

The *Ex Post Facto* Clause carries that principle into criminal law and gives it

constitutional force.  For a law to offend the Clause, "it must be retrospective, that is, it must

apply to events occurring before its enactment, and it must disadvantage the offender affected by

it."[109]  A law violates the Clause where it "deprives one charged with crime of any defense

available according to law at the time when the act was committed."[110]  And Congress may not

"retroactively withdraw[] a complete defense to prosecution after it has already attached."[111]

A statute phrased as a grant of jurisdiction is not exempt from this analysis.[112]  Ordinary

jurisdictional statutes often apply to pending cases because a new jurisdictional rule usually

"takes away no substantive right but simply changes the tribunal that is to hear the case."[113]  But

a statute that "*creates* jurisdiction where none previously existed . . . speaks not just to the power

of a particular court but to the substantive rights of the parties as well," and is therefore "subject

to our presumption against retroactivity."[114]  Applying that distinction in a criminal case, one

court held that "[t]he retrospective establishment of federal jurisdiction violates the *ex post facto*

---

[107] *Id.* at 280.
[108] *Id.* at 269–70.
[109] *Weaver v. Graham*, 450 U.S. 24, 29 (1981).
[110] *Beazell v. Ohio*, 269 U.S. 167, 169–70 (1925); *accord Collins v. Youngblood*, 497 U.S. 37, 43 (1990).
[111] *Stogner v. California*, 539 U.S. 607, 632 (2003).
[112] *See Hughes Aircraft Co. v. U.S ex rel. Schumer*, 520 U.S. 939, 951 (1997).
[113] *Landgraf*, 511 U.S. at 274.
[114] *Hughes Aircraft*, 520 U.S. at 951; *accord Carr v. United States*, 560 U.S. 438, 449–50 (2010) (emphasis in original) (a criminal statute's "undeviating use of the present tense" is a "'striking indic[ator]' of its 'prospective orientation,'" and the absence of the past tense  is "powerful evidence" that Congress intended 18 U.S.C. § 2252(a)(2) to reach only post-enactment conduct).

clause," because applying the amended statute would "defeat [the defendant's] defense to the original certification and impose federal jurisdiction in a situation where none existed."[115]

## III.   **Argument**

### A.   RICO's Conspiracy and Complicity Provisions Do Not Enlarge the Predicates' Territorial Reach

RICO supplies no territorial reach of its own, and neither do its conspiracy provision or Section 2.  Both the conspiracy and complicity provisions reach only as far as the predicate statute supporting those theories of culpability.  Count One charges Ms. de Joaquín with conspiring, in violation of Section 1962(d), to conduct the affairs of the "Joaquín LLDM Enterprise" through a pattern of racketeering activity in violation of Section 1962(c), across the period from October 15, 1970, through August 2025.[116]  It lists six predicate families, each paired with Section 2: (1) sex trafficking, 18 U.S.C. § 1591; (2) forced labor, 18 U.S.C. § 1589; (3) Mann Act transportation and inducement, including enticement of minors, 18 U.S.C. §§ 2421, 2422, 2423; (4) sexual exploitation of children, 18 U.S.C. §§ 2251, 2252; (5) financial-institution fraud, 18 U.S.C. § 1344; and (6) structuring and bulk-cash smuggling, 31 U.S.C. §§ 5324, 5332.[117]  That structure does not relieve the government of the predicate-specific inquiry; rather, it makes that inquiry unavoidable, because "racketeering activity" is defined entirely by reference to acts indictable under the separately listed predicates, and RICO cannot enlarge their reach on its own.[118]

The conspiracy label does not change that result.  *RJR Nabisco* confronted the same question and resolved it against any broader reading, "assum[ing] without deciding that

---

[115] *United States v. Juvenile*, 599 F. Supp. 1126, 1131–32 (D. Or. 1984).
[116] Indictment ¶ 25.
[117] Indictment ¶ 25(a)–(g).
[118] 18 U.S.C. §§ 1961(1), 1962(c).

§ 1962(d)'s extraterritoriality tracks that of the provision underlying the alleged conspiracy."[119]

That assumption reflects the settled rule for inchoate offenses: "the extraterritorial reach of an ancillary offense like aiding and abetting or conspiracy is coterminous with that of the underlying criminal statute."[120] A RICO conspiracy therefore reaches no further abroad than the predicates it incorporates. The government may not cure a predicate-specific defect by recasting foreign conduct as part of an enterprise, a pattern, or an agreement; an enterprise may exist, yet Count One must still rest on valid racketeering predicates.

Section 2 fails for the same reason. Section 2 makes one who "aids, abets, counsels, commands, induces or procures" an "offense against the United States" punishable as a principal, and extends the same liability to one who "willfully causes" such an offense.[121] But aiding and abetting is itself an ancillary offense, and the Second Circuit has held that "[t]he aiding and abetting statute . . . is not so broad as to expand the extraterritorial reach of the underlying statute," and that "[t]he government may not expand the extraterritorial reach of [a statute] by recourse to the conspiracy and complicity statutes."[122] Section 2 thus cannot make conduct an "offense against the United States" where the underlying predicate did not reach that conduct when it occurred. Across every predicate found in Count One, then, the government cannot use Section 2 to supply a territorial hook the predicate itself lacks.

This rule also disposes of the agreement element. Count One alleges that the defendants "agreed that a conspirator would commit at least two acts of racketeering activity in the conduct

---

[119] *RJR Nabisco*, 579 U.S. at 341.
[120] *Hoskins*, 902 F.3d at 96; *see United States v. Napout*, 963 F.3d 163, 179 (2d Cir. 2020) (quoting *Hoskins*, in turn quoting *United States v. Ali*, 718 F.3d 929, 939 (D.C. Cir. 2013)).
[121] 18 U.S.C. § 2(a), (b).
[122] *Hoskins*, 902 F.3d at 96–97.

of the affairs of the Joaquín LLDM Enterprise."[123]  The government may not satisfy that element

with foreign conduct that fails the predicate-specific inquiry, with enterprise-wide group

allegations, or with catchall means-and-methods language.  As the discussion in Part III.B below

shows, no predicate survives that inquiry as to Ms. de Joaquín, and the agreement element falls

with them.

B.      Each Predicate Requires Its Own Two-Step Analysis, and the Indictment Satisfies Neither Step

The two-step inquiry must run predicate by predicate, not against Count One as an

undifferentiated whole.  For each predicate the government invokes, it must show that the

specific statute reaches the specific foreign conduct alleged, at step one or step two.

This is not a novel demand when assessing the sufficiency of a criminal RICO charge.

Courts confronting RICO charges built on foreign conduct already perform exactly this

predicate-by-predicate analysis: "[w]here a criminal defendant is charged for foreign conduct

under the RICO statute, the Court must determine whether 'the predicate[] alleged . . . appl[ies]

extraterritorially.'"[124]  Courts thus work through each charged predicate to decide which one, if

any, reached the defendants' foreign conduct.[125]

The analysis itself is the same at every turn.  At step one, the Court must ask whether the

predicate "gives a clear, affirmative indication that it applies extraterritorially"; if so, its reach is

limited "to its terms."[126]  If not, the Court turns to the statute's focus and asks whether the

conduct relevant to that focus occurred here.[127]  *RJR Nabisco* already forecloses one shortcut: a

---

[123] Indictment ¶ 26.

[124] *United States v. Iossifov*, 45 F.4th 899, 912 (6th Cir. 2022).

