UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,

v.

NAASÓN JOAQUÍN GARCÍA,
EVA GARCÍA DE JOAQUÍN,
JORAM NÚÑEZ JOAQUÍN, *et al.*,

Defendants.

S1 25 Cr. 370 (LAP)

**THE GOVERNMENT'S MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS AND TO STRIKE, FOR A BILL OF PARTICULARS, TO SEVER, AND TO DISCLOSE WITNESS IDENTITIES**

JAMES M. MCDONALD
United States Attorney
Southern District of New York
26 Federal Plaza, 37th Floor
New York, New York 10278

Ryan W. Allison
Lisa Daniels
Elizabeth A. Espinosa
Michael R. Herman
Assistant United States Attorneys
*Of Counsel*

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ........................................ 1

ARGUMENT ........................................ 3

I. THE DEFENDANTS' MOTIONS TO DISMISS AND TO STRIKE ARE MERITLESS ........................................ 3

A. Applicable Law ........................................ 3

B. Discussion ........................................ 4

1. The Court Should Deny Naasón Joaquín García's Motion to Dismiss Based on Venue ........................................ 4

2. The Court Should Deny the Defendants' Motions to Dismiss Based on the Free Exercise Clause and the RFRA ........................................ 7

3. The U.S. Attorney's Office for the Southern District of New York Did Not Selectively Prosecute Naasón Joaquín García ........................................ 13

4. The Court Should Deny Naasón Joaquín García's Fact-Bound Motion to Dismiss Based on Supposedly Duplicitous Conspiracies ........................................ 14

5. The Court Should Deny Eva García de Joaquín's Fact-Bound Motions to Dismiss and to Strike Based on Extraterritoriality ........................................ 16

II. THE DEFENDANTS' MOTION FOR A BILL OF PARTICULARS IS MERITLESS ........................................ 20

A. Applicable Law ........................................ 20

B. Discussion ........................................ 23

III. EVA GARCÍA DE JOAQUÍN'S MOTION TO SEVER HER TRIAL FROM THE TRIALS OF HER COCONSPIRATORS IS MERITLESS ........................................ 28

A. Applicable Law ........................................ 28

B. Discussion ........................................ 31

IV. JORAM NÚÑEZ JOAQUÍN'S MOTION FOR THE DISCLOSURE OF WITNESS IDENTITIES IS PREMATURE ........................................ 35

CONCLUSION ........................................ 36

# TABLE OF AUTHORITIES

**Page**

**Cases**

*Costello v. United States*,
350 U.S. 359 (1956) ... 4

*Emp. Div., Dep't of Human Res. of Ore. v. Smith*,
494 U.S. 872 (1990) ... 8

*Huddleston v. United States*,
485 U.S. 681 (1988) ... 19

*Luce v. United States*,
469 U.S. 38 (1984) ... 18

*Reynolds v. United States*,
98 U.S. 145 (1878) ... 7, 8

*Richardson v. Marsh*,
481 U.S. 200 (1987) ... 29

*Salinas v. United States*,
522 U.S. 52 (1997) ... 32, 33

*Smith ex rel. Smith v. Bd. of Ed., N. Babylon Union Free Sch. Dist.*,
844 F.2d 90 (2d Cir. 1988) ... 9

*Thomas v. Review Bd. of the Ind. Emp. Sec. Div.*,
450 U.S. 707 (1981) ... 12

*United States v. Aiyer*,
33 F.4th 97 (2d Cir. 2022) ... 4

*United States v. Alameh*,
341 F.3d 167 (2d Cir. 2003) ... 13

*United States v. Amato*,
15 F.3d 230 (2d Cir. 1994) ... 29

*United States v. Amer*,
110 F.3d 873 (2d Cir. 1997) ... 8, 11, 12

*United States v. Any & All Radio Station Equip.*,
93 F. Supp. 2d 414 (S.D.N.Y. 2000) ............ 12

*United States v. Applins*,
637 F.3d 59 (2d Cir. 2011) ............ 32

*United States v. Aracri*,
968 F.2d 1512 (2d Cir. 1992) ............ 14

*United States v. Armstrong*,
517 U.S. 456 (1996) ............ 13

*United States v. Ballard*,
322 U.S. 78 (1944) ............ 9, 10

*United States v. Barrera*,
950 F. Supp. 2d 461 (E.D.N.Y. 2013) ............ 27

*United States v. Beasley*,
72 F.3d 1518 (11th Cir. 1996) (per curiam) ............ 8

*United States v. Blondet*,
2022 WL 507698 (S.D.N.Y. Feb. 18, 2022) ............ 36

*United States v. Bonventre*,
646 F. App'x 73 (2d Cir. 2016) ............ 25, 26

*United States v. Bortnovsky*,
820 F.2d 572 (2d Cir. 1987) (per curiam) ............ 20, 28

*United States v. Brennan*,
798 F.2d 581 (2d Cir. 1986) ............ 19

*United States v. Burke*,
700 F.2d 70 (2d Cir. 1983) ............ 29

*United States v. Cardascia*,
951 F.2d 474 (2d Cir. 1991) ............ 29

*United States v. Carson*,
702 F.2d 351 (2d Cir. 1983) ............ 30

*United States v. Casamento*,
887 F.2d 1141 (2d Cir. 1989) ............ 29

*United States v. Cephas*,
937 F.2d 816 (2d Cir. 1991) .... 21

*United States v. Chambers*,
2018 WL 1726239 (S.D.N.Y. Apr. 9, 2018) .... 27

*United States v. Chem. Found., Inc.*,
272 U.S. 1 (1926) .... 13

*United States v. Chen*,
378 F.3d 151 (2d Cir. 2004) .... 25

*United States v. Cimino*,
31 F.R.D. 277 (S.D.N.Y. 1962) .... 22

*United States v. Cleveland*,
329 U.S. 14 (1946) .... 7, 8

*United States v. Conley*,
2002 WL 252766 (S.D.N.Y. Feb. 21, 2002) .... 21

*United States v. Dawkins*,
999 F.3d 767 (2d Cir. 2021). .... 3, 4

*United States v. DiNome*,
954 F.2d 839 (2d Cir. 1992) .... 33

*United States v. Fares*,
978 F.2d 52 (2d Cir. 1992) .... 13

*United States v. Feola*,
651 F. Supp. 1068 (S.D.N.Y. 1987) .... 22

*United States v. Figueroa*,
618 F.2d 934 (2d Cir. 1980) .... 33

*United States v. Firtash*,
39 F. Supp. 3d 872 (N.D. Ill. 2019) .... 17

*United States v. Gallo*,
668 F. Supp. 736 (E.D.N.Y. 1987) .... 33

*United States v. Gilbert*,
266 F.3d 1180 (9th Cir. 2001) .... 14

*United States v. Goldberg*,
756 F.2d 949 (2d Cir. 1985) .......... 4

*United States v. Goodwin*,
457 U.S. 368 (1982) .......... 13

*United States v. Gottlieb*,
493 F.2d 987 (2d Cir. 1974) .......... 21

*United States v. Harris*, |
733 F.2d 994 (2d Cir. 1984) .......... 19

*United States v. Henry*,
861 F. Supp. 1190 (S.D.N.Y. 1994) .......... 22

*United States v. Heppner*,
519 F.3d 744 (8th Cir. 2008) .......... 10

*United States v. Hernandez*,
85 F.3d 1023 (2d Cir. 1996) .......... 30

*United States v. Kandic*,
134 F.4th 92 (2d Cir. 2025) .......... 15

*United States v. Kazarian*,
2012 WL 1810214 (S.D.N.Y. May 18, 2012) .......... 20

*United States v. Kirk Tang Yuk*,
885 F.3d 57 (2d Cir. 2018) .......... 6

*United States v. Lamar Williams*,
Trial Tr., No. 22 Cr. 600 (LAP) (S.D.N.Y. Feb. 10, 2026) .......... 16

*United States v. Langford*,
990 F.2d 65 (2d Cir. 1993) .......... 18

*United States v. Leonelli*,
428 F. Supp. 880 (S.D.N.Y. 1977) .......... 23

*United States v. Little*,
2020 WL 3869126 (S.D.N.Y. July 9, 2020) .......... 30

*United States v. Loadholt*,
2025 WL 2962619 (S.D.N.Y. Oct. 21, 2025) .......... 6

*United States v. Mahabub*,
2014 WL 4243657 (S.D.N.Y. Aug. 26, 2014) ........ 22

*United States v. Majeed*,
|2024 WL 992884 (D. Kan. Mar. 6, 2024) ........ 8

*United States v. Malinsky*,
19 F.R.D. 426 (S.D.N.Y. 1956) ........ 28

*United States v. Maxwell*,
534 F. Supp. 3d 299 (S.D.N.Y. 2021) ........ 28

*United States v. Miller*,
116 F.3d 641 (2d Cir. 1997) ........ 28

*United States v. Mitlof*,
165 F. Supp. 2d 558 (S.D.N.Y. 2001) ........ 23

*United States v. Monserrate*,
2011 WL 3480957 (S.D.N.Y. Aug. 4, 2011) ........ 21

*United States v. Morales*,
280 F. Supp. 2d 262 (S.D.N.Y. 2003) ........ 21

*United States v. Naranjo*,
14 F.3d 145 (2d Cir. 1994) ........ 6

*United States v. Ohle*,
678 F. Supp. 2d 215 (S.D.N.Y. 2010) ........ 5, 14

*United States v. Page*,
657 F.3d 126 (2d Cir. 2011) ........ 30

*United States v. Paredes*,
176 F. Supp. 2d 179 (S.D.N.Y. 2001) ........ 18

*United States v. Persico*,
621 F. Supp. 842 (S.D.N.Y. 1985) ........ 21

*United States v. Pierre-Louis*,
2018 WL 4043140 (S.D.N.Y. Aug. 9, 2018) ........ 20

*United States v. Purcell*,
967 F.3d 159 (2d Cir. 2020) ........ 6

*United States v. Rahman*,
189 F.3d 88 (2d Cir. 1999) ........ 8

*United States v. Rajaratnam*,
736 F. Supp. 2d 683 (S.D.N.Y. 2010) ........ 15

*United States v. Ramirez*,
894 F.2d 565 (2d Cir. 1990) ........ 19

*United States v. Raniere*,
55 F.4th 354 (2d Cir. 2022) ........ 24

*United States v. Rigas*,
258 F. Supp. 2d 299 (S.D.N.Y. 2003) ........ 22

*United States v. Rittweger*,
524 F.3d 171 (2d Cir. 2008) ........ 30

*United States v. Roldan-Zapata*,
916 F.2d 795 (2d Cir. 1990) ........ 19

*United States v. Rosa*,
11 F.3d 315 (2d Cir. 1993) ........ 31

*United States v. Salameh*,
152 F.3d 88 (2d Cir. 1998) ........ 28, 29, 30

*United States v. Salerno*,
481 U.S. 739 (1987) ........ 12

*United States v. Sampson*,
898 F.3d 270 (2d Cir. 2018) ........ 4, 18

*United States v. Samsonov*,
2009 WL 176721 (S.D.N.Y. Jan. 23, 2009) ........ 21, 22