[125] *See, e.g.*, *United States v. Hawit*, No. 15-CR-252-PKC, 2017 WL 663542, at *10 (E.D.N.Y. Feb. 17, 2017).

[126] *RJR Nabisco*, 579 U.S. at 337–39; *Morrison*, 561 U.S. at 265.

[127] *RJR Nabisco*, 579 U.S. at 337.

predicate's reference to "*foreign* commerce" does not, by itself, satisfy step one, because "even statutes . . . that expressly refer to 'foreign commerce' do not apply abroad."[128]

Time matters, because several of the listed predicates did not exist, or did not carry their present territorial terms, across the entire charged period that runs from 1970 to 2025. Four of the predicate statutes were enacted only after the charging period began: bank fraud under Section 1344 in 1984, structuring under Section 5324 in 1986, bulk-cash smuggling under Section 5332 in 2001, and the foreign-production provision of Section 2251(c) in 2003.[129] A fifth, Section 2423(c), reached only a citizen or lawful permanent resident who "travels in foreign commerce" when it was enacted in 2003; the "resides, either temporarily or permanently, in a foreign country" basis was not added until 2013, *viz.*, before then, the provision did not reach a citizen who had stopped traveling and was merely residing abroad.[130]

---

[128] *Id.* at 353 (quoting *Morrison*, 561 U.S. at 262–63) (emphasis in original).

[129] The trafficking and forced-labor predicates aside, the predicate statutes Count One lists were enacted across the charged period as follows: Section 1344 was added by the Comprehensive Crime Control Act of 1984, Pub. L. No. 98–473, tit. II, § 1108(a), 98 Stat. 1837, 2147 (Oct. 12, 1984); Section 5324 was added by the Anti-Drug Abuse Act of 1986, Pub. L. No. 99-570, tit. I, subtitle H, § 1354(a), 100 Stat. 3207, 3207–22 (Oct. 27, 1986), and took effect three months later, on January 27, 1987, *see id.* § 1364(a), 100 Stat. at 3207–34; Section 5332 was added by the USA PATRIOT Act, Pub. L. No. 107–56, tit. III, § 371(c), 115 Stat. 272, 337 (Oct. 26, 2001); and the foreign-production provision now codified at Section 2251(c) was added by the PROTECT Act of 2003, Pub. L. No. 108–21, tit. V, § 506(2)–(3), 117 Stat. 650, 683 (Apr. 30, 2003) (redesignating the former subsection (c) as (d)).

[130] Section 2423(c) was added by the PROTECT Act of 2003, Pub. L. No. 108-21, tit. I, § 105(a), 117 Stat. 650, 653 (Apr. 30, 2003), reaching a "United States citizen or alien admitted for permanent residence who travels in foreign commerce." The "or resides, either temporarily or permanently, in a foreign country" basis was added by the Violence Against Women Reauthorization Act of 2013, Pub. L. No. 113–4, tit. XII, § 1211(b), 127 Stat. 54, 142 (Mar. 7, 2013). *See United States v. Pepe*, 895 F.3d 679, 682 (9th Cir. 2018) (the "resides" basis postdated the defendant's conduct, and as originally enacted, the statute "was previously inapplicable to U.S. citizens living abroad unless they were traveling.").

The government must therefore show, for each foreign act, that the version of the predicate in force—when the act occurred—reached it.  The government cannot make that showing for even one of the six families.  Parts III.C through III.H take each in turn.

C.    Sections 2421 and 2422 Give No Clear Indication of Foreign Reach, and Their Focus Is the Person Protected

The Mann Act travel predicates fail step one and turn, at step two, on the protection of the person coerced or transported rather than on the words "foreign commerce."  Section 2421 criminalizes transporting an individual "in interstate or foreign commerce" with intent that the individual engages in prostitution or other criminal sexual activity.[131]  Section 2422(a) criminalizes inducing such travel for the same purpose.[132]  Neither contains the unmistakable command step one requires; each rests on the generic "foreign commerce" phrasing that *RJR Nabisco* has already held insufficient.[133]

The one subsection courts have construed under the modern framework, Section 2422(b), confirms where the focus lies.[134]  In *Harris*, the Fourth Circuit did not decide whether § 2422(b) reaches foreign conduct at step one, but in holding the prosecution before it a permissible domestic application, it located the statute's focus in the harm Congress meant to prevent, explaining that the "primary evil Congress meant to avert" is "the psychological sexualization of children" and that the statute reaches "an intentional attempt to achieve a *mental* state – a

---

[131] 18 U.S.C. § 2421(a).

[132] 18 U.S.C. § 2422(a).

[133] *RJR Nabisco*, 579 U.S. at 353.

[134] The Second Circuit has not identified the statutory "focus" that governs the *Morrison* and *RJR Nabisco* domestic-application inquiry for Sections 2421 and 2422.  As to Section 2423, the Second Circuit has addressed extraterritorial reach directly, holding that Section 2423(b) applies abroad but does not reach travel occurring wholly between two foreign countries without a United States nexus.  *See infra* note 141 (citing *United States v. Weingarten*, 632 F.3d 60 (2d Cir. 2011)).

minor's assent."[135]  What controls, the court held, "is the location of a child victim when she is targeted by an offender; that is the site at which her 'assent' is coerced," and the prosecution there was domestic because the victim was "coerced into sexual activity in the United States."[136] That same focus governs Sections 2421 and 2422(a): a domestic application requires that the victim, the inducement, or the resulting unlawful activity touch United States territory, not merely that the word "commerce" appears in the indictment.

This indictment supplies none of that.  The only allegation tying Ms. de Joaquín to travel is that she, together with Sosa, Rangel García, and other LLDM Church members working at the direction of Naasón or Samuel, would "book travel and hotel accommodations for the victims for these trips."[137]  Although Paragraph 24(d) names the victims who allegedly traveled and lists destinations both inside and outside the United States, it does not tie any particular booking to Ms. de Joaquín, to any identified victim, to any specific trip, or to any date.  Nor does it allege that any victim received an inducement from Ms. de Joaquín, or engaged in any resulting unlawful activity, inside the United States.  Under *Harris*, that is the showing the government must make.  It has not done so.

D.  The Indictment Does Not Plead Facts That Fall Within the Scope of Section 2423's Extraterritorial Subsections

Under Section 2423, only those subsections with express foreign-conduct text have extraterritorial reach.  None of the three applies here.  *First*, Section 2423(a), which covers transporting a minor "in interstate or foreign commerce," fails step one for the same reason as Sections 2421 and 2422(a), and its focus, like theirs, is the protection of the minor transported.[138]

---

[135] *United States v. Harris*, 991 F.3d 552, 559 (4th Cir. 2021).
[136] *Id.* at 554, 560.
[137] Indictment ¶ 24(d).
[138] 18 U.S.C. § 2423(a).

*Second*, Section 2423(b) presents a closer question, because it reaches "a United States citizen or an alien admitted for permanent residence . . . who travels in foreign commerce" with the prohibited purpose.[139]  Even crediting *arguendo* that this citizenship-and-residency qualifier clears step one, the reach it confers is limited "to its terms."[140]  The Second Circuit has already read "foreign commerce" here to demand a genuine United States nexus, holding that foreign-to-foreign travel by a citizen, with no connection to United States territory, is not "travel[] in foreign commerce" at all.[141]  The Second Circuit credited Section 2423(b)'s "foreign commerce" language at step one only because, there, "travel[] in foreign commerce" describes the specific conduct the statute proscribes and goes "to the heart of the statute's operative text," rather than appearing as a generic jurisdictional definition.[142]  Even then, the Court confined the provision to its terms, reversing a conviction premised on travel between two foreign countries.[143]  The instant indictment pleads neither Ms. de Joaquín's citizenship or residency status at the relevant time nor any United States nexus for any travel attributed to her, so Section 2423(b) reaches nothing alleged against her.