*United States v. Samuels*,
2020 WL 5517772 (S.D.N.Y. Sept. 14, 2020) ........ 31

*United States v. Scarpa*,
913 F.2d 993 (2d Cir. 1990) ........ 4

*United States v. Serpoosh*,
919 F.2d 835 (2d Cir. 1990) ........ 30

*United States v. Shaw*,
2008 WL 4899541 (S.D.N.Y. Nov. 13, 2008) ........ 18

*United States v. Sierra*,
2012 WL 2866417 (S.D.N.Y. July 11, 2012) ........ 26

*United States v. Sindone*,
2002 WL 48604 (S.D.N.Y. Jan. 14, 2002) ........ 22

*United States v. Skelos*,
2015 WL 6159326 (S.D.N.Y. Oct. 20, 2015) ........ 21

*United States v. Smith*,
2007 WL 980431 (S.D.N.Y. Apr. 3, 2007) ........ 31

*United States v. Spinelli*,
352 F.3d 48 (2d Cir. 2003) ........ 32, 33, 34

*United States v. Starks*,
2024 WL 4528169 (S.D.N.Y. Oct. 18, 2024) ........ 27

*United States v. Sterritt*,
678 F. Supp. 3d 317 (E.D.N.Y. 2023) ........ 27

*United States v. Stimler*,
864 F.3d 256 (3d Cir. 2017) ........ 11, 12

*United States v. Strawberry*,
892 F. Supp. 519 (S.D.N.Y. 1995) ........ 21

*United States v. Sun Myung Moon*,
718 F.2d 1210 (2d Cir. 1983) ........ 7

*United States v. Szur*,
1998 WL 132942 (S.D.N.Y. Mar. 20, 1998) ........ 15

*United States v. Taylor*,
707 F. Supp. 696 (S.D.N.Y. 1989) ........ 21

*United States v. Tomero*,
496 F. Supp. 2d 253 (S.D.N.Y. 2007) ........ 4

*United States v. Torres*,
901 F.2d 205 (2d Cir. 1990) ........ 20, 21, 25

*United States v. Towne*,
870 F.2d 880 (2d Cir. 1989) .......... 18

*United States v. Triana-Mateus*,
2002 WL 562649 (S.D.N.Y. Apr. 15, 2002) .......... 21

*United States v. Trippe*,
171 F. Supp. 2d 230 (S.D.N.Y. 2001) .......... 21

*United States v. Turoff*,
853 F.2d 1037 (2d Cir. 1988) .......... 29

*United States v. Unpradit*,
35 F.4th 615 (8th Cir. 2022) .......... 6

*United States v. Vanwort*,
887 F.2d 375 (2d Cir. 1988) .......... 15

*United States v. Wahab*,
2022 WL 17581560 (S.D.N.Y. Dec. 12, 2022) .......... 15, 16

*United States v. Walsh*,
194 F.3d 37 (2d Cir. 1999) .......... 25

*United States v. Wedd*,
2016 WL 1055737 (S.D.N.Y. Mar. 10, 2016) .......... 25

*United States v. Wedd*,
993 F.3d 104 (2d Cir. 2021) .......... 4

*United States v. Wey*,
2017 WL 237651 (S.D.N.Y. Jan. 18, 2017) .......... 3

*United States v. Williams*,
701 F. Supp. 3d 258 (S.D.N.Y. 2023) .......... 12, 14

*United States v. Zackson*,
12 F.3d 1178 (2d Cir. 1993) .......... 19

*United States v. Zafiro*,
945 F.2d 881 (7th Cir. 1991) .......... 29

*Wayte v. United States*,
470 U.S. 598 (1985) .......... 13

*Zafiro v. United States*,
506 U.S. 534 (1993)........................................................ 28, 30

**Statutes**

18 U.S.C. § 1591(b)(1) ........................................................ 10

18 U.S.C. § 1591(b)(2) ........................................................ 10

18 U.S.C. § 1591(e)(5)........................................................ 10

18 U.S.C. § 1596........................................................ 17

28 U.S.C. § 112(b) ........................................................ 5

42 U.S.C. § 2000bb........................................................ 7

42 U.S.C. § 2000bb-1 ........................................................ 11

**Rules**

Fed. R. Crim. P. 14(a)........................................................ 29, 30, 32

Fed. R. Crim. P. 7(f) ........................................................ 20

Fed. R. Crim. P. 8(b)........................................................ 28, 29, 31, 32

Fed. R. Evid. 404(b)........................................................ 19, 27

Fed. R. Evid. 413 ........................................................ 27

S.D.N.Y. Local Crim. R. 16.1........................................................ 3, 35

**PRELIMINARY STATEMENT**

Indictment S1 25 Cr. 370 (LAP) (the "Indictment") charges defendants Naasón Joaquín García ("Naasón"), Eva García de Joaquín ("Eva"), Joram Núñez Joaquín ("Joram"), and others with participating in a long-running criminal conspiracy to sexually traffic and abuse women and children, create child pornography, perpetrate financial crimes, and obstruct justice. (Dkt. 4).[1] As described in detail in the Indictment, the defendants and their coconspirators used their roles as leaders in the LLDM Church for decades to manipulate Church members, enrich themselves, and achieve their illegal purposes.

The defendants have filed motions to dismiss and to strike, a motion seeking a bill of particulars, a motion for severance, and a motion seeking the identities of certain witnesses. (Dkts. 59-63). The Court should deny them in their entirety.

*First*, the defendants' motions to dismiss on various grounds are meritless. Naasón's venue arguments (Dkt. 59, at 7-22) are premised on misstatements of the applicable legal standards and basic mistakes of fact; in reality, each Count of the Indictment alleges that the relevant conduct occurred "in the Southern District of New York and elsewhere," which is all the law requires. The defendants' religious expression arguments (Dkt. 59, at 23-32; Dkt. 61, at 53-60; Dkt. 63, at 16-20) are similarly baseless; no constitutional provision or federal statute provides the defendants with blanket immunity to use religious messaging to coerce victims into participating in commercial sex acts. Naasón's effort to dismiss the Indictment because of supposed selective prosecution (Dkt. 59, at 32-34) is based on years-old statements made not by anyone associated with the U.S. Attorney's Office for the Southern District of New York but by a former state official

---

[1] Unless otherwise stated, capitalized terms have the meanings ascribed to them in the Indictment and all internal quotation marks, citations, and alterations have been omitted.

who played no role in instituting this prosecution. And the fact-based claims that Naasón makes about duplicitous conspiracies (Dkt. 59, at 35-43) and that Eva makes about foreign conduct that was supposedly beyond the extraterritorial reach of the racketeering laws (Dkt. 61, at 22-52) are premature and not appropriate for resolution at this stage of the case.

*Second*, the defendants offer no persuasive reason to require the Government to file a bill of particulars. (*See* Dkt. 59, at 44-53). The Indictment is a thirty-one-page document that details the defendants' means, methods, locations, purposes, and crimes. In fact, the Indictment is so specific that all the questions about the nature of the charges that the defendants raise in their brief are answered by the Indictment itself. In addition, the Government has provided the defendants with numerous other sources of information about the nature of the charges, including extensive discovery, hundreds of pages of detailed law enforcement reports describing the relevant evidence, hundreds of pages of detailed search warrant affidavits, and detailed public filings. The Government is also planning to serve pretrial evidentiary notices and is willing to confer with the defendants regarding a timeline for the early disclosure of *Jencks* Act material to further assist the defendants' trial preparation. Considering those disclosures, a bill of particulars is unnecessary.

*Third*, Eva's motion to sever her trial from those of her codefendants (Dkt. 61, at 2-21) can be easily rejected. Eva is charged with participating in a conspiracy that included each of her codefendants. As their coconspirator, Eva is criminally responsible for the foreseeable acts of her codefendants in furtherance of the conspiracy whether she personally participated in those acts or not. All the evidence that is admissible against Eva's codefendants is thus equally admissible against her. Severing Eva will just force all the same witnesses to provide all the same testimony about all the same events involving all the same people at multiple trials. There is no basis in the

Constitution, the Federal Rules of Criminal Procedure, or the general principles of judicial economy that would require that result.

*Fourth*, Joram's motion regarding witness identities (Dkt. 63, at 21-24) is unripe. Joram's counsel did not confer with the Government before filing this motion, as required by Rule 16.1 of the Local Criminal Rules of this District. If they had, Joram's counsel would have learned that the Government is willing to provide them with much, if not all, of the information they seek, subject to a protective order, closer to trial. The Court can deny this motion without prejudice.

## ARGUMENT

### I. THE DEFENDANTS' MOTIONS TO DISMISS AND TO STRIKE ARE MERITLESS

#### A. Applicable Law

An indictment must contain "a plain, concise, and definite written statement of the essential facts constituting the offense charged" and "give the official or customary citation of the ... law that the defendant is alleged to have violated." Fed. R. Crim. P. 7(c)(1). "An indictment is sufficient as long as it (1) contains the elements of the offense charged and fairly informs a defendant of the charge against which he must defend, and (2) enables the defendant to plead an acquittal or conviction in bar of future prosecutions for the same offense." *United States v. Dawkins*, 999 F.3d 767, 779 (2d Cir. 2021). "To satisfy these requirements, an indictment need do little more than track the language of the statute charged and state the time and place (in approximate terms) of the alleged crime." *Id*. "An indictment does *not* … have to specify evidence or details of how the offense was committed." *United States v. Wey*, 2017 WL 237651, at *5 (S.D.N.Y. Jan. 18, 2017).

"An indictment returned by a legally constituted and unbiased grand jury, ... if valid on its face, is enough to call for trial of the charges on the merits." *Costello v. United States*, 350 U.S.