*Third*, Section 2423(c) is the clearest extraterritorial predicate in the group, and for that reason, the clearest illustration of a reach confined "to its terms."[144]  The statute covers a citizen or lawful permanent resident who "travels in foreign commerce, or resides, either temporarily or permanently, in a foreign country," and engages in illicit sexual conduct.[145]  But the "resides . . .

---

[139] *Id.* § 2423(b).

[140] *Morrison*, 561 U.S. at 265.

[141] *United States v. Weingarten*, 632 F.3d 60, 67–72 (2d Cir. 2011).

[142] *Id.* at 66.

[143] *Id.* at 66, 70–71 (holding Section 2423(b) does not criminalize travel occurring wholly between two foreign countries without a United States nexus).

[144] *Morrison*, 561 U.S. at 265.

[145] 18 U.S.C. § 2423(c).

in a foreign country" basis arrived only in 2013; before then, the provision did not reach a citizen who had stopped traveling and simply resided abroad.[146]  Reliance on Section 2423(c) thus requires the government to plead Ms. de Joaquín's citizenship or lawful-permanent-resident status, the relevant period, and either qualifying foreign-commerce travel or, for conduct after 2013, foreign residence.  The indictment provides none of this.

In sum, Section 2423 does nothing to save the indictment's allegations against Ms. de Joaquín.

E.	Section 2251 Reaches Abroad Only Through Domestic Production
or Transmission

Section 2251(a) (domestic production of child-exploitation material) reaches foreign conduct only where the depiction was produced or transmitted in the United States, and Section 2251(c) (foreign production for import into the United States) reaches abroad only on its express import terms.[147]  In *Skinner*, the Fourth Circuit applied the two-step framework to Section 2251(a) and located its focus precisely, holding that the focus "is the production or transmission of the visual depiction," ruling "[t]he sexually explicit conduct alone is not enough," because the production or transmission is "the harm or evil the law seeks to

---

[146] *Pepe*, 895 F.3d at 688–90; *see supra* note 130 (enactment and 2013-amendment dates for Section 2423(c)).

[147] The Second Circuit has not decided whether Section 2251(a) applies extraterritorially. However, the Eastern District of New York held that Sections 2251 and 2252 apply extraterritorially to a foreign national "who sends child pornography into the United States," resting on the pre-*Morrison* "comprehensive statutory scheme" rationale.  *United States v. Kalichenko*, No. 14-CR-95-JFB, 2019 WL 1559422, at *2–4 (E.D.N.Y. Apr. 10, 2019).  On appeal, the Second Circuit did not adopt that step-one reasoning, *i.e.*, that section 2251 applies extraterritorially.  Instead, it assumed the statutes supply no clear, affirmative indication of extraterritorial reach and affirmed at step two, as a permissible "domestic application," because the defendant transmitted the visual depictions into the United States to a paying recipient here. *See United States v. Kalichenko*, 840 F. App'x 644, 645 (2d Cir. 2021) (summary order). *See also United States v. Valerio*, 765 F. App'x 562, 569 & n.4 (2d Cir. 2019) (summary order) (describing the Section 2251(a) and (c) division and noting the relationship is "unsettled").

prevent."[148]  The production and transmission of the depictions occurred in Virginia; the defendant himself was in New Zealand.  In affirming the conviction, the Fourth Circuit sustained domestic application of Section 2251(a) because the conduct at the statute's focus took place in the United States.  What mattered was the location of the production and transmission, not the location of the defendant or the wider scheme.[149]

Section 2251(c) supplies express extraterritorial text, by design.  Congress structured Section 2251 so that the government may rely on Section 2251(a)'s domestic provisions where it can, but must resort to Section 2251(c) where the conduct occurs abroad.[150]  Consistent with that design, Section 2251(c) reaches one who, "outside of the United States," uses or coerces a minor to produce a visual depiction and either "intends that such visual depiction to be transported to the United States" or in fact so transports it.[151]  That plain text clears step one, but it likewise confines the predicate to its terms: the government must plead the foreign production and the intended or actual transport to the United States.

Neither Section 2251(a) nor Section 2251(c) is pleaded against Ms. de Joaquín.  The indictment's child-exploitation allegations name only Naasón and Rangel García.[152]  Nothing alleges that Ms. de Joaquín produced, transmitted, or facilitated the transport of any depiction, and Count One's enterprise-wide predicate list cannot supply what the indictment omits as to her.

---

[148] *United States v. Skinner*, 70 F.4th 219, 226 (4th Cir. 2023) (*per curiam*).
[149] *Id.*
[150] *See* 18 U.S.C. § 2251(c) (reaching conduct "outside of the United States" on its express terms).  Section 2251(a) contains no comparable foreign-conduct language, and § 2251(c) supplies it; the government must therefore proceed under § 2251(c), on its terms, where the production is foreign.
[151] 18 U.S.C. § 2251(c).
[152] Indictment ¶¶ 24(e)–(f), 35–37.

F.      Section 2252 Requires a Domestic Shipment, Mailing, or Receipt

Section 2252 (transporting, distributing, or receiving child-exploitation material) fails step one for the same reason as the travel predicates, and its focus is on the specific act of shipment, mailing, or receipt the statute proscribes. The provision criminalizes transporting, shipping, receiving, or distributing child-exploitation material through the mails or in interstate or foreign commerce, among other means, and it carries no express extraterritorial command.[153] Although some courts held Section 2252 to have some foreign reach, those decisions predate *RJR Nabisco* or rest on the "comprehensive scheme" rationale rather than the statute's focus.[154]

The Second Circuit has not addressed the extraterritorial reach or focus of Section 2252, and no court of appeals has applied the Supreme Court's modern two-step "focus" analysis to it. The decisions extending the statute abroad rest on the view that §§ 2251–2252 form a "comprehensive statutory scheme to eradicate the sexual exploitation of children"—a purpose-based rationale that cannot survive *RJR Nabisco's* demand for a clear, statute-specific textual indication, whether the decision predates *Morrison* or reaches that rationale despite it.[155] By

---

[153] 18 U.S.C. § 2252(a).
[154] *See*, *e.g.*, *Kalichenko*, 2019 WL 1559422, *3–4 (holding conduct indictable by a defendant who sent material *into* the United States, a transmission with a domestic destination).
[155] *See United States v. Thomas*, 893 F.2d 1066, 1068–69 (9th Cir. 1990) (applying §§ 2251–2252 to film produced abroad and mailed into the United States, on the "comprehensive statutory scheme" rationale); *accord United States v. Kapordelis*, 569 F.3d 1291, 1307 (11th Cir. 2009) (§ 2251); *United States v. Harvey*, 2 F.3d 1318, 1327–28 (3d Cir. 1993) (§ 2251). Each predates *Morrison* and *RJR Nabisco* and infers foreign reach from the statute's general purpose rather than from a clear, statute-specific textual indication. That purpose-based inference cannot survive *RJR Nabisco*. It is distinct from a holding that locates extraterritorial reach in a statute's operative text or in its express limitation to United States nationals abroad. *Cf. Weingarten*, 632 F.3d at 64–66 (sustaining Section 2423(b)'s extraterritorial reach because "travel [] in foreign commerce" is operative text and because the provision expressly reaches only United States citizens and lawful permanent residents). A court in this circuit has adopted the comprehensive-scheme rationale post-*Morrison*, but it did so on the same purpose-based ground and as to conduct directed into the United States. *See supra* note 147 (discussing *Kalichenko*, 2019 WL

39

direct analogy to the Fourth Circuit's reading of the sibling provision in the same chapter, the focus of Section 2252 is the charged act of shipment, mailing, transport, or receipt, so a domestic application requires that act—a shipment into or out of the United States, a mailing to or from it, or a receipt within it—rather than some part of a broader scheme. Even the foreign-conduct cases sustaining domestic liability under this chapter involved such an act. But the indictment alleges nothing of the sort by Ms. de Joaquín.