359, 363 (1956); *see also United States v. Scarpa*, 913 F.2d 993, 1013 (2d Cir. 1990) (motions to strike similarly turn on the face of an indictment's allegations). On a motion to dismiss or to strike, all allegations in the indictment are assumed to be true. *United States v. Goldberg*, 756 F.2d 949, 950 (2d Cir. 1985); *United States v. Tomero*, 496 F. Supp. 2d 253, 255 (S.D.N.Y. 2007). It is not for the court to "weigh whether certain factual allegations … [a]re consistent with the charged violations" at this stage. *Dawkins*, 999 F.3d at 780. Indeed, "authorizing district court judges to resolve dispositive fact-based evidentiary disputes on [dismissal] motions risks invading 'the inviolable function of the jury' in our criminal justice system" and "upset[ting] the policy choices reflected in the criminal discovery rules" by forcing the Government "to reveal its complete case before trial" to "overcome such motions." *United States v. Sampson*, 898 F.3d 270, 280-81 (2d Cir. 2018). A motion to dismiss is not the vehicle to resolve any "factual dispute that is inextricably intertwined with a defendant's potential culpability," *id*. at 281, as courts "do not evaluate the adequacy of the facts to satisfy the elements of the charged offense" until "after trial," *United States v. Wedd*, 993 F.3d 104, 121 (2d Cir. 2021). Nor is a motion to dismiss an appropriate mechanism for pretrial resolution of criminal charges based on allegedly undisputed facts, akin to "summary judgment" in civil practice. *United States v. Aiyer*, 33 F.4th 97, 117 (2d Cir. 2022).

**B. Discussion**

**1. The Court Should Deny Naasón Joaquín García's Motion to Dismiss Based on Venue**

Naasón's venue arguments (Dkt. 59, at 7-22), which are largely regurgitated from his unsuccessful motion to unseal grand jury transcripts (Dkt. 51, at 17-20), are frivolous.

It is settled law that including an allegation at the beginning of each count of an indictment that the offense occurred "in the Southern District of New York and elsewhere" satisfies the venue pleading requirement, and that "[t]he question of whether there is sufficient evidence to support

venue is appropriately left for trial." *United States v. Ohle*, 678 F. Supp. 2d 215, 231 (S.D.N.Y. 2010). The Indictment here alleges that the relevant criminal conduct for each Count occurred, began, continued, or concluded in this District and elsewhere. (*See, e.g.*, Dkt. 4 ¶¶ 15, 24(d), 25, 27, 29, 30, 31, 33, 34, 35, 36, 37, 38(d)). For that reason, when it denied Naasón's grand jury transcripts motion, the Court easily concluded that the Indictment "sufficiently allege[s] proper venue." (Dkt. 58, at 8). Nothing has changed.

Naasón's venue arguments are principally improper fact-based claims that the Court should not entertain before trial. (*See* Dkt. 58, at 8 ("[A]ny challenge to [venue] is an issue for trial ….")). Many of Naasón's venue arguments also contain basic errors. For example, Naasón accuses the Government of "circumlocution" because the Indictment alleges that certain conduct occurred in "New York, New York," which Naasón mistakenly believes "is a term that refers to the entire City of New York." (Dkt. 59, at 18). In reality, "New York, New York" does not refer to the whole of New York City but to the County of New York, *i.e.*, Manhattan, which is encompassed within this District. *See* 28 U.S.C. § 112(b) ("The Southern District comprises the counties of … New York …."). The County of New York is where Naasón transported, maintained, and harbored his victims in July 2017 after they arrived in New York City on a trip from South Africa. As another example, Naasón correctly locates John F. Kennedy International Airport in the Eastern District of New York, but he incorrectly assumes that creates a venue problem. (Dkt. 59, at 7-8). It is the transportation over the waters surrounding that airport, which are within the Southern District of New York, not the landing at the airport itself, among other bases, that supports venue here. *See* 28 U.S.C. § 112(b) ("The Southern District comprises … the waters within the Eastern District.").

Naasón also spends many pages resisting well-established, binding caselaw about venue based on transportation over the waters of the Southern District of New York (Dkt. 59, at 12-14 &

n.6) and about the standard venue pleading standards (Dkt. 59, at 15-18). None of the out-of-Circuit cases Naasón cites or the arguments he makes provides a reason, or authorization, for the Court to upset the settled venue law in this Circuit. *See, e.g.*, *United States v. Kirk Tang Yuk*, 885 F.3d 57, 71-72 (2d Cir. 2018) (transporting contraband over the waters under the Verrazano-Narrows Bridge in furtherance of a criminal conspiracy is "undoubtedly sufficient for [a] jury to find that" a conspirator "committed an overt act in furtherance of the … conspiracy … in the Southern District of New York"); *United States v. Loadholt*, 2025 WL 2962619, at *2 (S.D.N.Y. Oct. 21, 2025) ("[A]n indictment survives a motion to dismiss where it alleges simply that the offense occurred 'in the Southern District of New York and elsewhere.'").

Naasón concludes his venue arguments by repeatedly misstating the legal standards for venue for the various charges in the Indictment. (Dkt. 59, at 18-22). These, too, are improper grounds for dismissal given the facial validity of the venue allegations in the Indictment. But to be clear, the test for venue for Counts One, Two, Five, and Six, which are all continuing conspiracy offenses, is whether any reasonably foreseeable "overt act in furtherance of the conspiracy was committed" by any conspirator in this District. *United States v. Naranjo*, 14 F.3d 145, 147 (2d Cir. 1994). The venue test for the substantive offense of sex trafficking charged in Count Three is whether, among other things, Naasón "maintain[ed]," "harbor[ed]," or "transport[ed]" Victim-7 in this District. *See, e.g.*, *United States v. Unpradit*, 35 F.4th 615, 628 (8th Cir. 2022). Similarly, the venue test for the substantive offense of interstate travel for unlawful sexual acts charged in Count Four is whether, among other things, Victim-7 "traveled … through the Southern District of New York." *United States v. Purcell*, 967 F.3d 159, 187 (2d Cir. 2020). At trial, the Government will adduce facts to satisfy each of those tests. For now, however, all the Court needs to decide is whether the Indictment sufficiently alleges that those tests are satisfied, which it clearly does.

**2. The Court Should Deny the Defendants' Motions to Dismiss Based on the Free Exercise Clause and the RFRA**

The Court should reject the defendants' efforts to launder the Joaquín LLDM Enterprise's crimes through the Free Exercise Clause of the First Amendment and the Religious Freedom Restoration Act of 1993 (the "RFRA"), 42 U.S.C. §§ 2000bb, *et seq.* (*See* Dkt. 59, at 23-32; Dkt. 61, at 53-60; Dkt. 63, at 16-20). The Court was appropriately "highly skeptical" of these arguments when Naasón first previewed them in his motion to unseal grand jury transcripts, noting that it was "aware of no case law or statute that would effectively license religious leaders to engage in sex trafficking so long as it were linked to religious belief." (Dkt. 58, at 6).[2] None of the defendants' briefs in support of their motions to dismiss or to strike offer any such authority.

As the Government explained in the grand jury transcripts briefing, the First Amendment permits prosecutions of individuals who exploit religious messages, among other means, to coerce adults to participate in commercial sex acts. (*See* Dkt. 54, at 6-7 & n.2). The fact that certain conduct may be "supported by a religious creed" generally does not afford any "defense in a prosecution." *United States v. Cleveland*, 329 U.S. 14, 20 (1946); *accord Reynolds v. United States*, 98 U.S. 145, 161-67 (1878) (upholding convictions under federal anti-bigamy laws against the claim that "those who make polygamy a part of their religion are excepted from the operation of the statute"); *United States v. Sun Myung Moon*, 718 F.2d 1210, 1227 (2d Cir. 1983) ("The First

---

[2] Joram seeks another bite at the apple of unsealing the grand jury minutes, asking again to inspect the minutes to determine whether the Government presented evidence to the grand jury about the truth or falsity of the defendants' religious beliefs in connection with a fraud theory of sex trafficking or otherwise improperly instructed the grand jury. (Dkt. 63, at 11). Setting aside that this argument is based on the erroneous premise that the Government seeks to argue that the defendants committed sex trafficking through fraud by proving that the LLDM Church doctrines are objectively false, this Court already rejected exactly this motion by Naasón. (*See* Dkt. 53, at 3; Dkt. 58, at 6-8). Joram offers no reason why the Court should reach a different conclusion here.

Amendment does not insulate a church or its members from judicial inquiry when a charge is made that their activities violate a penal statute."). To hold otherwise "would place beyond the law any act done under claim of religious sanction." *Cleveland*, 329 U.S. at 20.

Under longstanding First Amendment doctrine, "if prohibiting the exercise of religion … is not the object of the [challenged law] but merely the incidental effect of a generally applicable and otherwise valid provision, the First Amendment has not been offended." *Emp. Div., Dep't of Human Res. of Ore. v. Smith*, 494 U.S. 872, 878 (1990); *see id.* at 879 ("Laws … are made for the government of actions, and while they cannot interfere with mere religious belief and opinions, they may with practices.... Can a man excuse his practices to the contrary because of his religious belief? To permit this would be to make the professed doctrines of religious belief superior to the law of the land, and in effect to permit every citizen to become a law unto himself." (quoting *Reynolds*, 98 U.S. at 166)). Applying that rule, courts routinely uphold federal criminal statutes in the face of free exercise challenges. *See, e.g.*, *United States v. Rahman*, 189 F.3d 88, 135 (2d Cir. 1999) ("If the evidence showed that [the defendant] conspired to levy war against the United States or solicited others to commit crimes of violence ... it would not constitute a defense that he was justified in doing so within a framework of Islamic Law."); *United States v. Amer*, 110 F.3d 873, 879 (2d Cir. 1997) (upholding a kidnapping statute as applied to any "conduct within its reach without regard to whether the conduct was religiously motivated"); *United States v. Majeed*, 2024 WL 992884, at *10 (D. Kan. Mar. 6, 2024) (rejecting argument that the First Amendment bars labor trafficking charges that involved the use of threats to "enforce[] … religious doctrine" and manipulating victims' "fear of what may happen in the afterlife"); *see also United States v. Beasley*, 72 F.3d 1518, 1527 (11th Cir. 1996) (per curiam) (in a racketeering conspiracy prosecution, the jury could consider the defendant's religious beliefs and "affiliation with a

religious group … where probative of an issue in a criminal prosecution," such as how the "religious teachings were used to justify, rationalize, and promote crime," and "to show how [a religious leader] exerted influence and control over the members and how he used his preachings to justify heinous crimes"). The federal adult sex trafficking laws charged in the Indictment here, which apply to all sex trafficking conduct generally not just to sex trafficking that includes religious messaging, are no different.