G. Section 1344 Does Not Apply Abroad and Requires a Domestic Banking Core

Section 1344 (the bank-fraud predicate) does not reach foreign conduct at step one, and its focus requires a domestic banking core the indictment never ties to Ms. de Joaquín. The Second Circuit has resolved the threshold question directly, holding that "[t]he bank fraud statute does not purport to apply to extraterritorial conduct."[156] At step two, the court located the statute's focus in "a scheme to obtain property owned or controlled by a bank under false or fraudulent pretenses," and held that such a scheme is domestic when its "core component" is "the use of domestic mail or wires to direct the theft or misappropriation of property located within the United States and held by a domestic bank."[157]

A D.C. District Court applying the same framework to a Section 1344 charge has reached the same result. In *United States v. Jin*, the government conceded that Section 1344 carries no clear indication of extraterritorial reach, and the court, applying the two-step test to a bank-fraud conspiracy, located the focus in "the defendant's execution of a 'scheme or artifice' to defraud or deceive a U.S. bank" and found a domestic application because the defendant's false

---

1559422 at *2–4). The Fourth Circuit's focus analysis in *Skinner* points the other way. *See Skinner*, 70 F.4th at 222–24.

[156] *Bascuñán v. Elsaca*, 927 F.3d 108, 124 (2d Cir. 2019).

[157] *Id.* at 124.

40

transmissions to United States financial institutions occurred here.[158]  Section 1344 thus reaches

foreign-connected conduct only where the government identifies a specific United States

institution, domestic property or transmissions directed at it, and conduct that was a core

component of the scheme.

This indictment offers none of that.  The indictment's financial allegations do not name

Ms. de Joaquín, and they identify no institution, account, or domestic transmission as to her.[159]

Section 1344 is therefore unavailable against her on the present pleading, wherever the

underlying conduct occurred.

H.      Sections 5324 and 5332 Regulate the Border and Do Not Reach Foreign-to-
        Foreign Conduct

Sections 5324 and 5332 (the structuring and bulk-cash-smuggling predicates) raise no

extraterritoriality question at all, because each regulates the United States border itself, and a

foreign-to-foreign transaction is not an offense under either statute in the first place.  Courts

construing analogous cross-border statutes have said as much: "[r]egulation of conduct in

crossing the United States borders is not regulation of extraterritorial conduct," and the

presumption against extraterritoriality "does not apply to statutes that regulate entering and

exiting the United States."[160]

That principle controls both provisions.  Section 5324(a) governs structuring

"transaction[s] with one or more domestic financial institutions"; it does not regulate conduct

---

[158] *United States v. Jin*, No. 23-091-2-CKK, 2025 WL 2409749, at *11 (D.D.C. Aug. 19, 2025).
[159] Indictment ¶¶ 24(i)–(j).
[160] *United States v. All Assets Held at Bank Julius Baer & Co.*, 251 F. Supp. 3d 82, 99–100 &
n.13 (D.D.C. 2017) (analyzing the cross-border element of 18 U.S.C. § 2315 and quoting
*European Cmty. v. RJR Nabisco, Inc.*, 764 F.3d 129, 140 n.7 (2d Cir. 2014) ("[r]egulation of
conduct in crossing the United States borders is not regulation of extraterritorial conduct," and
the presumption "does not apply to statutes that regulate entering and exiting the United
States."), *rev'd on other grounds*, 579 U.S. 325 (2016)).

involving foreign institutions at all, so there is no foreign application for the Court to assess.[161]

Section 5324(c) reaches only evasion of the reporting duty in Section 5316, which itself applies

to monetary instruments transported into or out of the United States.[162]  Section 5332 is written

the same way, criminalizing the concealment and transport of more than $10,000 "from a place

within the United States to a place outside of the United States, or from a place outside the

United States to a place within the United States."[163]  By its terms, it reaches only movement

across the United States border, in one direction or the other, and never the movement of

currency between two foreign points.  A foreign-to-foreign cash transfer is not an impermissible

extraterritorial application of Section 5332; it is conduct the statute never proscribes.  The

indictment, in any event, does not identify Ms. de Joaquín as the actor in any structuring or cash-

transport conduct, and even if it did, the government would still have to plead a transaction

crossing the United States border.[164]

These six families exhaust Count One's predicates, and the result is uniform: the

indictment satisfies neither step of the two-step inquiry, for any predicate, as to Ms. de Joaquín.

Section 2 changes nothing, for the reasons given in Part III.A above.  And because no predicate

survives, the government cannot satisfy Paragraph 26's agreement allegation through these same

deficient predicates, through enterprise-wide group allegations, or through catchall means-and-

methods language.  With the string dissolved, the pearls of the RICO necklace scatter.

---

[161] 31 U.S.C. § 5324(a)(3).
[162] 31 U.S.C. § 5324(c); *see* 31 U.S.C. § 5316.
[163] 31 U.S.C. § 5332(a)(1).
[164] Indictment ¶¶ 24(i)–(j).

I. Section 1596 Cannot Retroactively Supply a Hook for Pre-Enactment Foreign Trafficking and Forced-Labor Conduct

       *i.      Section 1596 Supplies Prospective Reach, Not Retroactive Reach*

Section 1596 (the 2008 grant of extraterritorial jurisdiction over the trafficking and forced-labor offenses) does not reach the pre-enactment foreign conduct most specific to Ms. de Joaquín because the statute is prospective and the conduct is closed. Section 1596 matters here because Count One includes the trafficking and forced-labor predicates; Congress added Section 1596 on December 23, 2008, and that provision grants extraterritorial jurisdiction over listed trafficking offenses, attempts, and conspiracies, including Sections 1589 and 1591.[165] By its own terms, the statute reaches only those offenses Congress enumerated, and it does not supply reach for the remaining predicate families addressed in Part III.C–H.

For Ms. de Joaquín, that timing problem is concrete. Her most individualized allegations tie to Samuel, whose tenure as Apostle ended in 2014 with his death, and Paragraphs 10 and 20 allege grooming, facilitation, abuse, and the holding-down incident without pleading a date, a location, or a jurisdictional basis.[166] The missing location is decisive, because Ms. de Joaquín lived in Mexico until after Samuel's death in 2014. The broader group allegations that include her, in Paragraphs 24(a) through 24(d) and 24(g), likewise plead no special maritime and territorial jurisdiction under Section 7 of Title 18, no federal-employment or accompanying status under Section 3271 of that title, and no other pre-Section 1596 hook for foreign trafficking or forced-labor conduct.[167] To the extent any of this is treated as pre-December 23, 2008, foreign conduct, Section 1596 cannot supply the missing hook.