Although the Government cited many of the same cases and made the same First Amendment arguments in the grand jury transcripts briefing, the defendants have not engaged with those cases or arguments at all. Instead, the defendants continue to base their First Amendment arguments entirely on one decision from decades ago: *United States v. Ballard*, 322 U.S. 78 (1944). That decision stands for the proposition that, under the Free Exercise Clause, "[g]enerally it is not proper for courts to evaluate the truth or correctness of an individual's sincerely held religious beliefs." *Smith ex rel. Smith v. Bd. of Ed., N. Babylon Union Free Sch. Dist.*, 844 F.2d 90, 93 (2d Cir. 1988) (citing *Ballard*, 322 U.S. at 86). But, as the Government has previously explained, nothing about the charges in this case will require the Court or the jury to do that. (*See* Dkt. 58, at 6 (the Court recognizing that "the charges in the Indictment do not, in fact, turn on the truth of the LLDM Church's religious tenets")). The objective truth of the defendants' religious beliefs is not at issue at all in this case—what matters to the adult sex trafficking charges is what the victims believed about the consequences of failing to submit to the defendants' directives and how the defendants used those beliefs to threaten the victims with "physical," "nonphysical," or "psychological … harm" that was "sufficiently serious, under all the surrounding circumstances, to compel a reasonable person of the same background and in the same circumstances to perform

or to continue performing commercial sexual activity in order to avoid incurring that harm." 18 U.S.C. § 1591(e)(5).

The defendants' only response to this point is to claim that the reference to "a reasonable person" in the statutory definition of "serious harm" requires "the jury … to make a finding as to whether a reasonable person would believe that Hell is a real place." (Dkt. 59, at 29 n.14). That is incorrect. The jury will not be asked whether it is reasonable to believe in Hell. It will be asked whether "a reasonable person of the same background and in the same circumstances" as the adult victims of the Joaquín LLDM Enterprise's sex trafficking, *i.e.*, an objective person who believed what those victims believed, would feel sufficiently threatened by the words and conduct of the defendants and their coconspirators that the person would "perform or … continue performing commercial sexual activity in order to avoid incurring that harm." There is nothing unconstitutional about that inquiry. It does not ask whether the LLDM Church's teachings are actually true or false. It asks only whether threats based on those teachings, true or not, could coerce a reasonable person who believed in the teachings to participate in commercial sex acts. *Cf. United States v. Heppner*, 519 F.3d 744, 749 (8th Cir. 2008) (recognizing that *Ballard* was inapposite because, although the defendants used religious messaging to commit crimes, "the truth of their religious beliefs, or those of [their victims], was [not] an issue at trial").

Moreover, as the Government has also previously explained, the defendants' effort to dismiss the entire Indictment based on their objection to this one theory of coercion is improper. (*See* Dkt. 54, at 8-9). The "coercion" theory that the defendants challenge applies only to the crime of sex trafficking of adults, in violation of 18 U.S.C. § 1591(b)(1). The Government does not need to prove coercion of any kind to establish that the defendants are guilty of sex trafficking of minors, in violation of 18 U.S.C. § 1591(b)(2), as charged as an object of the conspiracies in Counts One

and Two. The Government also does not need to prove coercion to establish that the defendants are guilty of racketeering conspiracy as charged in Count One, conspiracy to produce child pornography as charged in Count Five, or child exploitation enterprise as charged in Count Six. For the Counts that do require some force or coercion, that is, the adult sex trafficking portions of Counts One and Two and Counts Three and Four, the Indictment alleges multiple alternative theories of liability that do not depend on the coercion conduct that the defendants claim the First Amendment protects. For example, the Indictment alleges that Naasón and his coconspirators compelled victims to participate in commercial sex acts through "physical force," "restraint[s]," "threats of force," and threats to end the victims' "relationship with [their] family members or friends inside the LLDM Church." (Dkt. 4 ¶¶ 24(c), 31, 33). None of those methods of force or coercion is subject to a First Amendment defense. Naasón claims that these alternative allegations of force and coercion are "vague, unspecified, and boilerplate" (Dkt. 59, at 25 n.12), but the time for him to contest the facts alleged in the Indictment is at trial. At this stage, the Court must accept those factual allegations about the various alternative theories of liability as true and evaluate only whether those allegations could support a conviction, which they clearly could.

Naasón's arguments under the RFRA meet a similar fate. (Dkt. 59, at 30-32). The RFRA precludes the Government from "substantially burden[ing] a person's exercise of religion" unless the burden "is in furtherance of a compelling governmental interest; and … is the least restrictive means of furthering that compelling governmental interest." 42 U.S.C. § 2000bb-1; *see Amer*, 110 F.3d at 879 n.1. It is the religious claimant's burden to establish a substantial burden that triggers the RFRA's protections. *See, e.g.*, *United States v. Stimler*, 864 F.3d 256, 268 (3d Cir. 2017), *rehr'g granted and vacated in part on other grounds by United States v. Goldstein*, 902 F.3d 411 (mem.) (3d Cir. 2018); *United States v. Any & All Radio Station Equip.*, 93 F. Supp. 2d 414, 419

(S.D.N.Y. 2000). If a claimant is able to comply with a law and still have "acceptable alternative means of religious practice," then the claimant has not established that the law imposes a substantial burden. *Stimler*, 864 F.3d at 268; *accord Any & All Radio Station Equip.*, 93 F. Supp. 2d at 419 (holding that "claimants have not demonstrated that the [relevant laws and policies] put[] pressure on them to modify their behavior and violate their beliefs" because there were acceptable alternative methods to practice their religion).

Naasón has failed to establish that it would substantially burden his religious practice to comply with the federal sex trafficking laws. Those laws do not preclude Naasón from "serving as a spiritual guide and teacher of the LLDM Church." (Dkt. 59, at 31). They only prohibit Naasón from abusing his role in the LLDM Church to issue coercive threats that cause his victims to participate in commercial sex acts to avoid the threatened harms. Naasón does not explain why he must be permitted to make threats for that purpose in order to practice his religion. *Cf. Amer*, 110 F.3d at 879 n.1 (kidnapping law did not substantially burden religious practice because it did not "put substantial pressure on an adherent to modify his behavior and to violate his beliefs" (quoting *Thomas v. Review Bd. of the Ind. Emp. Sec. Div.*, 450 U.S. 707, 718 (1981))).

In any event, even if the federal sex trafficking laws did substantially burden Naasón's religious expression, they would pass RFRA scrutiny. "[T]he [G]overnment has a compelling interest in uniform application of laws about violent crimes," such as the federal sex trafficking laws, and "no other effective means of such uniformity exist[]." *Stimler*, 864 F.3d at 268; *see also United States v. Salerno*, 481 U.S. 739, 749 (1987) (the Government has a "compelling" interest in prevention of serious crimes); *United States v. Williams*, 701 F. Supp. 3d 258, 273-74 (S.D.N.Y. 2023) (the RFRA does not impact federal criminal laws that are "sufficiently justified and narrowly tailored," such as those involving "force, threats of force, and obstruction" (collecting cases)).

**3. The U.S. Attorney's Office for the Southern District of New York Did Not Selectively Prosecute Naasón Joaquín García**

Naasón's argument that he has been selectively prosecuted by the U.S. Attorney's Office for the Southern District of New York is meritless. (Dkt. 59, at 32-34).

Courts apply a "demanding" standard for a selective-prosecution claim. *United States v. Armstrong*, 517 U.S. 456, 463 (1996). The Government "retains 'broad discretion' as to whom to prosecute." *Wayte v. United States*, 470 U.S. 598, 607 (1985) (quoting *United States v. Goodwin*, 457 U.S. 368, 380 n.11 (1982)). "As a result, 'the presumption of regularity supports' ... prosecutorial decisions and, 'in the absence of clear evidence to the contrary, courts presume that [prosecutors] have properly discharged their official duties.'" *Armstrong*, 517 U.S. at 464 (alteration original) (quoting *United States v. Chem. Found., Inc.*, 272 U.S. 1, 14-15 (1926)). Overcoming the presumption of regularity requires "'clear evidence' that the decision to prosecute not only (1) 'had a discriminatory effect' but also (2) 'was motivated by a discriminatory purpose.'" *Id.* (quoting *Armstrong*, 517 U.S. at 465); *accord United States v. Alameh*, 341 F.3d 167, 173 (2d Cir. 2003). The first element requires proof that "others similarly situated have not generally been proceeded against because of conduct of the type forming the basis of the charge against the defendant," and that the defendant has been "singled out." *United States v. Fares*, 978 F.2d 52, 59 (2d Cir. 1992). The second element requires proof that the "selection of the defendant for prosecution has been invidious or in bad faith, *i.e.*, based upon such impermissible considerations as race, religion, or the desire to prevent his exercise of constitutional rights." *Id.*

Naasón's arguments do not approach clear evidence of discriminatory purpose or effect. Naasón's only "evidence" of discriminatory purpose are statements made by the former attorney general of California years before the federal investigation that led to the Indictment in this case began. (*See* Dkt. 59, at 32-34). Naasón offers no reason whatsoever to conclude that the U.S.

Attorney's Office for the Southern District of New York was aware of, much less motivated by, anything that former official from a different sovereign said or believed when it sought the Indictment. *See, e.g.*, *United States v. Gilbert*, 266 F.3d 1180, 1187 (9th Cir. 2001) (dismissing selective prosecution claim premised on supposed misconduct by another agency because "[i]n all but the most extreme cases, it is only the biases and motivations of the prosecutor that are relevant"). Naasón's "evidence" of discriminatory effect—specifically, news reports generally estimating the number of clergy members who have not been prosecuted for sexual abuse—is similarly scant. Naasón offers no reason to believe that this Office has ever had evidence that is anywhere near as strong as the evidence against Naasón with respect to any of those other religious leaders and decided to single out Naasón. *See, e.g.*, *Williams*, 701 F. Supp. 3d at 266 (denying selective prosecution claim because "Defendants have not identified any specific unprosecuted individual … for which the Government has at least as strong evidence to prosecute").

**4. The Court Should Deny Naasón Joaquín García's Fact-Bound Motion to Dismiss Based on Supposedly Duplicitous Conspiracies**

The Court can easily dispatch Naasón's argument that the entire Indictment must be dismissed because Count One supposedly charges multiple conspiracies. (Dkt. 59, at 35-43).