---

[165] 18 U.S.C. § 1596(a).
[166] Indictment ¶¶ 10, 20.
[167] Indictment ¶¶ 24(a)–(d), (g).

That gap creates the retroactivity problem. Section 1596 carries no express retroactivity command, and under the rule set out above, applying it to closed conduct would attach a new legal consequence to that conduct.[168] It would take foreign conduct that was not indictable under Section 1591 or Section 1589 when it occurred and make it usable, years later, as racketeering activity. That is not a mere procedural adjustment. It is a new territorial basis for federal criminal liability. Under *Landgraf*, that requires a clear congressional command. Section 1596 contains none.

Two trafficking decisions confirm both halves of the point. The Fifth Circuit in *Adhikari* held that the presumption against extraterritoriality is not relaxed merely because a case involves trafficking or forced labor, or because a court suspects Congress would have preferred broader reach; such "case-specific policy arguments miss the mark" because the canon is "a presumption about a *statute's meaning*."[169] The Eleventh Circuit in *Baston* supplied the converse, explaining that "[s]ection 1596(a)(2) gives extraterritorial effect to section 1591, the statute that defines the crime of sex trafficking by force, fraud, or coercion."[170] Read together, they show why timing is dispositive. If Section 1596 is the only foreign-prosecution hook, then applying it to pre-enactment conduct does not regulate forum or procedure; it manufactures reach to create a new crime that did not exist when the conduct occurred. The Court should therefore read Section 1596 prospectively and refuse to use it as the sole basis for pre-December 23, 2008, foreign predicates.

---

[168] *Landgraf*, 511 U.S. at 269–70, 280.
[169] *Adhikari v. Kellogg Brown & Root, Inc.*, 845 F.3d 184, 198 (5th Cir. 2017) (emphasis in original).
[170] *United States v. Baston*, 818 F.3d 651, 668 (11th Cir. 2016).

A continuing-conspiracy label does not avoid this problem.  Section 1962(d) may let the government charge an agreement that continued past December 23, 2008.  But the agreement's duration does not answer the predicate-specific question of whether a particular foreign act was racketeering activity when committed.  Under *RJR Nabisco*, the act qualified only if the predicate statute in force at the time made it indictable.[171]  That indictable-when-committed rule leaves the government free to rely on valid post-enactment conduct.  It does not let the government convert pre-enactment foreign conduct into racketeering activity after the fact, because later enterprise membership, later acts by others, or a characterization of the enterprise as continuing cannot supply a hook that did not exist when the foreign act occurred.

    *ii.*        *Retroactive Use of Section 1596 Would Violate the Ex Post Facto Clause*

Retroactive use of Section 1596 would not merely offend a canon of construction (*i.e.*, the presumption against retroactivity); it would remove a defense Ms. de Joaquín held when the alleged conduct occurred in violation of the *Ex Post Facto* Clause.  Section 1596 is no neutral forum rule as applied to pre-enactment foreign conduct.  While ordinary jurisdictional statutes reach pending cases because they merely regulate the forum, a statute that creates jurisdiction where none existed affects substantive rights.[172]  One court applied that distinction in a criminal case and held that retroactive use of an amended jurisdictional statute would "defeat [the defendant's] defense" and "impose federal jurisdiction in a situation where none existed."[173]

That defect is the constitutional core of this motion.  Before Section 1596, Ms. de Joaquín could argue that Sections 1591 and 1589 did not reach wholly foreign conduct absent another federal hook.  Section 1596 later supplied a broader hook.  Using that later statute to convert pre-

---

[171] *RJR Nabisco*, 579 U.S. at 339.
[172] *Landgraf*, 511 U.S. at 274; *Hughes Aircraft*, 520 U.S. at 951.
[173] *Juvenile*, 599 F. Supp. at 1132.

December 23, 2008, foreign trafficking or forced-labor conduct into predicate activity would strip her of the territorial-scope defense she held when the conduct allegedly occurred.

While this speaking indictment has plenty of scandalous things to say, it is silent on the issues that matter here: when and where Ms. de Joaquín's alleged conduct occurred, and what then-extant law reached that conduct. The indictment alleges that she facilitated and participated in Samuel's abuse and held down a minor victim so that Samuel could rape her.[174] Yet it pleads no date, no location, and no pre-Section 1596 hook for those allegations. Critically, she lived in Mexico throughout Samuel's lifetime, relocating to Los Angeles only after his death in 2014.[175] To make any pre-enactment foreign version of those allegations into racketeering activity, the government would have to use a later statute to remove a defense the predicate itself left intact when the conduct occurred. The *Ex Post Facto* Clause forbids precisely that.

### iii. Before Section 1596, Sections 1591 and 1589 Had Only Limited Foreign Reach

The pre-Section 1596 landscape confirms that retroactive use of the statute would change the legal consequences of past conduct; before 2008, the trafficking and forced-labor statutes reached abroad only narrowly. Before Congress enacted Section 1596, Sections 1591 and 1589 lacked the general extraterritorial provision Section 1596 later supplied.[176] For the portion of the charged period from 1970 through October 2001, no extraterritorial hook of any kind reached private trafficking or forced-labor conduct abroad. Section 7 of Title 18 separately extends special maritime and territorial jurisdiction, for offenses by or against a United States national, to United States diplomatic, consular, military, and related premises and residences in foreign

---

[174] Indictment ¶¶ 10, 20.
[175] Def. Bail Opp. (ECF No. 41) at 5.
[176] *See Roe v. Howard*, 917 F.3d 229, 237, 244 (4th Cir. 2019) (cataloging the limited routes that existed).

states.[177]  Since 2006, Sections 1589 and 1590 have applied to "extraterritorial acts committed by United States employees" through Section 3271, which covers one who, "while employed by . . . the Federal Government outside the United States," engages abroad in conduct that would be a chapter 77 offense if committed in the United States.[178]  Only in 2008 did the TVPRA "further expand[] the extraterritorial reach of the TVPA" by enacting Section 1596.[179]

Those limits are meaningful and govern the pre-December 23, 2008, analysis.  If a pre-enactment foreign act fell within a then-existing hook, Count One may proceed on that hook alone; if it fell outside every hook, Section 1596 cannot make that conduct indictable now.  The indictment identifies no predicate that reached Ms. de Joaquín's conduct when it occurred.  The Court should therefore dismiss or strike Count One as to Ms. de Joaquín.  At a minimum, the Court should narrow Count One to exclude the foreign conduct no predicate reached.

This indictment pleads none of those limited routes for Ms. de Joaquín's pre-enactment foreign conduct.  It does not allege that the relevant conduct occurred within special maritime and territorial jurisdiction under Section 7, that Ms. de Joaquín, Samuel, the victims, or the enterprise were employed by or accompanying the federal government abroad under Section 3271, or any other pre-Section 1596 hook.  These omissions are material: in fact, they are dispositive.  More pointedly, they confirm the absence of any basis to treat the Samuel-era allegations as domestic, post-relocation conduct, (particularly given that Ms. de Joaquín lived in Mexico throughout that period), and of any basis to treat any pre-December 23, 2008, foreign

---

[177] 18 U.S.C. § 7(9), added by the USA PATRIOT Act, Pub. L. No. 107-56, tit. VIII, § 804(a), 115 Stat. 272, 377 (Oct. 26, 2001); *see Howard*, 917 F.3d at 244.