If an indictment "on its face sufficiently alleges a single conspiracy, the question of whether a single conspiracy or multiple conspiracies exists is a question of fact for the jury." *Ohle*, 678 F. Supp. 2d at 222; *see United States v. Aracri*, 968 F.2d 1512, 1519 (2d Cir. 1992) ("Whether the government has proved a single conspiracy or has instead proved multiple other independent conspiracies is a question of fact for a properly instructed jury."). To ensure that the jury unanimously finds a defendant guilty of a single conspiracy in each count, courts often deliver a standard "multiple conspiracies" jury instruction "depending upon the evidence presented at trial" rather than dismissing any charges pretrial. *United States v. Szur*, 1998 WL 132942, at *11

(S.D.N.Y. Mar. 20, 1998); *see, e.g.*, *United States v. Kandic*, 134 F.4th 92, 101 (2d Cir. 2025) (a trial court's "careful charge regarding unanimity" and a "special verdict sheet" cured any prejudice of a duplicitous count by removing "any possibility of a non-unanimous verdict"); *United States v. Wahab*, 2022 WL 17581560, at *9 (S.D.N.Y. Dec. 12, 2022) ("[M]uch of the risk of prejudice created by a potentially duplicative charge can be cured through proper instructions at trial."). "For that reason[,] courts in this Circuit have repeatedly denied motions to dismiss a count as duplicitous." *United States v. Rajaratnam*, 736 F. Supp. 2d 683, 688 (S.D.N.Y. 2010).

Count One facially alleges a single conspiracy to participate in the Joaquín LLDM Enterprise in violation of the racketeering laws. (Dkt. 4 ¶ 25). All the single conspiracy rule requires is proof of "mutual dependence and assistance among the participants, a common aim or purpose, or a permissible inference, from the nature and scope of the operation, that each actor was aware of his part in a larger organization where others performed similar roles equally important to the success of the venture." *Wahab*, 2022 WL 17581560, at *7 (quoting *United States v. Vanwort*, 887 F.2d 375, 383 (2d Cir. 1988)). The Indictment alleges that the conspirators in the Joaquín LLDM Enterprise shared common purposes, including, among other things, to sexually gratify the Apostle, including through the sexual exploitation of women and children, the creation of sexually explicit photographs and videos of children, and the enabling of the Apostle's sexual violence against LLDM Church members; to financially enrich members of the Apostle's family; to secure the loyalty of LLDM Church members to the Apostle's family; to preserve the power of the Apostle's family over the Church; and to protect the members of the Joaquín LLDM Enterprise from law enforcement. (Dkt. 4 ¶¶ 23(a)-(f)). The Indictment also alleges that the defendants and their coconspirators acted together to serve those purposes, including by agreeing to commit racketeering acts with each other and to support other conspirators' commission of racketeering

acts. (Dkt. 4 ¶¶ 24(a)-(k), 25(a)-(g)). That sufficiently alleges a single racketeering conspiracy and is grounds to deny Naasón's motion.

Naasón claims that Count One encompasses multiple conspiracies because the Indictment alleges that the conspiracy began before Naasón joined it and that Naasón became its leader after his father, Samuel, died. (Dkt. 59, at 37-40). But neither of those facts precludes a jury from concluding that there was a single conspiracy to participate in the Joaquín LLDM Enterprise. It is routine for a long-running racketeering conspiracy to change its membership and leadership as new members identify themselves and come of age and as older members leave the conspiracy or pass away. *See, e.g.*, Tr. 956, *United States v. Lamar Williams*, No. 22 Cr. 600 (LAP) (S.D.N.Y. Feb. 10, 2026) (the Court instructing the jury that a racketeering "enterprise must continue to exist in substantially similar form throughout the period charged," but "[i]t does not have to be exactly the same membership throughout the period charged," provided that the enterprise retains "a recognizable core that continues during a substantial period during the time frame charged"). That does not mean that new racketeering conspiracies necessarily form each time the membership of the group is modified. "The members of a conspiracy are not required to have conspired directly with each co-conspirator and need only be conscious of the general nature and extent of the conspiracy." *Wahab*, 2022 WL 17581560, at *7. The Indictment's allegations satisfy that standard. Naasón's fact-based arguments about the supposed insufficiency of those allegations to prove a single conspiracy are not appropriate in this posture.

**5. The Court Should Deny Eva García de Joaquín's Fact-Bound Motions to Dismiss and to Strike Based on Extraterritoriality**

Eva's argument to dismiss Count One on extraterritoriality grounds is similarly baseless. (Dkt. 61, at 22-52).

It is unnecessary to engage now with Eva's lengthy claims about the extraterritorial reach of the various predicate laws cited in Count One. The Indictment charges multiple instances of classically domestic conduct: It alleges that the defendants agreed that they or a coconspirator would commit two or more predicate racketeering acts "in the Southern District of New York and elsewhere" (Dkt. 4 ¶ 25), including in various places abroad and throughout the United States, such as "California, … Nevada, Texas, Georgia, Indiana, North Carolina, South Carolina, New Jersey, [and] Washington, D.C." (Dkt. 4 ¶ 15; *see, e.g.*, Dkt. 4 ¶¶ 24(b) (victims of sex trafficking harbored in California), 24(d) (victims of sex trafficking transported "to various destinations within the United States"), 24(f) (minor victims of sexual abuse manipulated and coerced California, and Naasón possessed child pornography during "interstate … trips" to New York and elsewhere), 24(g) (labor trafficking victims forced to clean homes in California)). The Indictment also alleges specific instances of sex trafficking by the Joaquín LLDM Enterprise that were partially extraterritorial but that occurred after 2008 (when Congress passed 18 U.S.C. § 1596), including at least one instance that personally involved Eva. (Dkt. 4 ¶¶ 27-29). Those factual allegations, accepted as true at this stage, adequately allege permissible domestic and extraterritorial applications of the racketeering laws to the Joaquín LLDM Enterprise. Eva may contest those facts and raise an extraterritoriality defense at or after trial, but those are not appropriate arguments for dismissal. *See United States v. Firtash*, 39 F. Supp. 3d 872, 881-88 (N.D. Ill. 2019) (denying a motion to dismiss a racketeering conspiracy charge on extraterritoriality grounds principally because "[t]he allegations in the Indictment, presumed to be true, sufficiently set out the element of domestic [racketeering predicate] violations" despite the defendant's factual arguments about extraterritorial conduct).

Eva's further argument that evidence of foreign conduct by the Joaquín LLDM Enterprise that is beyond the extraterritorial scope of the racketeering predicates listed in Count One should not "be presented to the jury, used to establish the pattern or the agreement, or used for sentencing or forfeiture" is also premature. (*See* Dkt. 61, at 51). Evidentiary objections of that sort should be raised in motions *in limine*. *See United States v. Paredes*, 176 F. Supp. 2d 179, 181 (S.D.N.Y. 2001); *see also Luce v. United States*, 469 U.S. 38, 41 n.4 (1984) (the purpose of motions *in limine* is to obtain rulings on evidentiary issues in advance of trial). It is not at all clear at this point—many months before *Jencks* Act material has been produced, pretrial evidentiary notices have been served, and trial is scheduled to begin—that the Government will need to admit any evidence of foreign conduct that is not charged in Count One. Eva cannot use a motion at this stage to circumvent the discovery rules by forcing an early dispute about evidence of allegedly uncharged foreign conduct that the Government may not seek to admit. *See Sampson*, 898 F.3d at 280-81.

In any event, when the time comes, the Court will not need to exclude evidence of any foreign conduct even if that conduct is beyond the extraterritorial scope of Count One. Courts routinely admit evidence of uncharged activity by racketeering conspirators if the activity "arose out of the same transaction or series of transactions as the charged offense, or if it [is] inextricably intertwined with the evidence regarding the charged offense, or if it is necessary to complete the story of the crime [on] trial." *United States v. Shaw*, 2008 WL 4899541, at *5 (S.D.N.Y. Nov. 13, 2008) (quoting *United States v. Towne*, 870 F.2d 880, 886 (2d Cir. 1989) (alterations in original)). This is true even if the uncharged act occurred beyond the temporal or geographic limitations of the charged enterprise or conspiracy. *See, e.g.*, *United States v. Langford*, 990 F.2d 65, 70 (2d Cir. 1993). Evidence of uncharged conduct is also admissible to "inform the jury of the background of the conspiracy charged," "to complete the story of the crimes charged," and to "help[] explain to

the jury how the illegal relationship between [participants in the crime] developed." *United States v. Roldan-Zapata*, 916 F.2d 795, 804 (2d Cir. 1990) (quoting *United States v. Brennan*, 798 F.2d 581, 589-90 (2d Cir. 1986); *United States v. Harris*, 733 F.2d 994, 1006 (2d Cir. 1984)). Any of those would be legitimate reasons to admit evidence of foreign conduct here even if that conduct does not fall within the domestic or extraterritorial bounds of a particular racketeering predicate identified in Count One.

Separately, to the extent evidence of uncharged foreign conduct is introduced in this trial, it would also be admissible under Rule 404(b) of the Federal Rules of Evidence. That rule authorizes the admission of evidence of any uncharged "crime, wrong, or act" to prove "motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." Fed. R. Evid. 404(b). "Other act" evidence may be admitted if it (1) is advanced for a proper purpose; (2) is relevant to the crimes for which the defendant is on trial; and (3) has probative value which is not substantially outweighed by any unfair prejudicial effect. *See United States v. Zackson*, 12 F.3d 1178, 1182 (2d Cir. 1993); *United States v. Ramirez*, 894 F.2d 565, 568 (2d Cir. 1990) (citing *Huddleston v. United States*, 485 U.S. 681, 691-92 (1988)). For example, Eva's participation with Samuel and other conspirators in the Joaquín LLDM Enterprise in the rape of a minor in Mexico could be used under Rule 404(b) to prove Eva's knowledge of the nature and scope of the racketeering conspiracy's sexual abuse activity in the United States or to rebut any suggestion that Eva only accidentally or mistakenly supported Samuel, Naasón, or other conspirators when they engaged in similar sexual abuse of minors in the United States. But the Court does not need to adjudicate any of that now. The Government intends to serve Rule 404(b) notices on Eva and her codefendants in accordance with the pretrial timeline set by the Court,

closer to trial. After the Government does so, Eva can raise evidentiary objections in her motions *in limine*, and the Court will have a developed record on which to rule on those objections.

## II. THE DEFENDANTS' MOTION FOR A BILL OF PARTICULARS IS MERITLESS

### A. Applicable Law

The proper scope and function of a bill of particulars is to provide sufficient information about the nature of the charge to enable a defendant to prepare for trial, to avoid unfair surprise, and to preclude a second prosecution for the same offense. Fed. R. Crim. P. 7(f); *United States v. Torres*, 901 F.2d 205, 234 (2d Cir. 1990), *abrogated on other grounds by United States v. Marcus*, 628 F.3d 36, 41 (2d Cir. 2010); *United States v. Bortnovsky*, 820 F.2d 572, 574 (2d Cir. 1987) (per curiam). "A bill of particulars should be required only where the charges of the indictment are so general that they do not advise the defendant of the specific acts of which he is accused." *Torres*, 901 F.2d at 234.