[178] 18 U.S.C. § 3271, added by the Trafficking Victims Protection Reauthorization Act of 2005, Pub. L. No. 109–164, tit. I, § 103(a)(1), 119 Stat. 3558, 3562 (enacted Jan. 10, 2006); *see Howard*, 917 F.3d at 244.

[179] *Howard*, 917 F.3d at 237.

version of those allegations as falling within a then-existing hook. In short, the indictment identifies no law that reached this conduct when it occurred. Section 1596 cannot bridge that gap now.

> J. In the Further Alternative, the Court Should Order the Narrow Bill of Particulars Needed to Litigate the Timing and Territorial Defenses

If the Court does not dismiss, strike, or narrow Count One, Ms. de Joaquín asks the Court to order a narrow bill of particulars.[180] A bill of particulars serves three functions: it enables the defendant to prepare her defense, it prevents unfair surprise at trial, and it bars a second prosecution for the same offense.[181] RICO magnifies the need for particulars. The Second Circuit in *Davidoff* held that with the "wide latitude" the government enjoys in framing a RICO conspiracy charge "comes an obligation to particularize the nature of the charge to a degree that might not be necessary in the prosecution of crimes of more limited scope."[182] *Davidoff* imposed that obligation on a "RICO conspiracy of seven years' duration."[183]

Ms. de Joaquín served particularized demands on the government on January 13 and June 17, 2026. The June 17 demand asked the government to identify each act attributed to her that it contends occurred outside the United States, to state whether each occurred before or after December 23, 2008, and to identify the basis on which it contends each foreign act was indictable when it occurred. The government refused both demands, on January 29 and July 1, 2026, and neither refusal addressed the territorial or timing requests at all.[184]

---

[180] Fed. R. Crim. P. 7(f).
[181] *Wong Tai v. United States*, 273 U.S. 77, 80–82 (1927) (assessing the denial of particulars by whether the indictment informed the defendant of the charge with sufficient particularity to enable him to prepare his defense, avoid surprise at trial, and plead the judgment in bar of a later prosecution for the same offense).
[182] *United States v. Davidoff*, 845 F.2d 1151, 1154 (2d Cir. 1988).
[183] *Id.*
[184] *See supra* note 83.

Ms. de Joaquín's demands clearly satisfy the standard for particulars.  Rather than seek evidentiary detail, the June 17 demand seeks facts without which she cannot litigate the defenses identified in this motion.  Parts III.A through III.I turn on when and where each act attributed to Ms. de Joaquín occurred, yet the government fails to supply these necessary facts (either in the indictment or otherwise).[185]  The duration of the charged RICO conspiracy here compounds the need for particulars.  Count One charges a conspiracy of roughly fifty-five years,[186] *forty-eight years longer* than *Davidoff*.[187]

The government's answer to both of Ms. de Joaquín's demands was that the particulars sit in discovery, in the detention letter, and in the search warrant affidavits.[188]  The Second Circuit has rejected that answer: the government does "not fulfill its obligation merely by providing mountains of documents to defense counsel who were left unguided" as to which acts

---

[185] *See supra* note 83.

[186] Indictment ¶ 25.

[187] *Davidoff*, 845 F.2d at 1154.

[188] *See* supra note 83.  Ms. de Joaquín's demands are attached as Exhibit A and Exhibit B, and the government's responses as Exhibit C and Exhibit D.  In declining the first demand, the government wrote that "[t]he Indictment itself thus provides a sufficient basis to deny your request in its entirety," and that "[g]iven these strict requirements for a bill of particulars, the level of detail provided in the Indictment, the discovery and disclosures provided to date, the additional discovery that is forthcoming, and the Government's detailed detention letter (*see* Dkt. 12), no further disclosure is required as a matter of law."  Ex. C (Jan. 29, 2026, Ltr.) at 2.  It identified a single search warrant affidavit, by Bates number, that it said, "alone contains the answers to many of your demands."  *Id.*  In declining the second, the government wrote that "[t]he answers to most of your recent set of inquiries are readily apparent in discovery, public filings, prior communications, or from the Indictment itself," and that "[m]ost of your demands, with the exception of identifying all victim-witnesses by name, are already answered by the lengthy speaking Indictment, the lengthy detention letter that addresses García de Joaquín's conduct in detail, *see* Dkt. 12, at 9–11, and the well-organized and foldered discovery produced to date."  Ex. D (July 1, 2026, Ltr.) at 1–2.  Neither response addressed the requests set out in Section E of the June 17 demand, which sought identification of each act attributed to Ms. de Joaquín that the government contends occurred outside the United States, whether each occurred before or after December 23, 2008, and the jurisdictional basis on which the government contends each foreign act was indictable when it occurred.  S*ee* Ex. B (June 17, 2026, Ltr.) at 4–5.

it will prove.[189]  In *Nachamie*, the court ordered particulars where the government had produced

"over 200,000 pieces of paper" yet had "not yet informed the defendants which of these claims

were false and in what way they were false."[190]  Disclosures that are helpful but "neither

'exhaustive' nor 'exclusive'" do not defeat the need for particulars.[191]  The affidavits and the

detention letter describe conduct.  They do not state which acts the government attributes to

Ms. de Joaquín as racketeering activity, when each act occurred, or where.  The promised

enterprise letter and Section 3500 material do not fill the gap.  The government has never said

those disclosures will address timing or territoriality, and it has calendared them for trial

preparation, while this pretrial motion presents defenses that Rule 12 requires the Court to

resolve now.

Importantly, even decisions in enterprise cases denying particulars support ordering

particulars here because the indictments at issue in other enterprise cases identified discrete acts.

For example, in *Muyet*, the indictment "sets forth the date of the attacks, the names of the

defendants charged in the attacks, and the nature of each attack."[192]  Count One does the opposite

as to Ms. de Joaquín.  It names her in group allegations that span six predicate families and half a

century, and for the conduct it does describe, it supplies no date, no place, and no

predicate subsection.

In sum, should the Court not dismiss, strike, or narrow Count One (which it should), this

Court should order the particulars Ms. de Joaquín requires.  The particulars Ms. de Joaquín seeks

---

[189] *United States v. Bortnovsky*, 820 F.2d 572, 575 (2d Cir. 1987).
[190] *United States v. Nachamie*, 91 F. Supp. 2d 565, 571 (S.D.N.Y. 2000); *see id.* at 572–75
(ordering the government to identify each claim for which it would hold the defendant criminally
responsible and to specify the manner in which each was allegedly false).
[191] *United States v. Rinsch*, 807 F. Supp. 3d 238, 253 (S.D.N.Y. 2025).
[192] *United States v. Muyet*, 945 F. Supp. 586, 600 (S.D.N.Y. 1996).

are narrow: the predicate subsection, the date and place of the offending conduct the government attributes to Ms. de Joaquín, and, for foreign conduct, the jurisdictional basis establishing it was unlawful when committed. Those facts are necessary, not merely helpful. Without them, Ms. de Joaquín is handcuffed from litigating her *ex post facto* and territorial defenses.

## IV. <u>Conclusion and Relief Requested</u>

RICO borrows the reach of its predicates and adds none of its own, and none of Count One's predicates reached Ms. de Joaquín's foreign conduct when it occurred. Section 1596 cannot supply that reach retroactively without offending the presumption against retroactivity and the *Ex Post Facto* Clause. The Court should therefore dismiss or strike Count One as to Ms. de Joaquín to the extent Count One rests on foreign predicate conduct that was not indictable when it occurred, or on pre-December 23, 2008, trafficking or forced-labor conduct under Sections 1591 and 1589.