If the information the defendant seeks "is provided in the indictment or in some acceptable alternate form," no bill of particulars is required. *Bortnovsky*, 820 F.2d at 574. In exercising its broad discretion to determine whether the charges are "so general" that they require supplementing, a court should consider the text of the indictment, the discovery, and other filings by the Government. *See, e.g.*, *United States v. Kazarian*, 2012 WL 1810214, at *25 (S.D.N.Y. May 18, 2012) (noting the "enormous amount of discovery material" that provided the defendant "with much of the information sought in the request for a bill of particulars"); *United States v. Pierre-Louis*, 2018 WL 4043140, at *7 (S.D.N.Y. Aug. 9, 2018) (denying request for bill of particulars where indictment charged sex trafficking conspiracy spanning two decades because indictment and discovery "would suggest that defendant has enough information to apprise him of the charges with enough precision to enable him to prepare a defense, avoid unfair surprise at trial, and preclude a second prosecution for the same offense"); *United States v. Monserrate*, 2011 WL

3480957, at *4 (S.D.N.Y. Aug. 4, 2011) (denying request for bill of particulars where discovery materials and indictment were "sufficient to apprise the defendant of the charge against him" and to allow him to prepare for trial); *United States v. Samsonov*, 2009 WL 176721, at *4 (S.D.N.Y. Jan. 23, 2009) (denying bill of particulars request where indictment, letters, and discovery materials gave defendant adequate information to prepare for trial).

In other words, the defense cannot use a bill of particulars as a general investigative tool, *United States v. Morales*, 280 F. Supp. 2d 262, 274 (S.D.N.Y. 2003), or as a device to compel disclosure of the Government's evidence prior to trial, *United States v. Triana-Mateus*, 2002 WL 562649, at *5 (S.D.N.Y. Apr. 15, 2002) (citing *United States v. Gottlieb*, 493 F.2d 987, 994 (2d Cir. 1974)); *see also United States v. Strawberry*, 892 F. Supp. 519, 526 (S.D.N.Y. 1995). Supplying evidentiary detail is not the function of the bill of particulars. *Torres*, 901 F.2d at 234. Accordingly, the Government is not required to: (a) "particularize all of its evidence," *United States v. Cephas*, 937 F.2d 816, 823 (2d Cir. 1991); (b) disclose the precise manner in which the crimes charged in the indictment were committed, *Torres*, 901 F.2d at 233-34; or (c) provide the defendant with a preview of the Government's case or legal theory, *United States v. Skelos*, 2015 WL 6159326, at *13 (S.D.N.Y. Oct. 20, 2015) ("[A] defendant is not entitled to disclosure of the manner in which the government will attempt to prove the charge, the precise manner in which the government will allege the defendant committed the crimes charged, or a preview of the government's evidence or legal theories."). The ultimate test is whether the information sought is *necessary* for trial preparation or to plead double jeopardy, not whether it is potentially helpful to the defense. *See United States v. Conley*, 2002 WL 252766, at *4 (S.D.N.Y. Feb. 21, 2002); *United States v. Trippe*, 171 F. Supp. 2d 230, 240 (S.D.N.Y. 2001); *United States v. Taylor*, 707 F. Supp. 696, 699 (S.D.N.Y. 1989); *United States v. Persico*, 621 F. Supp. 842, 868 (S.D.N.Y. 1985).

There are good reasons why bills of particulars are warranted only where the allegations in an indictment, as supplemented by discovery and otherwise, are so general as to render it impossible to prepare a defense. Because a bill of particulars "confines the Government's proof to particulars furnished," it can "restrict unduly the Government's ability to present its case," *United States v. Feola*, 651 F. Supp. 1068, 1132 (S.D.N.Y. 1987), or be used impermissibly to "lock the government into its proof," *United States v. Rigas*, 258 F. Supp. 2d 299, 304 (S.D.N.Y. 2003). "The [G]overnment's presentation of evidence at trial is limited to the particulars contained in the bill, so care must be taken not to overly restrict the government's proof while still protecting the defendant from unfair surprise." *United States v. Mahabub*, 2014 WL 4243657, at *2 (S.D.N.Y. Aug. 26, 2014); *see also Samsonov*, 2009 WL 176721, at *3 (bill of particulars "must not be misused ... to foreclose the Government from using proof it may develop as the trial approaches").

Moreover, the Government's provision of particulars tantamount to an itemized preview of its proof creates the very real danger that a defendant will "tailor [] testimony to explain away the Government's case." *United States v. Henry*, 861 F. Supp. 1190, 1197 (S.D.N.Y. 1994) (citing *United States v. Cimino*, 31 F.R.D. 277, 279 (S.D.N.Y. 1962)); *United States v. Sindone*, 2002 WL 48604, at *1 (S.D.N.Y. Jan. 14, 2002) ("The stakes in a criminal case are high, and temptations of perjury, subornation and intimidation are ever present. Accordingly, the government is not required to turn over information that will permit a defendant to preview the government's case and tempt him to tailor proof to explain it away, or see to it that the government's proof is not presented.").

Applying these principles, courts in this District routinely deny motions for bills of particulars that are, at bottom, demands for additional details of the manner in which the offense was committed or how the Government intends to prove its case at trial. *See, e.g.*, *United States v.*

*Mitlof*, 165 F. Supp. 2d 558, 569 (S.D.N.Y. 2001) (denying request for bill of particulars identifying "each act of 'fraud, neglect, connivance, misconduct, and violation of law,'" and noting that the Government may not be compelled to disclose the manner in which it will prove charges, the manner in which defendant committed the crime charged, or a preview of Government's evidence or legal theories); *United States v. Leonelli*, 428 F. Supp. 880, 882 (S.D.N.Y. 1977) (rejecting request for bill of particulars regarding the names, dates, and places for the case as "an attempt to discover the minutia of the Government's case").

**B. Discussion**

There is no basis for a bill of particulars in this case. It is apparent from the thirty-one-page Indictment that the charges concern the defendants' participation in a racketeering conspiracy as members of the Joaquín LLDM Enterprise from 1970 to 2025, Naasón, Eva, and others' participation in a sex trafficking conspiracy from 2014 to 2019, Naasón and others' commission of one substantive count of sex trafficking and one substantive count of inducement to travel to engage in an unlawful sex act in or about July 2017, and Naasón and others' participation in conspiracies to produce child pornography and to sexually exploit children from 2014 to 2019. The statutes the defendants are accused of violating and the time periods when they are accused of having violated those statutes are clear.

The Indictment is a speaking indictment that goes far above and beyond a mere recitation of the elements of each offense by detailing the charged conspiracy. Among other things, it explains in detail the nature and scope of the defendants' racketeering conspiracy, including the extensive history of the Joaquín LLDM Enterprise (Dkt. 4 ¶¶ 8-14); the roles that each member of the Joaquín LLDM Enterprise played in the conspiracy (Dkt. 4 ¶¶ 10-11, 14, 17-22); the purposes of the Joaquín LLDM Enterprise (Dkt. 4 ¶¶ 23(a)-(f)); the criminal means and methods the conspirators deployed to achieve the purposes of the Joaquín LLDM Enterprise (Dkt. 4 ¶¶ 24(a)-

(k)); and the crimes the conspirators agreed to commit in furtherance of the Joaquín LLDM Enterprise (Dkt. 4 ¶¶ 25(a)-(f)). The Indictment also identifies many specific instances of sex trafficking and sexual abuse perpetrated by the Joaquín LLDM Enterprise, including a sex trafficking trip in or about May and June 2015 (Dkt. 4 ¶ 27); another sex trafficking trip in or about April 2017 (Dkt. 4 ¶ 28); another sex trafficking trip in or about July 2017 (Dkt. 4 ¶¶ 29, 33-34); multiple specific instances of minor victims being sex trafficked by the defendants (Dkt. 4 ¶ 37(a)); and multiple specific instances of minor victims being forced to produce child pornography (Dkt. 4 ¶ 37(b)).

In fact, many of the questions on which the defendants claim to seek additional detail are already answered by the Indictment itself. For example, the defendants claim to seek additional information about the basis for venue for each count. (Dkt. 59, at 46-49). The Indictment already specifies many of those bases. (*See, e.g.*, Dkt. 4 ¶¶ 27, 29, 33-34, 36, 37(d)). The defendants claim to seek additional information about the Government's theory of commercial sex acts. (Dkt. 59, at 49-52). That information, too, is already apparent from the face of the Indictment. The Indictment explains that, on account of their sex acts, the Joaquín LLDM Enterprise's sex trafficking victims received, among other things, "housing, travel, the promise of religious blessings and eternal salvation, tickets to concerts and amusement parks, and the avoidance of eternal damnation." (Dkt. 4 ¶ 24(a); *accord* Dkt. 4 ¶¶ 24(b), 24(d)). The Indictment also describes how members of the Enterprise who identified, facilitated, and prepared victims for sexual abuse received "powerful positions in the Joaquín LLDM Enterprise" in exchange. (Dkt. 4 ¶ 24(a); *see United States v. Raniere*, 55 F.4th 354, 365 (2d Cir. 2022) ("[W]e reject the argument that only the exchange of things with monetary value can suffice for purposes of the statutory definition of 'commercial sex act.' A privileged position in an organization may constitute intangible 'value.'")). The defendants

also claim to seek additional information about how the defendants and their coconspirators coerced their sex trafficking victims and used religious messaging to manipulate their victims. (Dkt. 59, at 49-53). Again, that information is already clear from the Indictment. (*See, e.g.*, Dkt. 4 ¶ 24(c) (describing in detail the "coercion and force [used] to cause the victims to engage in commercial sex acts")).

Simply put, this is not a case in which the allegations in the Indictment "are so general that they do not advise the defendant of the specific acts of which he is accused." *United States v. Walsh*, 194 F.3d 37, 47 (2d Cir. 1999) (quoting *Torres*, 901 F.2d at 234). Rather, the Indictment alone provides a sufficient basis to answer all the defendants' queries and deny the defendants' motion in its entirety. *See, e.g.*, *United States v. Bonventre*, 646 F. App'x 73, 79 (2d Cir. 2016) ("'[E]vidientiary detail is not the function of the bill of particulars.' Particulars are necessary only where indictment charges are 'so general that they do not advise the defendant of the specific acts of which he is accused.'" (quoting *Torres*, 901 F.2d at 234; *United States v. Chen*, 378 F.3d 151, 163 (2d Cir. 2004))); *United States v. Wedd*, 2016 WL 1055737, at *3 (S.D.N.Y. Mar. 10, 2016) (denying motion for bill of particulars where "the Indictment is a 'speaking' Indictment that provides a significant amount of detail as to the Government's theory of the case and the nature of the proof that will underlie the charges at trial").