In the alternative, the Court should narrow Count One to exclude that conduct and the corresponding portions of the Paragraph 26 agreement allegation, and order that any conduct so excluded may not be presented to the jury, used to establish the pattern or the agreement, or used for sentencing or forfeiture.

Should the Court decline both forms of relief above, Ms. de Joaquín requests, in the further alternative and for the reasons stated in Part III.J, that the Court direct the government to file a bill of particulars under Rule 7(f) stating, for each predicate act it will attribute to Ms. de Joaquín under Count One, (1) the subsection of the predicate statute charged, (2) the date and place of the act, and (3) if the act is foreign, the jurisdictional basis on which the government contends it was indictable when it occurred. These particulars are necessary because the indictment pleads none of them, and because the *Ex Post Facto* question turns on whether any

attributed act predates December 23, 2008.  Ms. de Joaquín attaches as **Exhibit E** the particulars she asks the Court to "So Order."

In sum, Ms. de Joaquín asks the Court to enforce two settled rules: a predicate must have reached her alleged conduct when it occurred, and Section 1596 does not reach back. Nothing more.

**SPIRITUAL COERCION IS A LEGALLY UNTENABLE BASIS TO MAINTAIN THE GOVERNMENT'S CONSPIRACY CHARGES PREDICATED ON SEX TRAFFICKING AGAINST MS. DE JOAQUÍN**

## I.      <u>Preliminary Statement</u>

The government cannot prosecute legal conduct.  Accordingly, this Court must strike the government's coercion allegations as a means by which Ms. de Joaquín committed the crimes in the indictment because the indictment fails to allege conduct that fits within the definition of "coercion" under 18 U.S.C. § 1591(e)(2).  That failure is fatal to the government's reliance on that alleged means because, absent those allegations, the government does not adequately allege criminal conduct.  In other words, the indictment fails to state a criminal offense with respect to this theory.[193]  It is therefore ripe for this Court to strike this language at this stage as unnecessary surplusage in the indictment as legal conduct is irrelevant to the crime charged.

In addition, the government cannot now simply rely on the term "coercion" (in addition to "force, threats of force, . . . and fraud"[194]) rather than allege the specific form of that coercion. Under these circumstances, that is insufficient.  This is because the facts provided in other parts of the indictment demonstrate that the government's allegations of "coercion" overlap, relate to, and intersect with protected First Amendment activity—namely, the free exercise of religion. Swaths of the indictment's alleged form of coercion is *only* "spiritual" in nature.  Because "spiritual coercion" is conduct that clearly falls outside the scope of 18 U.S.C. § 1591(e)(2), this Court must limit the government's reliance on "coercion" as a means by which Ms. de Joaquín allegedly committed the alleged crimes.[195]

---

[193] *See* Fed. R. Crim. P. 12(b)(3)(B)(v).
[194] *See* 18 U.S.C. § 1591(a)–(b).
[195] While Ms. de Joaquín vehemently disputes the veracity of the allegations that she used force, threats of force, or fraud to allegedly facilitate the engagement of commercial sex acts,

## II. **Applicable Law**

### A. Relevant Pleading Rules

Under Rule 12(b)(3)(B)(v), a criminal defendant can raise a pre-trial motion challenging the sufficiency of an indictment for failing to state an offense.[196] "In other words, if the allegations could not possibly form the basis of liability of the offenses charged in an indictment, the charge must be dismissed."[197] In ruling on a pre-trial motion to dismiss for failure to state an offense, this Court cannot look beyond the four corners of the indictment.[198] While this Court "must assume the truth of the allegations in the indictment[,]"[199] it is also "well settled that an indictment is sufficient [only] if it . . . contains the elements of the offense charged and fairly informs a defendant of the charge against which [s]he must defend."[200]

The Second Circuit has "explained that an indictment must charge a crime with sufficient precision to inform the defendant of the charges [s]he must meet and with enough detail that [s]he may plead double jeopardy in a future prosecution based on the same set of events."[201] Relatedly, Rule 7(c)(1) states that "[t]he indictment . . . must be a plain, concise, and definite written statement of the essential facts constituting the offense charged."[202] "Upon [a] defendant's motion, the court may [also] strike surplusage from the indictment."[203] Courts grant

---

Ms. de Joaquín acknowledges that she cannot challenge these means at this time. Ms. de Joaquín shall refute these false allegations at the appropriate time.

[196] *See United States v. Rodriguez*, 162 F.4th 288, 292 (2d Cir. 2025); *United States v. Aleynikov*, 676 F.3d 71, 75–76 (2d Cir. 2012) ("[A] federal indictment can be challenged on the ground that it fails to allege a crime within the terms of the applicable statute.").

[197] *United States v. Ahemeid*, 819 F. Supp. 3d 143, 146 (E.D.N.Y. 2026).

[198] *United States v. Larson*, 807 F. Supp. 2d 142, 151 (W.D.N.Y. 2011).

[199] *Id.*

[200] *Alfonso*, 143 F.3d at 776 (quotation marks and citations omitted).

[201] *Id.* at 776 (citation omitted).

[202] Fed. R. Crim. P. 7(c)(1).

[203] Fed. R. Crim. P. 7(d).

motions to strike surplusage "where the challenged allegations are not relevant to the crime charged and are inflammatory and prejudicial."[204]

### B. Relevant Conspiracy-Specific Rules

In the RICO context, "the agreement proscribed by [18 U.S.C. §] 1962(d) is [a] conspiracy to participate in a charged enterprise's affairs through a pattern of racketeering, not a conspiracy to commit predicate acts."[205] While the government need not prove nor plead the predicate acts that undergird a RICO conspiracy, courts in this Circuit have recognized that the predicate acts are "often . . . relevant to establish the existence of the charged agreement[.]"[206] Thus, it follows that in order to satisfy the pleading requirement of an agreement in some cases, an indictment must adequately plead predicate acts.[207]

To properly plead sex trafficking, the government must plead that a defendant "(1) knowingly recruit[ed], entice[d], harbor[ed], transport[ed], provide[d], obtain[ed], advertise[d], maintain[ed], patronize[d], or solicited [her] victim; and (2) d[id] so while knowing[ly] or recklessly disregarding that force, threats of force, fraud, coercion, or any combination of such means would be used to cause [her] victim to engage in a commercial sex act."[208] For sex trafficking purposes, "'coercion[]' means[:] (A) threats of serious harm to or physical restraint against any person; (B) any scheme, plan, or pattern intended to cause a person to believe that

---

[204] *United States v. Scarpa*, 913 F.2d 993, 1013 (2d Cir. 1990) (citation omitted).
[205] *United States v. Pizzonia*, 577 F.3d 455, 463 (2d Cir. 2009) (second alteration in original) (quotation marks and citations omitted).
[206] *See United States v. D'Amico*, 734 F. Supp. 2d 321, 332 (S.D.N.Y. 2010) (quotation marks and citations omitted).
[207] *Cf. United States v. Yannotti*, 541 F.3d 112, 129 (2d Cir. 2008) ("The underlying predicate acts are relevant . . . to establish the existence of the charged agreement among members of the conspiracy . . . .").
[208] *United States v. Frey*, 736 F. Supp. 3d 128, 143 (E.D.N.Y. 2024).

failure to perform an act would result in serious harm to or physical restraint against any person; or (C) the abuse or threatened abuse of law or the legal process."[209]

This indictment includes allegations that fail to adequately plead conduct that is criminal, so this Court should strike that conduct from the indictment.