While the additional particularity the defendants request might be helpful for them, that is not the appropriate standard for a bill of particulars. For example, unsatisfied with the specificity of the descriptions of the commercial sex acts in the Indictment, the defendants seek a bill of particulars identifying "*which* alleged victims" received benefits on account of their sex acts, "if they each received all the 'benefits' provided, if some victims only received religious blessings, etc.," as well as "at what point some sort of 'promotion' was given" to conspirators on account of

their participation in the Joaquín LLDM Enterprise's sex trafficking, "whether it was after the first alleged victim, some point in between, or after the last alleged victim that these 'promotions' were given." (Dkt. 59, at 51). That kind of request for evidentiary details cannot justify a bill of particulars. *See Bonventre*, 646 F. App'x at 79. Instead, the inquiry is properly focused on whether the information already available to the defendants is so general that a bill of particulars is *necessary* to the preparation of their defense. Plainly, based on the Indictment alone, it is not.

Moreover, in addition to the speaking Indictment, the Government has produced substantial discovery in this case, including extractions of numerous phones, electronic devices, and email accounts for each defendant and for many of their coconspirators containing tens of thousands of the defendants' text messages, emails, photographs, and videos. Much of this data is text searchable, and the time periods to which it relates are readily apparent. The Government has also produced dozens of multi-page law enforcement reports describing in detail the relevant contents of those electronic device extractions and numerous search warrant affidavits, many of which are well over one hundred pages each, that contain detailed narratives of the criminal acts committed by the defendants. The Government has also filed detailed letters on the public docket further specifying the allegations. (Dkt. 12). And at the appropriate time before trial, at any of the defendants' request, and in connection with trial-related deadlines, the Government will provide a so-called "enterprise" letter. *See United States v. Sierra*, 2012 WL 2866417, at *8 (S.D.N.Y. July 11, 2012) ("RICO enterprise letter[s] ... have been productively utilized in numerous racketeering cases in this District, as a means of particularizing the allegations in an indictment or the evidence the Government intends to introduce at trial."). The Government is also willing to discuss with defense counsel reasonable dates for pretrial disclosure of *Jencks* Act materials, subject to a protective order. Thus far, where defense counsel have had questions about the discovery materials

thus far, they have reached out to the Government, and the Government has responded productively. (*See, e.g.*, Dkts. 60-5, 60-6). The Government will work with the defense to answer such questions as their review of the discovery and trial preparation continues.

In other words, the defendants already have more than sufficient information to permit them to prepare for trial. Any remaining detail regarding the specifics of the proof in this case will come from witness testimony. Further, if the Government intends to introduce any evidence of criminal acts other than those alleged in the Indictment, it will not come as a surprise, because the Government will serve pretrial notices under Rules 404(b) and 413 specifying the evidence it intends to offer. *See United States v. Barrera*, 950 F. Supp. 2d 461, 479 (E.D.N.Y. 2013). That is ample information at this stage to assist in the defendants' investigation and preparation for trial. *See United States v. Starks*, 2024 WL 4528169, at *5 (S.D.N.Y. Oct. 18, 2024) (bill of particulars not warranted where "the Government has stated that it will provide Starks with Section 3500 materials sufficiently in advance of trial to prevent any prejudicial surprise, along with a list of trial exhibits and a witness list"); *United States v. Chambers*, 2018 WL 1726239, at *2 (S.D.N.Y. Apr. 9, 2018) (denying request for bill of particulars where "this Court will require production of *Jencks* Act material in advance of trial to apprise the defendant of the essential facts").

Most of the defendants' questions in their motion boil down to an attempt to obtain information to which they are not entitled at this stage, including victim identities. *See United States v. Sterritt*, 678 F. Supp. 3d 317, 331-32 (E.D.N.Y. 2023) (rejecting request for identities of the victims where "[t]he government has already spelled out enough"); *Barrera*, 950 F. Supp. 2d at 478 ("[T]he Government need not disclose the names of the … conspiracy's intended victims in order for [the defendant] to be adequately apprised of the specific crimes of which he is accused."). Particularly in cases involving sexual abuse, sexual violence, and obstruction of justice,

courts in this District do not require the Government to identify victims this far in advance of trial. *See, e.g.*, *United States v. Maxwell*, 534 F. Supp. 3d 299, 318 (S.D.N.Y. 2021) ("no basis" to require that the alleged victims' names be included in the indictment or disclosed as part of a bill of particulars, where the Government had already provided discovery on the victims and agreed to disclose their names prior to trial). Early disclosure of that type of information poses serious risks of obstruction of justice and witness intimidation. "Discovery in criminal proceedings is not comparable to discovery in civil [proceedings] because of the nature of the issues, the danger of intimidation of witnesses, and the greater danger of perjury and subornation of perjury." *United States v. Malinsky*, 19 F.R.D. 426, 428 (S.D.N.Y. 1956). Indeed, as charged in the Indictment, there have already been multiple attempts to tamper with witnesses and obstruct investigations into the defendants' conduct in this case. (*See, e.g.*, Dkt. 4 ¶¶ 14, 24(k)).

The discovery productions to date, the Government's public filings, the detailed Indictment, the Government's correspondence with defense counsel, and the Government's undertaking to provide additional information and notices well in advance of trial, taken together, more than adequately inform the defendants of the charges against them. This is simply not a case where the relevance of key events is "shrouded in mystery." *Bortnovsky*, 820 F.2d at 574. The Court should deny the motion for a bill of particulars.

## III. EVA GARCÍA DE JOAQUÍN'S MOTION TO SEVER HER TRIAL FROM THE TRIALS OF HER COCONSPIRATORS IS MERITLESS

### A. Applicable Law

Under Rule 8(b) of the Federal Rules of Criminal Procedure, "[t]here is a preference … for joint trials of defendants who are indicted together." *United States v. Salameh*, 152 F.3d 88, 115 (2d Cir. 1998) (quoting *Zafiro v. United States*, 506 U.S. 534, 537 (1993)); *see United States v. Miller*, 116 F.3d 641, 679 (2d Cir. 1997). "This preference is particularly strong where ... the

defendants are alleged to have participated in a common plan or scheme." *Salameh*, 152 F.3d at 115; *see United States v. Cardascia*, 951 F.2d 474, 482 (2d Cir. 1991); *United States v. Turoff*, 853 F.2d 1037, 1042 (2d Cir. 1988). As the Supreme Court has explained:

> Many joint trials—for example, those involving large conspiracies to import and distribute illegal drugs—involve a dozen or more co-defendants …. It would impair both the efficiency and the fairness of the criminal justice system to require ... that prosecutors bring separate proceedings, presenting the same evidence again and again, requiring victims and witnesses to repeat the inconvenience (and sometimes trauma) of testifying, and randomly favoring the last-tried defendants who have the advantage of knowing the prosecution's case beforehand. ... Even apart from these tactical considerations, joint trials generally serve the interests of justice by avoiding the scandal and inequity of inconsistent verdicts.

*Richardson v. Marsh*, 481 U.S. 200, 210 (1987); *see also United States v. Zafiro*, 945 F.2d 881, 886 (7th Cir. 1991) (joint trials reduce both litigation costs and "error costs," *i.e.*, the costs associated with depriving the jury of making its determinations based on "the full picture").

If the joinder of offenses or defendants "appears to prejudice a defendant or the government, the court may order separate trials of counts, sever the defendants' trials, or provide any other relief that justice requires," pursuant to Rule 14(a) of the Federal Rules of Criminal Procedure. But because Rule 8 inherently "authorizes some prejudice," a defendant who "seeks separate trials under Rule 14 carries a heavy burden of showing that joinder will result in substantial prejudice." *United States v. Amato*, 15 F.3d 230, 237 (2d Cir. 1994); *see also United States v. Casamento*, 887 F.2d 1141, 1149-50 (2d Cir. 1989) (a defendant seeking severance bears an "extremely difficult burden" to establish substantial prejudice).

Substantial prejudice under Rule 14 must be viewed through the lens of the strong presumption in favor of joint trials. *See Richardson*, 481 U.S. at 210. It is not enough for severance to show that separate trials would increase the chances of a defendant's acquittal. *See United States v. Burke*, 700 F.2d 70, 83 (2d Cir. 1983). Rather, the defendant "must show prejudice so severe as

to amount to a denial of a constitutionally fair trial," *United States v. Serpoosh*, 919 F.2d 835, 837 (2d Cir. 1990), such that "there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence," *Zafiro*, 506 U.S. at 539. The prejudice must also be "sufficiently severe to outweigh the judicial economy" of a joint trial. *United States v. Page*, 657 F.3d 126, 129 (2d Cir. 2011).

In conspiracy cases, the evaluation of the potential for substantial prejudice must take into account that once a defendant is a member of a conspiracy, "all the evidence admitted to prove that conspiracy, even evidence relating to acts committed by co-defendants, is admissible against the defendant." *Salameh*, 152 F.3d at 111. As such, the mere fact that evidence may be admitted concerning acts, even violent acts, committed by joined defendants is not, standing alone, sufficient to warrant severance. "The fact that one of several codefendants is tried for a crime not committed by another codefendant does not, without more, create the sort of miscarriage of justice that would require [severance]." *United States v. Hernandez*, 85 F.3d 1023, 1029 (2d Cir. 1996); *see United States v. Rittweger*, 524 F.3d 171, 179 (2d Cir. 2008) ("[T]he fact that evidence may be admissible against one defendant but not another does not necessarily require a severance.") (quoting *United States v. Carson*, 702 F.2d 351, 367 (2d Cir. 1983)).

Further, because Rule 14 permits a district court to "provide any other relief that justice requires," Fed. R. Crim. P. 14(a), the rule "does not require severance even if prejudice is shown; rather, it leaves the tailoring of the relief to be granted, if any, to the district court's sound discretion," *Zafiro*, 506 U.S. at 538-39. Even in the rare circumstances where "the risk of prejudice" created by a joinder "is high," measures that are "less drastic" than severance, such as limiting instructions, often will suffice to cure any risk of prejudice." *Id.* at 539; *see, e.g.*, *United States v. Little*, 2020 WL 3869126, at *3 (S.D.N.Y. July 9, 2020) ("[E]ven assuming … prejudice

existed, Defendant has not established that it could not be rectified by limiting instructions to the jury."); *United States v. Samuels*, 2020 WL 5517772, at *4 (S.D.N.Y. Sept. 14, 2020); *United States v. Smith*, 2007 WL 980431, at *4 (S.D.N.Y. Apr. 3, 2007) (same). Given the preference of the Federal Rules of Criminal Procedure for joint trials, the requirement to show substantial prejudice, and the curative effect of limiting instructions, "[t]he principles that guide the district court's consideration of a motion for severance usually counsel denial." *United States v. Rosa*, 11 F.3d 315, 341 (2d Cir. 1993).