## III. <u>Argument</u>

### A. <u>The Inextricable Link Between the Government's Allegations and Protected First Amendment Activity Necessitates Specific Factual Allegations of Coercion</u>

Part of the alleged RICO and sex trafficking conspiracies in Counts One and Two of the indictment allege predicate acts that Ms. de Joaquín coerced unnamed individuals to engage in commercial sex acts.[210] Because the indictment does not plead any facts that evince an agreement for either Count One or Two,[211] the face of the indictment plainly shows that the government is using the alleged predicate acts to demonstrate an agreement. Because the indictment does not allege any form of coercion that fits within the contours of 18 U.S.C. § 1591(e)(2) for its sex-trafficking predicates, those allegations are legally invalid. The only form of coercion described in the indictment runs afoul of the First Amendment.

The First Amendment "embraces the right to maintain theories of life and death and of the hereafter which are rank heresy to followers of the orthodox faiths."[212] Individuals "may believe what they cannot prove. They may not be put to the proof of their religious doctrines or beliefs."[213] Even if someone's religious beliefs "may be beyond the ken of mortals does not mean that they can be made suspect before the law."[214] If religious doctrines which may "seem

---

[209] 18 U.S.C. § 1591(e)(2).
[210] *See* Indictment ¶¶ 24–26, 28, 30–31.
[211] *See generally* Indictment.
[212] *United States v. Ballard*, 322 U.S. 78, 86 (1944).
[213] *Id.*
[214] *Id.* at 87.

incredible, if not preposterous," "are subject to trial before a jury charged with finding their truth or falsity, then the same can be done with the religious beliefs of any sect. When the triers of fact undertake that task, they enter a forbidden domain."[215]

This fundamental and well-established principle of our constitutional jurisprudence is critical here. The gravamen of the government's coercion theory as applied to Ms. de Joaquín, as well as the other defendants, depends on the government's theory of the alleged corruption of LLDM doctrine and church culture.[216] In other words, the alleged coercive conduct was an alleged misuse of "spiritual" beliefs; an inquiry forbidden by *Ballard* and its progeny.

The government confesses its insidious theory of spiritual coercion in its own description of the "means and methods" by which the defendants allegedly "participated in the conduct" of the alleged "Joaquín LLDM Enterprise."[217] The indictment alleges that Ms. de Joaquín and others "lure[d], manipulate[d], and coerce[d] minor and adult victims into the Apostle's orbit, *often under the guise of serving the Apostle to receive religious blessings*."[218] Elsewhere, the indictment alleges that Ms. de Joaquín, and other alleged members of the Joaquín LLDM Enterprise, "used coercion and force to cause the victims to engage in commercial sex acts. [They] maintained control over the victims *by manipulating and abusing the culture of the LLDM church, which taught absolute obedience and devotion to the Apostle*."[219] The indictment further alleges that Ms. de Joaquín "manipulat[ed] and coerc[ed]" victims of the Apostle's sexual abuse "by manipulating and coercing them through the Enterprise's corruption of LLDM Church

---

[215] *Id.*
[216] *See* Indictment ¶¶ 8–14.
[217] *See*, *e.g.*, Indictment ¶ 24(a).
[218] Indictment ¶ 24(a) (emphasis added).
[219] *See* Indictment ¶ 24(c) (emphasis added).

doctrine."[220]  The alleged victims "believed that they would suffer ostracization and eternal

damnation if they did not comply with their work orders."[221]  Elsewhere still, the indictment

alleges that Ms. de Joaquín coerced the alleged victims "by holding out the promise

of blessings."[222]

These excerpts are not isolated concepts sprinkled sporadically throughout the indictment

in support of theories of legally proscribed coercion.  This is, in fact, the government's coercion

theory against Ms. de Joaquín in its entirety.  The government has made that clear.  To assess the

government's coercion theory, a jury must evaluate the truth or falsity of the consequences of

obeying the Apostle, how and when LLDM members receive blessings, and/or the validity of

LLDM doctrine.  *Ballard* squarely prohibits such inquiry.  Because these facts clearly go into the

province of protected First Amendment activity, this Court cannot permit the government to

proceed on its alleged coercion theory.

Unlike the other means to facilitate sex trafficking—*i.e.*, force, threats of force, and

fraud—Congress specifically defined "coercion" in 18 U.S.C. § 1591(e)(2).  As a matter of law,

"coercion" requires: "(A) threats of serious harm to or physical restraint against any person;

(B) any scheme, plan, or pattern intended to cause a person to believe that failure to perform an

act would result in serious harm to or physical restraint against any person; or (C) the abuse or

threatened abuse of law or the legal process."[223]  The government's purported theory of coercion,

described above and throughout the indictment, does not fit within this clearly defined term.

---

[220] Indictment ¶ 24(g).
[221] Indictment ¶ 24(g).
[222] Indictment ¶ 24(c).
[223] 18 U.S.C. § 1591(e)(2).

Importantly, this question is ripe for the Court's determination and should not be punted to a later stage of litigation. This is not a question of whether certain conduct in the indictment factually constitutes a "threat of serious harm" or "physical restraint." Rather, this Court faces a constitutional legal question as to whether the government's coercion theory here legally states a criminal offense. It does not. The government's obligation to provide factual detail in an indictment may be limited, but it is not non-existent. And where the indictment propounds a legally invalid theory, this Court must strike those invalid allegations.[224]

Ms. de Joaquín is prepared to dispute the false allegations of use of force, threats of force, and fraud on the merits. However, because the government has advanced an invalid spiritual coercion theory, this Court should strike those improper legal allegations at this stage.[225]

B.      Ms. de Joaquín's Requested Relief is Discrete and Specific

For the reasons provided above, Ms. de Joaquín asks this Court to strike the government's coercion theory undergirding one of the bases of its sex-trafficking predicate for Count One and Two. While the crime of conspiracy targets the "agreement," because the indictment states that the government intends to prove agreement through predicate-act conduct, it is appropriate to require some predicate-act pleading. And, where, as here, the government's theory encroaches the province of protected constitutional activity, the government's burden to provide some factual detail that tracks the elements of the predicate is necessary. Because the government's spiritual coercion theory falls outside the definition of coercion provided in

---

[224] Ms. de Joaquín most certainly disputes the factually inaccurate theories of sex trafficking by force, threats of force, or fraud, but she acknowledges that she cannot attack those theories at this stage of litigation. *See* Indictment ¶ 10.
[225] Ms. de Joaquín has requested relief in the form of a bill of particulars. *See supra* at 48. Should the government provide a bill of particulars and contend that its theory of coercion is not "spiritual" in nature, Ms. de Joaquín reserves the right to challenge that contention.

59

18 U.S.C. § 1591(e)(2), this Court must strike the government's coercion theory from the indictment.

Dated:  July 24, 2026
      New York, New York

                ChaudhryLaw PLLC

                By:    */s/ Priya Chaudhry*
                        Priya Chaudhry
                        Justin Mungai

                        147 West 25th Street, 12th Floor
                        New York, New York 10001
                        Tel: (212) 785-5550

                        priya@chaudhrylaw.com
                        justin@chaudhrylaw.com

                        *Attorneys for Defendant*
                        *Eva García de Joaquín*