**B. Discussion**

The charges against Eva are properly joined with those against her coconspirators under Rule 8(b). All the charges in the Indictment relate to a common plan or scheme—that is, to further the Joaquín LLDM Enterprise. The Enterprise existed, and its members acted, for the benefit of the Apostle of the LLDM Church and for the rest of the Joaquín family, including Eva. (Dkt. 4 ¶¶ 1-22). Each conspirator in the Joaquín LLDM Enterprise played a different role in the Enterprise—Naasón, Samuel, and the rest of the Joaquín family, including Eva, principally benefited from the Enterprise's activities; women close to the Apostles principally facilitated the Apostle's sexual abuse and control over the LLDM Church; and other members of the Joaquín LLDM Enterprise focused mostly on protecting the Apostle from law enforcement. (Dkt. 4 ¶¶ 17-22). But all the conspirators played those roles substantially for the same reason: to further the Joaquín LLDM Enterprise and serve the sexual, financial, and power interests of the Apostle and the Joaquín family. It is thus appropriate to join all the members of that conspiracy in a single trial.

Eva's argument that she was improperly joined under Rule 8(b) misunderstands the basic principles of racketeering conspiracy. (*See* Dkt. 61, at 12-15). Eva focuses on her own supposedly "isolated conduct" (Dkt. 61, at 14) and contends that evidence of the sexual abuse that Naasón, Samuel, and other conspirators in the Joaquín LLDM Enterprise perpetrated without Eva's

personal involvement is irrelevant and inadmissible as to her. (Dkt. 61, at 18). But Count One charges Eva with agreeing *with others* for decades to participate in an enterprise that would involve the commission of two or more racketeering acts. *See, e.g.*, *United States v. Applins*, 637 F.3d 59, 81 (2d Cir. 2011). That makes the conduct of the people with whom Eva conspired directly relevant to the charges against her. Indeed, Eva may be found guilty of Count One if she merely knowingly agreed to support the Joaquín LLDM Enterprise in any manner regardless of whether she committed any racketeering predicate act herself, and if she did so, then Eva will be responsible for all the reasonably foreseeable acts of her coconspirators, whether she personally participated in those acts or not. *See Salinas v. United States*, 522 U.S. 52, 62-65 (1997) ("[a] conspiracy may exist even if a conspirator does not agree to commit or facilitate each and every part of the substantive offense," and if "[t]he partners in the criminal plan …. divide up the work, … each is responsible for the acts of each other"). The evidence of Eva's coconspirators' criminal conduct in furtherance of the Joaquín LLDM Enterprise is thus inextricably intertwined with the evidence of the conspiracy with which she is charged, and it is proper under Rule 8(b) to prove that conduct once at a joint trial of all apprehended conspirators together. *See, e.g.*, *United States v. Spinelli*, 352 F.3d 48, 55 (2d Cir. 2003) ("Differing levels of culpability and proof are inevitable in any multi-defendant trial and, standing alone, are insufficient grounds for separate trials.").

For similar reasons, Eva comes nowhere close to establishing substantial prejudice to justify a severance under Rule 14. Eva argues that she will be subjected to "spillover prejudice" in a joint trial with Naasón because the jury will hear evidence of sexual abuse that Naasón perpetrated without Eva's direct participation. (Dkt. 61, at 15-18). But as explained, the actions of Naasón, Samuel, and Eva's other conspirators, including the acts in which Eva was not personally involved, are admissible as direct evidence against Eva to prove the nature and scope of the

racketeering conspiracy with which she is charged. *See, e.g.*, *Salinas*, 522 U.S. at 63-64. Evidence of Naasón's or Samuel's racketeering conduct is not "spillover" proof but rather competent direct proof of the racketeering charge against her. *See, e.g.*, *Spinelli*, 352 F.3d at 55-56 (severance not required because "much of the evidence about [one conspirator's] crimes would have been admissible at a separate trial of [the other conspirator], since it was relevant to proving the nature and scope of the conspiracy in which both were, to differing degrees, involved"); *United States v. DiNome*, 954 F.2d 839, 843-44 (2d Cir. 1992) ("The typical spillover claim is that evidence admissible against only one defendant is prejudicial to all defendants and that individual trials should have been held to avoid that prejudice. In the present case, however, the evidence in question is relevant to the RICO charges against all defendants and most probably would have been admitted even if defendants had been accorded individual trials.").[3]

Eva is also wrong to suggest that severance is required simply because she is charged in Counts One and Two of the Indictment while Naasón is charged in all six Counts. (Dkt. 61, at 5-9, 16-18). All the charges in this case overlap because all the conduct described in the Indictment was committed in furtherance of the same Joaquín LLDM Enterprise. That is why the predicate

---

[3] Eva cites *DiNome* for that decision's additional holding that two defendants who were not charged with racketeering offenses but were tried jointly with several racketeering defendants should have been tried separately. (Dkt. 61, at 16 & nn. 61-62). That component of *DiNome* is clearly inapplicable to Eva, as she and all her codefendants in this case are charged with participating together in the same racketeering conspiracy. Eva also relies on *United States v. Figueroa*, 618 F.2d 934 (2d Cir. 1980), and *United States v. Gallo*, 668 F. Supp. 736 (E.D.N.Y. 1987), neither of which provides useful guidance. The relevant portion of *Figueroa* was about whether, after reversing the conviction of one defendant because the district court had improperly admitted evidence of that defendant's prior bad acts, the Court of Appeals should vacate the convictions of the two codefendants with whom that defendant had been tried. *See* 618 F.2d at 944-48. The indictment in *Gallo* charged sixteen defendants in twenty-two separate counts, making it one of the most complex mafia prosecutions on record, which required severance for administrative reasons alone. *See* 668 F. Supp. at 738. Those are unique circumstances that are not presented here.

racketeering acts charged in Count One (*see* Dkt. 4 ¶¶ 25(a)-(g)) include the crimes charged in Counts Two through Six (*see* Dkt. 4 ¶¶ 30-37)—because all the conduct was intertwined with the same, overarching conspiracy. The evidence that proves the crimes charged in Counts Two through Six will simultaneously prove predicate acts of the crime charged with which Eva is charged in Count One. And, as explained, as a conspirator in the Joaquín LLDM Enterprise, Eva is responsible for all the criminal conduct that Naasón committed that was reasonably foreseeable to her and in furtherance of the Enterprise.

Eva's remaining generalized concerns about evidentiary issues, judicial economy, and fundamental fairness are no basis to overcome the preference for joint trials. Eva's fear about making "myriad … challenges" to evidence about her coconspirators' conduct is overblown. (Dkt. 61, at 18). None of those evidentiary challenges is likely to prevail because of the wide scope of admissible evidence in a racketeering conspiracy prosecution, as described above. In any event, even if there were evidence in this trial that was admissible only against Naasón and not against Eva, that would "not necessarily require a severance" because the Court can instruct the jury to consider each defendant's guilt independently. *Spinelli*, 352 F.3d at 55-56; *see also id.* at 55 n.3 (sample instruction regarding consideration of each defendant's guilt independently).

Eva's claim that a joint trial against all the apprehended defendants "will guarantee extra weeks of trial time" as compared to a separate trial for her alone also is misguided. (Dkt. 61, at 19). As an initial matter, that claim is empirically wrong because the evidence of Eva's coconspirators' crimes within the scope of the charged conspiracy is admissible against her to prove the racketeering conspiracy. At a separate trial of Eva alone, the Government still could, and would, prove the criminal acts that Eva's coconspirators committed in furtherance of the Joaquín LLDM Enterprise, even if she did not participate in those acts herself. Regardless, Eva

misunderstands the judicial economy analysis. In deciding whether to grant a severance, the Court is supposed to compare the time and cost of one joint trial of multiple defendants against the *combined* time and cost of each of the separate trials of the individual defendants, not just against the time and cost of the individual trial of Eva. It would obviously be most efficient to call all the witnesses who will testify against Naasón, Eva, and Joram—many of whom will testify about traumatic sexual violence—just once at a joint trial rather than calling them each multiple times at multiple separate trials of each defendant to provide substantially the same testimony about the conspiracy in which all the defendants participated.

Finally, Eva's fundamental fairness arguments are mine-run arguments that arise in every joint trial. (Dkt. 61, at 20). There is nothing unfair about the Government proving the full scope of the racketeering conspiracy with which Eva is charged, even when that scope includes foreseeable acts by Eva's coconspirators in which she did not personally participate. That is precisely what the racketeering conspiracy laws contemplate. To the extent Eva is concerned about not receiving an individualized assessment of her guilt, curative instructions (delivered just once at the end of trial, not every day, as Eva suggests) can address that issue.

## IV. JORAM NÚÑEZ JOAQUÍN'S MOTION FOR THE DISCLOSURE OF WITNESS IDENTITIES IS PREMATURE

Joram's motion for the disclosure of witness identities is not ripe for adjudication. (Dkt. 63, at 21-24). Local Criminal Rule 16.1 requires any "motion addressed to … any discovery matter," such as Joram's motion, to be accompanied by "an affidavit certifying that counsel has conferred with counsel for the opposing party in an effort in good faith to resolve by agreement the issues raised by the motion." Joram's counsel did not file any such affidavit, and indeed they could not do so because they never conferred with the Government about their request for witness

identities. That failure to comply with Local Criminal Rule 16.1 alone "is fatal to the motion." *United States v. Blondet*, 2022 WL 507698, at *2 (S.D.N.Y. Feb. 18, 2022) (collecting cases).

Had Joram's counsel raised this issue with the Government before filing their motion, the Government would have informed them that it intends to make witness identity disclosures substantially in advance of trial, when it produces witness statements under the *Jencks* Act and *Giglio* material, subject to the terms of the Protective Order, as Joram requests. Nothing in Joram's motion papers indicates that he is entitled to witness identities any earlier than on that standard timeline. The Court should deny Joram's present motion without prejudice and let the parties attempt to resolve this issue on their own in the first instance.

**CONCLUSION**

The defendants' motions should be denied.

DATED: New York, New York
August 21, 2026

Respectfully submitted,

JAMES M. MCDONALD
United States Attorney

By:__/s/______________________
Ryan W. Allison
Lisa Daniels
Elizabeth A. Espinosa
Michael R. Herman
Assistant United States Attorneys
(212) 637-2200